IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-10461
_____


UNITED STATES OF AMERICA,

                    Plaintiff-Appellee, Cross-Appellant,

versus


ALBERT LOUIS LIPSCOMB,

                    Defendant-Appellant, Cross-Appellee.

_____

        Appeals from the United States District Court
            for the Northern District of Texas

_____
                      July 12, 2002
Before SMITH, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

     Albert Lipscomb, a former member of the Dallas City Council, appeals his convictions for conspiracy and program bribery, in violation of 18 U.S.C. § 666 ("§ 666").  Whether he raises a constitutional challenge to his convictions, and, if so, how we should rule on that challenge, are questions that have divided our panel three ways, as will become clear from our separate writings. Despite this tripartite fractionation, however, different majorities of the panel conclude that (1) the question of § 666's as-applied constitutionality is properly before the panel and should be addressed; (2) the district court had subject-matter

jurisdiction of this criminal bribery case against Lipscomb; and (3) the court abused its discretion in transferring the trial <u>sua sponte</u> over Lipscomb's objections. We therefore reverse his conviction, vacate his sentence, and remand for a new trial.

## I. FACTS

Both Lipscomb's conduct and particular jurisdictional facts are important to the varying views of the members of this panel. We therefore recount them in considerable detail.

A.   <u>Lipscomb's Offense Conduct</u>

Lipscomb served on the Dallas City Council (the "Council") from 1984 to 1993 and again from 1995 until 2000. During his first period of service, Lipscomb vigorously opposed any measure favorable to taxicab companies, including Yellow Cab and Checker Cab (together, "Yellow Cab"), both owned by his co-conspirator, Floyd Richards. Lipscomb's animus against cab companies apparently was grounded in a belief that cab companies perennially failed to serve the minority community adequately.

During his second period of service on the Council, however, Lipscomb demonstrated a considerably kinder disposition toward cab companies, especially Yellow Cab. In 1994, during Lipscomb's hiatus from the Council, Richards asked Lipscomb to help improve Yellow Cab's reputation in the minority community and offered to pay Lipscomb $1,000 a month in cash for that help. Lipscomb assented to this proposal. Richards and Lipscomb agreed to continue this arrangement as long as it was mutually agreeable.

2

All this transpired orally.

Richards continued to make the monthly payments to Lipscomb after he was re-elected to the Council. At times, Richards would receive phone calls from Lipscomb indicating that he needed a payment, after which Lipscomb would visit Yellow Cab's office and receive cash that Richards took from the company safe. Sometimes during these meetings, Richards and Lipscomb would discuss taxicab issues then pending before the Council. The government alleged that in addition to making these monthly payments to Lipscomb, Richards gave Lipscomb free use of cars, free cellular telephone service, and free cab rides worth more than $3,300.

When Lipscomb ran again, his advisers heard Richards declare that he was willing to spend up to $30,000 to get Lipscomb elected. When Richards learned that corporations could not contribute to campaigns and that individuals could contribute no more than $1,000, however, he decided to "lend" $20,500 to a business owned by Lipscomb's daughter and son-in-law. That money was intended by all concerned to help fund Lipscomb's campaign, and it did so; but Lipscomb did not report the campaign "loan" or any of the payments in his campaign finance reports or his personal financial statements.

Richards testified that although he never made the quid pro quo explicit, he expected that, in return for the monthly payments and the campaign funding, Lipscomb would cast votes favorable to Yellow Cab. Richards testified further that he and Lipscomb had an

3

understanding, and that Richards was satisfied that Lipscomb knew that the payments would stop if he voted the wrong way.

Lipscomb's support of Yellow Cab went far beyond the casting of favorable votes at meetings of the Council. Over time, he and Richards discussed each of the taxicab issues on which Lipscomb allegedly was influenced by this bribery: (1) operating authority and fleet increases, (2) location of dispatch offices, (3) age limits and inspections, and (4) insurance ratings. Lipscomb had opposed Yellow Cab on these issues before 1994, but when he returned to the Council, he supported that company vigorously and often.

For example, in 1994 Lipscomb, as a private citizen, had spoken out against authority for Yellow Cab and two other cab companies to operate in Dallas. Once he returned to the council, though, he supported Yellow Cab's requests for increases in the size of its cab fleets. Yet when cab companies unaffiliated with Richards sought authority to operate in Dallas, Lipscomb urged that their applications be removed from the council's agenda. When another cab company's request for operating authority was taken up by the council, Lipscomb tried to require a voice vote on the matter.

Yellow Cab also needed relief from a city ordinance requiring cab companies to maintain their dispatch offices inside the Dallas city limits. After a city staffer learned that Yellow Cab was violating this policy, she sought to enforce it, but the Council

4

referred the matter to its Transportation Committee. Even though Lipscomb did not serve on that committee, he attended its meeting and browbeat the staffer, going so far as to ask her when she would retire. Eventually, with Lipscomb's encouragement, the Council permitted cab companies to operate dispatch offices in the Dallas suburbs, thus legitimating Yellow Cab's office, the only one in violation, in which Yellow Cab had invested $15,000.

Because Yellow Cab had the newest fleet among the cab companies serving Dallas, the City was encouraged by Yellow Cab energetically to enforce against its competitors the City's age limit on vehicles for hire and its requirement that they be inspected. In 1992, Lipscomb had favored relaxing both rules, but in 1996, after he was told by Richards that he wanted stricter enforcement, Lipscomb began to support age limits on sedan-style limousines similar to the limits that applied to taxicabs. He also sought to remove older shuttles and limousines from service more quickly, and he opposed the Council's effort to revisit its earlier vote — favorable to Yellow Cab — to approve stricter age limits.

Lipscomb also acted on Yellow Cab's behalf with respect to insurance issues. Yellow Cab lobbied the Council to require that the insurance coverage mandated for taxis be written by insurers with favorable financial ratings. This proposal proved to be controversial: The City's Director of Human Services, whose department handled insurance matters, was concerned that a rating requirement might favor large firms and exclude small businesses

5

owned by minorities or women.  Lipscomb nevertheless sought to put the rating requirement on the Council's agenda, and both seconded and voted for a motion to increase the minimum rating.

In sum, Lipscomb energetically used many of the tools at the disposal of a Council member —— his vote, his oversight authority, his agenda-setting power, and his other parliamentary privileges —— to support policies favorable to Yellow Cab, even though these policies conflicted with his previous positions.

B.    Jurisdictional Facts

During Lipscomb's second period of council service, the City, through many of its agencies and departments, received substantial federal funds.  In the year ending in September 1996, Dallas received $44.3 million and spent $48.1 million in federal financial assistance which funded a wide range of joint priorities: community development, farmer's market infrastructure, emergency shelter, housing, community policing, airport and freeway improvements, arts development, pollution control, emergency management, interlibrary cooperation, child immunization, homeless health care, and substance abuse control, among others.  Federal support in 1996 dwarfed state support, which totaled only $3.7 million received and $3.1 million spent.  Other years were similar: in 1997, the city received $54.3 million and spent $53.3 million in federal funds, but received only $3.0 million and spent $3.8 million in state funds.

Testimony of the city's chief financial officer showed that in

6

Dallas's efforts to obtain and then allocate federal funds, the Council played an integral role:

> Q. And once the City gets the Department of Housing money or grant funds, does the City then disburse those funds?
> A. Yes, we do.
> Q. And is the disbursement by approval of a City Councilmember or the City Council at large?
> A. If the individual expenditure is greater than $50,000, or $15,000 in the case of professional services, it would come back to the Council for approval of that specific contract.
> Q. And does that frequently happen?
> A. Yes, uh-huh.
> Q. All right. And, in fact, does the Council have to approve, vote for and approve the application to HUD and the other agencies of the federal government to get federal money?
> A. Yes. They vote for the application and the acceptance of the money.

The Council as a whole thus controlled —— and individual council members influenced —— the City's applications for, and receipt and expenditure of, at least forty million federal dollars each year.

## II. PROCEEDINGS

The government secured a lengthy indictment against Lipscomb. Counts 2 through 33 charged him with specific substantive bribery violations of § 666(a)(1)(B) and charged Richards with aiding and abetting those offenses. Conversely, counts 34 through 65 charged Richards with bribery violations of § 666(a)(2) and charged Lipscomb with aiding and abetting. Count 1 charged Lipscomb with conspiring to violate § 666. Notably, the government did not charge Lipscomb with the misuse of state or federal funds.

Three weeks before the long-scheduled trial date, the district court, acting sua sponte, without giving notice to the parties or holding a hearing, and over Lipscomb's strenuous objections,

7

transferred the trial from the Dallas Division of the Northern District of Texas to the Amarillo Division. Thereafter, Richards entered into a plea agreement which, among other things, required him to testify at trial. The jury convicted Lipscomb on all counts. The district court sentenced him to 41 months' imprisonment, imposed a $7,500 fine, and ordered him to pay a $6,500 special assessment. The court also directed that the sentence be served under home confinement because of Lipscomb's failing health and advanced age.

Lipscomb appeals his conviction on several grounds. The government cross-appeals the home-confinement aspect of his sentence.

### III. STATUTORY INTERPRETATION

A. <u>Lipscomb's Challenge to the Jurisdictional Reach of § 666</u>

As it stood at the time and now stands, § 666 contains two monetary thresholds. Section 666 reads, in principal part:

> **§ 666.  Theft or bribery concerning programs receiving Federal funds**
> (a) Whoever, if the circumstance described in subsection (b) of this section exists—
> > (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
> > > ...
> > > (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving <u>anything of value of $5,000 or more</u>;

8

> ...
> shall be fined under this title, imprisoned not more than 10 years, or both.
>     (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits <u>in excess of $10,000</u> under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.[1]

Lipscomb insists that we should narrowly construe § 666 to avoid the constitutional question that arises if we interpret the statute to prohibit activity not directly related to federal spending or federally funded programs.  He proposes that we construe the statute to require a nexus between his offense conduct and federal funds — or, put differently, that his conduct implicate a tangible federal interest.  He also contends that, when so construed, the statute does not reach his conduct.  Neither contention succeeds.

The phylogeny of § 666 jurisprudence does reflect a growing tension between two possible focuses of the statute.  One, which another court has dubbed the "funds focus," would concentrate on deterring direct depletion of federal funds; the other, the so-called "corruption focus," would combat "the corrupting, public-trust eroding effects of bribery" and would not require that federal funds be depleted or misallocated as a direct result of the bribe.[2]  Lipscomb's proposal that we adopt the narrower, funds focus, however, would require us to ignore our consistently broad

---

[1]18 U.S.C. § 666 (2000) (emphasis added).

[2]<u>United States v. Apple</u>, 927 F. Supp. 1119, 1124 (N.D. Ind. 1996).

interpretation of § 666 as targeting corruption <u>qua</u> corruption. Furthermore, even if we were to read § 666 and our cases to construe it narrowly, to superimpose a nexus element, we would still conclude that there is a sufficient linkage between Lipscomb's conduct and federal funds to support jurisdiction of Lipscomb's case.

B. <u>Westmoreland and Its Progeny: The Corruption Focus — No Further Nexus Required</u>

We first interpreted § 666 in <u>United States v. Westmoreland</u>.[3] The defendant, Westmoreland, was a county supervisor who was convicted of accepting bribes and kickbacks in connection with the purchasing of supplies for the county's highway construction projects.[4] The county received slightly more than $200,000 in total federal revenue-sharing funds, of which roughly 15% was allocated to Westmoreland's district.[5]

Westmoreland contended that "the federal revenue sharing funds received [by her district]...were segregated and not expended for the types of purchases she made."[6] She therefore argued that the bribery "concerned only state monies and did not fall within the purview of the statute."[7] We rejected such a construction as

---

[3] 841 F.2d 572 (5th Cir. 1988).

[4] <u>Id.</u> at 573-75.

[5] <u>Id.</u> at 575.

[6] <u>Id.</u>

[7] <u>Westmoreland</u>, 841 F.2d at 575.

10

contrary to the statute's text:

> Despite Westmoreland's protestations, we find the
> relevant statutory language plain and unambiguous. By
> the terms of section 666, when a local government agency
> receives an annual benefit of more than $10,000 under a
> federal assistance program, its agents are governed by
> the statute, and an agent violates subsection (b) when he
> engages in the prohibited conduct "in <u>any</u> transaction or
> matter or series of transactions or matters involving
> $5,000 or more concerning the affairs of" the local
> government agency. 18 U.S.C. § 666(b) (Supp. 1984)
> (emphasis added). Subsection (b) contains nothing to
> indicate that "any transaction involving $5,000" means
> "any federally funded transaction involving $5,000" or
> "any transaction involving $5,000 of federal funds[.]"[8]

Westmoreland also made the argument that Lipscomb makes here:

"[A]n expansive interpretation [of § 666]...extends federal power

in a manner that, in many instances, the federal interest at stake

does not warrant."[9] The <u>Westmoreland</u> panel responded:

> Once Congress has spoken, however, we do not sit to judge
> the wisdom of its action. It is sufficient that Congress
> seeks to preserve the integrity of federal funds by
> assuring the integrity of the organizations or agencies
> that receive them.... [T]he direct involvement of federal
> funds in a transaction is not an essential element of
> bribery under section 666(b); the government need not
> prove that federal monies funded a corrupt transaction.[10]

<u>Westmoreland</u> thus held that no connection was required between the

federal funds allocated to the county and the supervisor's illegal

---

[8]<u>Id.</u> at 576.

[9]<u>Id.</u> at 577–78.

[10]<u>Id.</u> at 578. We noted that "any reference to federal funds
is conspicuously absent from the operative provisions [of § 666],
and it is clear that Congress has cast a broad net to encompass
local officials who may administer federal funds, regardless of
whether they actually do." <u>Id.</u> at 577.

11

conduct.  Instead, the only requisite involvement of federal funds was the county's receipt of more than $10,000 per year.[11]

Since Westmoreland, we have sometimes applied its broad reading of § 666 unconditionally.  For example, in United States v. Moeller,[12] the government appealed the dismissal of § 666 counts against employees of the Texas Federal Inspection Service ("TFIS"), a cooperative venture of the agriculture departments of Texas and the United States, in which state workers were empowered to conduct federal inspections.[13]  Although we said that "there must be some nexus between the criminal conduct and the agency receiving federal assistance," that nexus was purely textual:  It was present when the Texas Department of Agriculture, a government agency for purposes of § 666, received more than $10,000 a year in federal funds, and the defendants, TFIS employees, were agents of that federally-funded agency.[14]  Thus Moeller cannot be read to have imposed the extratextual nexus that Lipscomb urges us to engraft on § 666.

Some uncertainty seeped into our § 666 jurisprudence as a

---

[11]Westmoreland, 841 F.2d at 575-76.  The Supreme Court has agreed, referring to the $5,000 figure as "the $5,000 threshold for the business or transaction in question."  Salinas v. United States, 522 U.S. 52, 57 (1997).

[12]987 F.2d 1134 (5th Cir. 1993).

[13]Id. at 1135.

[14]Id. at 1137-38 (emphasis added).

12

result of <u>United States v. Marmolejo</u>.[15]   There, we upheld the conviction of a county sheriff in Texas who had accepted bribes in return for permitting conjugal visits to a federal prisoner whom the State of Texas, in return for a federal <u>per diem</u> fee, housed in a state prison renovated with federal funds.[16]  In addressing whether § 666 gave jurisdiction to prosecute, we noted that "[w]e have previously held that § 666(a)(1)(B) does not require the government to prove that federal funds were directly involved in a bribery transaction, or that the federal monies funded the corrupt transaction."[17]   Nevertheless, when discussing whether conjugal visits were "anything of value" under § 666, we stated that

> [b]ecause the conduct in this case involves serious acts of bribery by agents of a local government who were carrying out their duties under a Federal program, we conclude that this case is within the scope of conduct Congress intended to encompass with 18 U.S.C. § 666.[18]

We did not identify whence we derived any limits on the "scope of conduct Congress intended to encompass."  The dissent argued that <u>Westmoreland</u> interpreted § 666 to reach "<u>only those acts of bribery that could somehow be traced, directly or indirectly, to the</u>

---

[15]89 F.3d 1185 (5th Cir. 1996), <u>aff'd</u> <u>sub nom.</u> <u>Salinas v. United States</u>, 522 U.S. 52 (1997).

[16]<u>Marmolejo</u>, 89 F.3d at 1188–89.

[17]<u>Id.</u> at 1191 (citing <u>Westmoreland</u>, 841 F.2d at 578).

[18]<u>Marmolejo</u>, 89 F.3d at 1192–93 (emphasis added).  <u>See also</u> <u>id.</u> at 1193 n.9 (examining legislative history and precedent to determine whether defendants' conduct was behavior that "Congress . . . intend[ed] to reach").

13

integrity of federal program funds."[19]  The Supreme Court granted

certiorari to address this argument and affirmed the panel

majority's holding, but beclouded our § 666 jurisprudence in the

process.

C.    The Salinas Speculation and Its Sequellae: The Funds Focus,
      Requiring a Further Nexus

In reviewing Marmolejo, under the caption Salinas v. United

States,[20] the Supreme Court asked whether § 666 is "limited to cases

in which the bribe has a demonstrated effect upon federal funds."[21]

The Court stated that "[t]he statute's plain language fails to

provide any basis" for such a limitation and that the legislative

history forecloses it.[22]  The Court thus agreed with our Marmolejo

holding that federal funds need not be directly involved in a

violation of § 666.[23]  The Court nonetheless obliquely suggested

_____

[19]Id. at 1203 (Jolly, J., dissenting) (emphasis in original).
"Turning to the precise legislative history, I find that it clearly
reveals that Congress did not intend for § 666(a)(1)(B) to be
applied to conduct such as the acceptance of bribes to allow
conjugal visits.  Instead, Congress was only concerned with
protecting the federal monies disbursed to non-federal entities."
Id.

[20]522 U.S. 52 (1997).

[21]Id. at 54.

[22]Id. at 57, 59.

[23]Id. at 56-57 (citation omitted and brackets original):
The enactment's expansive, unqualified language, both as
to the bribes forbidden and the entities covered, does
not support the interpretation that federal funds must be
affected to violate § 666(a)(1)(B)....  [T]he statute
forbids acceptance of a bribe by a covered official who
intends "to be influenced or rewarded in connection with

14

that there might be obstacles to applying § 666 to different facts:

> We need not consider whether the statute requires some other kind of connection between a bribe and the expenditure of federal funds, for in this case the bribe was related to the housing of a prisoner in facilities paid for in significant part by federal funds themselves. And that relationship is close enough to satisfy whatever connection the statute might require.[24]

Even so, the Court disposed of any constitutional question:

> [T]here is no serious doubt about the constitutionality of § 666(a)(1)(B) as applied to the facts of this case. [The briber] was without question a prisoner held in a jail managed pursuant to a series of agreements with the Federal Government. The preferential treatment accorded to him was a threat to the integrity and proper operation of the federal program. Whatever might be said about § 666(a)(1)(B)'s application in other cases, the application of § 666(a)(1)(B) to Salinas did not extend federal power beyond its proper bounds.[25]

Since Salinas, the Supreme Court has decided only one more § 666 case: United States v. Fischer,[26] which also sent mixed messages. Echoing Salinas, the Fischer Court described § 666 as "expansive, both as to the conduct forbidden and the entities covered"[27] and read the statute to reveal Congress's "expansive,

---

> any business, transaction, or series of transactions of [the defined] organization, government or agency." The prohibition is not confined to a business or transaction which affects federal funds. The word "any," which prefaces the business or transaction clause, undercuts the attempt to impose this narrowing construction.

[24]Salinas, 522 U.S. at 59.

[25]Id. at 60–61 (emphases added).

[26]Fischer v. United States, 529 U.S. 667 (2000).

[27]Id. at 678 (internal quotations and brackets omitted) (citing Salinas, 522 U.S. at 56).

unambiguous <u>intent to ensure the integrity</u> of organizations participating in federal assistance programs"[28] ⸻ clearly embracing the "corruption focus." The Court therefore affirmed the conviction of a defendant who had defrauded a municipal hospital authority that participated in the federal Medicare program.[29] In so doing, however, the Court once again mentioned in passing a conceivable constitutional problem: To read the statutory term "benefits" too broadly, the Court cautioned, so as to mean "[a]ny receipt of federal funds," could "turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance."[30] Justice Thomas, joined in dissent by Justice Scalia, likewise warned that "[w]ithout a jurisdictional provision that would ensure that in <u>each</u> case the exercise of federal power is related to the federal interest in a federal program, § 666 would criminalize routine acts of fraud or bribery" and threaten principles of federalism.[31]

Although <u>Salinas</u> and <u>Fischer</u> did not unconditionally validate our view that once a local government accepts more than $10,000 per year from the federal government, no further federal interest is needed to justify prosecution under § 666, neither did either of

---

[28]<u>Fischer</u>, 529 U.S. at 678 (emphasis added).

[29]<u>Id.</u> at 669–70, 681–82.

[30]<u>Id.</u> at 681.

[31]<u>Fischer</u>, 529 U.S. at 690 n.3 (Thomas, J., dissenting) (emphasis in original).

those cases condemn our broad approach.  The <u>Salinas</u> Court merely observed in passing that, even if a federal interest were required, such an interest clearly existed in preventing federal prisoners from bribing local jail officials participating in a federal incarceration program.  Similarly, the <u>Fischer</u> Court construed a term in § 666 broadly, simply musing that federalism principles might somehow limit the statute's sweep.  As either a statutory or constitutional matter, then, the Court might be seen as harboring inchoate qualms about whether, for § 666 to apply, there might be some need for a direct interest in the funds involved in the prohibited conduct (or, alternatively, a need for either a nexus between the federal dollars and the offense conduct or an extra-textual jurisdictional element to § 666).  Lipscomb argues this inference forcefully, noting that <u>Salinas</u> left open the question whether § 666 "requires some other kind of connection between a bribe and the expenditure of federal funds."[32]  He urges us to overlook <u>Westmoreland</u> and answer this question in the affirmative.

This, of course, we could not do even if we were so inclined. Mere ruminations in Supreme Court opinions do not empower a subsequent panel of our court to disregard, much less overrule, the holding of a prior panel.  And, as we noted just last year, "[w]e are not convinced that <u>Salinas</u> wrought a change upon our earlier

---

[32]<u>Salinas</u>, 522 U.S. at 59.

17

precedents."[33]  Because <u>Salinas</u> and <u>Fischer</u> went no further than to advert in <u>dicta</u> to the mere possibility that the argument now advanced by Lipscomb might someday be favored, we are bound to adhere to <u>Westmoreland</u>'s statutory holding.[34]

Likewise, our post-<u>Salinas</u> decisions interpreting § 666 must be read as adhering to this rule.  Nevertheless, the cautionary words in <u>Salinas</u> and <u>Fischer</u>, combined with our prior opinions' silence on the constitutional question, divided the next panel of this court to interpret § 666.  The panel majority in <u>United States v. Phillips</u>[35] reiterated <u>Moeller</u>'s requirement of a nexus between the misconduct and the agency (as distinct from a nexus between the misconduct and the federal funds themselves),[36] but added some extra-textual teeth in holding that defendant Phillips, a tax assessor, was not an "agent" of Louisiana's St. Helena Parish, which received over $10,000 in federal funds, so as to be liable himself under § 666 for putting on his payroll a political ally who

---

[33]<u>United States v. Reyes</u>, 239 F.3d 722, 735 (5th Cir. 2001), <u>cert. denied</u>, 121 S. Ct. 156 (2001) <u>and</u> 122 S.Ct. 2618 (2001).

[34]<u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 466 (5th Cir. 1999) ("It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting <u>en banc</u> or by the United States Supreme Court, a panel cannot overrule a prior panel's decision.").

[35]219 F.3d 404 (5th Cir. 2000).

[36]<u>Id.</u> at 413-14 ("[T]here must be some nexus between the criminal conduct and the agency receiving federal assistance.") (quoting <u>Moeller</u>, 987 F.2d at 1137) (emphasis original to <u>Phillips</u>).

18

then did no work.[37]  The panel instead viewed Phillips as an agent

of the Louisiana Tax Commission, which received no federal funds,

and concluded that the statute did not reach his activity.

Underlying this definitional question about "agent," however,

lurked the majority's concern that the defendant was too

functionally distant from the flow of federal funds to the parish:

> We know from the Supreme Court's decision in Salinas that
> the funds in question need not be purely federal, nor
> must the conduct in question have a direct effect on
> federal funds.  The statute possibly can reach misuse of
> virtually all funds of an agency that administers the
> federal program in question.  It is a different matter
> altogether, however, to suggest that the statute can
> reach any government employee who misappropriates purely
> local funds, <u>without regard to how organizationally
> removed the employee is from the particular agency that
> administers the federal program</u>.[38]

We acknowledge that it is at least arguable, albeit tenuously, that

this "organizationally removed" language conflicts with

Westmoreland and Moeller, even though the Phillips majority

purported to distinguish those two cases factually, and the

Phillips panel may be perceived as having favored the "funds focus"

---

[37]Phillips, 219 F.3d at 407–08, 411–15.

[38]Id. at 411 (citations omitted and emphasis added).  To the panel majority, the legislative history of § 666 revealed "Congress' concern with a defendant's ability to administer or control the federal funds provided to a particular agency," id. at 411 n.7, and Fischer counseled that "the fraud must have the potential to affect the identified federal funds or program," id. at 412 n.13.  But in the "absence of evidence that connects the assessor's office to control or expenditure of any funds of the parish," id. at 411 n.9, prosecuting under § 666 "advances no federal interest in safeguarding a particular federal program," id. at 414.

for § 666.  To the extent that there is a conflict, however, the older case controls, as the _Phillips_ dissenter correctly noted.[39]

Only by interpreting "agent" narrowly was the _Phillips_ majority able to avoid the constitutional question.[40]  The _Phillips_ dissent read our own precedents as rejecting any nexus requirement whatsoever and took issue with the panel majority's narrow definition of "agent."[41]  The dissent asserted that a "specific nexus —— between Phillips and the federal funds inside Parish coffers —— is not required" and furthermore that "it is sufficient that the criminal conduct affect the agency receiving federal assistance:  in essence, we have determined that there is an inherent federal interest in insuring that agencies receiving significant amounts of federal funding are not corrupt."[42]  In a nutshell, this is precisely the "corruption focus" that we had firmly adopted in _Westmoreland_, a focus that has never been overruled either by this court en banc or by the Supreme Court.

D.    Reyes _and_ Williams: Either Way, § 666 Covers Lipscomb

Two cases decided last year demonstrate our continued commitment to applying § 666 to members of municipal and parochial governing bodies.  These cases provide additional support for the

---

[39]_Id._ at 423 n.4 (E. Garza, J., dissenting).

[40]_Phillips_, 219 F.3d at 414 (majority).

[41]_Id._ at 422–23 (E. Garza, J., dissenting).

[42]_Id._ at 422–23.

20

proposition that § 666 easily reaches Lipscomb's conduct. In *United States v. Reyes*,[43] we affirmed the § 666 conviction of city council members who had been bribed to vote in favor of awarding a municipal construction project to a particular contractor.[44] The government noted that a federal loan would have supported the project had it gone forward, but we explicitly declined to rely on that fact, stating instead that federal support of the three city departments involved in the project —— the finance, housing, and legal departments —— justified prosecuting under § 666[45]:

> Applying *Westmoreland* and *Moeller*..., we conclude that the connection between federal benefits and the charged conduct is sufficient to uphold Reyes's convictions under § 666.... Like the county supervisor in *Westmoreland* and the senior agency officials in *Moeller*, here the charged criminal conduct related to city council members, who, by voting up or down on bids, ultimately decide how federal money will be spent.[46]

Such an analysis firmly supports Lipscomb's susceptibility to conviction under § 666: In Dallas, federal money supports the City's transportation and human services departments —— the very agencies of city government that Lipscomb sought corruptly to influence. *Reyes* reaffirms, as a statutory matter, that whatever nexus § 666 requires —— if any —— is present in this case.

---

[43]*United States v. Reyes*, 239 F.2d 722 (5th Cir. 2001).

[44]*Id.* at 726–32.

[45]*Id.* at 734 & n.5.

[46]*Id.* at 734 (emphasis added).

21

More recently, we decided <u>United States v. Williams</u>[47] without discussing any jurisdictional element or nexus requirement at all —— despite the fact that if there had been a jurisdictional flaw, it would have been incumbent on the <u>Williams</u> panel to address that problem, even <u>sua sponte</u>.  <u>Williams</u> involved facts virtually identical to those present in <u>Reyes</u>, in <u>Westmoreland</u>, and here.  Williams, a former member of the Jackson, Mississippi City Council, was convicted under § 666 of aiding and abetting the solicitation and acceptance of bribes —— specifically, $150,000 in exchange for a re-vote on a cable television license contract.[48]  The <u>Williams</u> court did not describe any direct federal fiscal interest at stake in that re-vote.  Such questions, however, may not have been briefed or argued in <u>Williams</u>, as the opinion in that case expressly rejected only other challenges —— those grounded in equal protection, due process, and sufficiency and admissibility of the evidence —— to Williams's conviction.[49]  Taken in isolation, <u>Williams</u> has little if any precedential value on the nexus issue, one way or the other.

But of course <u>Williams</u> does not stand alone.  It is merely the most recent in a series of our opinions —— <u>Westmoreland</u>, <u>Moeller</u>, <u>Marmolejo</u>, <u>Reyes</u>, and <u>Williams</u> —— that have consistently applied

---

[47]<u>United States v. Williams</u>, 264 F.3d 561 (5th Cir. 2001).

[48]<u>Id.</u> at 566–67.

[49]<u>Id.</u> at 567–78.

22

the broad "corruption focus" of § 666.  The <u>Phillips</u> panel did construe the term "agent" to avoid the constitutional question, but we cannot do that here: As a textual matter, the term "agent" plainly includes city council members.  <u>Westmoreland</u> applied § 666 to a county supervisor; <u>Reyes</u> and <u>Williams</u> both applied it to city council members.  Hence <u>Westmoreland</u>'s view of § 666 continues to be the law in this circuit and to preclude a more narrow construction of the statute.  Even though we get to the question from different jurisdictional perspectives, Judge Duhé and I are in complete accord on the result for Lipscomb of the foregoing analysis of § 666:  He was subject to being tried in federal district court for violating that statute, and he was subject to being convicted by a jury.

IV. DID LIPSCOMB RAISE THE CONSTITUTIONAL ISSUE?

Before addressing the constitutional problem that Lipscomb's statutory-construction argument presages (and writing for myself alone, although supplementing Judge Smith's analysis), I must make three observations on our intrapanel disagreement over whether the constitutional issue is properly before us.  To me, this debate: (1) is more semantical than substantive, (2) is in tension with controlling Supreme Court precedent, and (3) overlooks the real nature of the constitutional question at issue.

Semantics first: As the Supreme Court recently said,

23

"jurisdiction...is a word of many, too many, meanings."[50]  This imprecision is one source of our panel's split here.  Judge Duhé reads "jurisdiction" in the pleadings, briefs, and record to mean <u>adjudicative</u> jurisdiction only —— the authority of federal courts to hear only those categories of cases (subject-matter jurisdiction) authorized by Congress, between those categories of persons (personal jurisdiction) permitted by the Constitution.  But in the context of the expressly constitutional arguments that Lipscomb sometimes makes, Judge Smith and I read his use of "jurisdiction" —— at least on those occasions —— to mean <u>legislative</u> jurisdiction, the "authority" of Congress "to make its law applicable to particular persons or activities."[51]

Lipscomb also uses the ambiguous phrase "federal jurisdiction," which could be either adjudicative or legislative.  That ambiguity is not only terminological, but also conceptual.  To state the obvious, legislative jurisdiction flows <u>from</u> the Constitution <u>to</u> the Congress and limits, in today's context, the subject matter and the classes of persons that Congress may regulate by statute.  In contrast, adjudicative jurisdiction generally flows <u>from</u> Congress <u>to</u> the courts as grants of subject-matter jurisdiction, grants made by Congress in enacting laws

---

[50]<u>Steel Co. v. Citizens for a Better Environment</u>, 523 U.S. 83, 90 (1998).

[51]<u>Hartford Fire Ins. Co. v. California</u>, 509 U.S. 764, 813 (1993) (Scalia, J., dissenting).  Legislative jurisdiction "is quite a separate matter from jurisdiction to adjudicate."  <u>Id.</u>

24

pursuant to its power to constitute inferior federal courts.[52]  In the instant context, the judicial power extends constitutionally to cases arising under federal criminal laws.  Consequently, a court's <u>adjudicative</u> jurisdiction to convict a defendant of a federal crime cannot exist in the absence of Congress's <u>legislative</u> jurisdiction to criminalize the particular conduct of which the particular defendant is accused.

The reach of Congress's legislative jurisdiction, of course, is sometimes bounded by structural constitutional provisions.  For example, grants of jurisdiction are limited by the Necessary and Proper Clause, which covers laws that "carry into Execution...all other powers vested by this Constitution in the Government of the United States or in any Department or Officer thereof."[53]  I cannot even imagine how it could be "necessary and proper" to the exercise of either the judicial power or the power to constitute inferior courts for us to have <u>adjudicative</u> jurisdiction over a case implicating a statute that Congress lacked the <u>legislative</u> jurisdiction to enact.  It should go without saying, therefore, that our subject-matter jurisdiction has constitutional as well as statutory limits[54]:  It involves "the courts' statutory <u>or</u>

---

[52]U.S. Const. art. I, § 8, cl. 9.

[53]U.S. Const. art. I, § 8, cl. 18.

[54]<u>Edelman v. Jordan</u>, 415 U.S. 651, 678 (1974) ("The Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court.").

25

<u>constitutional</u> power to adjudicate the case."[55]

To repeat, then: A federal forum simply must lack adjudicative jurisdiction to hear a case based on a federal statute that Congress lacked the legislative jurisdiction (translation: constitutional power or authority) to apply to the situation in question.  If I am correct in my position that this case implicates our constitutional duty, at every level and at every stage of the proceedings, to ensure the existence of our adjudicative jurisdiction, then that duty trumps the canon of constitutional avoidance that Justice Brandeis discussed in <u>Ashwander v. TVA</u>,[56] a canon that on other occasions I have dutifully obeyed.[57]  At the risk of exposing my own intellectual shortcomings, then, I confess that neither semantically nor substantively can I understand the distinction, which Judge Duhé detects in Lipscomb's pleadings and briefs, between adjudicative, subject-matter jurisdiction and legislative jurisdiction (<u>structural</u> constitutionality) —— a distinction that is clear to Judge Duhé but in this case remains blurred to me.  If a successful as-applied challenge to the constitutionality of § 666 would limit Congress's legislative jurisdiction, i.e., would identify someone or some act beyond

---

[55]<u>Steel Co.</u>, 523 U.S. at 89 (original emphasis removed, emphasis added).

[56]<u>Ashwander v. TVA</u>, 297 U.S. 288, 346–48 (1936) (Brandeis, J., concurring).

[57]<u>See</u>, <u>e.g.</u>, <u>U.S. v. Fox</u>, 248 F.3d 394, 405 (2001), <u>vacated on other grounds</u>, <u>Fox v. United States</u>, 122 S.Ct. 1602 (2002).

26

Congress's authority, it cannot help but limit our adjudicative jurisdiction to the same degree. In this sense, because Lipscomb appears to raise a structural jurisdictional challenge, I question whether his is the kind of constitutional argument that may be waived through delay or disuse; if it "involves a court's power to hear a case, [it] can never be forfeited or waived."[58]

As I read them, Lipscomb's pleadings and briefs do raise — and thus do not waive — the constitutional issue. Rather, they question both Congress's legislative jurisdiction (constitutional authority) to enact § 666 and our adjudicative power to apply § 666 here. Lipscomb has raised a classic challenge to subject-matter jurisdiction: He "argues that the extension of federal jurisdiction over acts such as [his] would exceed the power of Congress."[59]

My belief that we should consider this argument finds support in Salinas itself. There the Supreme Court easily undertook to determine whether § 666 was constitutional, and squarely held that it was, as applied,[60] despite the fact that neither we nor the district court had addressed the statute's constitutionality.[61] In

_____

[58]United States v. Cotton, __ U.S. __, __; 122 S.Ct. 1781, 1785 (2002).

[59]United States v. Suarez, 263 F.3d 468, 484 (6th Cir. 2001) (Boggs, J., dissenting in part).

[60]Salinas, 522 U.S. at 61.

[61]Compare Salinas, 522 U.S. at 60–61, with Marmolejo, 89 F.3d at 1188–94 (omitting constitutional analysis). Even the dissent in Marmolejo did not make constitutional arguments. See Marmolejo, 89 F.3d at 1201–05. See also Salinas v. United States, 1997 U.S.

27

support of its "holding,"[62] the Court explained:

> [s]tatutes should be construed to avoid constitutional questions, but this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature. Any other conclusion, while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress....
> These principles apply to the rules of statutory construction we have followed to give proper respect to the federal-state balance.... [W]e cannot press statutory construction to the point of disingenuous evasion even to avoid a constitutional question.[63]

This is why, with all due respect, I find it odd, as we labor to interpret 18 U.S.C. § 666, for Judge Duhé to urge obeisance to the Ashwander canon, which the Supreme Court itself in Salinas first acknowledged and then declined to observe or apply.

To the extent that the real question is whether Lipscomb adequately raised constitutionality, I trust Judge Duhé would concede two premises: first, that Lipscomb urged the district court (and this one) so to construe § 666 as to avoid a serious and identified constitutional flaw; and second, that this panel has unanimously concluded that we cannot so construe the statute. Starting with these two premises, I cannot avoid the conclusion

---

Trans. Lexis 48, at *49–50:
QUESTION: But the Tenth Amendment argument that you're presenting to us now--
MR. ENRIQUEZ: Yes, ma'am.
QUESTION: --did you make that in the lower courts?
MR. ENRIQUEZ: We didn't specifically come out and say Tenth Amendment, Your Honor.

[62]Salinas, 522 U.S. at 61.

[63]Id. at 59–60 (citations and quotation marks omitted).

28

that Lipscomb did raise the constitutional flaw.  By construing the statute as all three of us do, we are sailing into the very waters that Lipscomb warned us were constitutionally uncharted.  I knowingly and willfully proceed to endeavor to chart them.

V.

AS-APPLIED CONSTITUTIONALITY UNDER DOLE

We review the constitutionality of a federal statute de novo.[64] My solo review here will focus on whether § 666 is necessary and proper to the spending power, but the proper foundation for that analysis is a review of the Supreme Court's spending-clause jurisprudence.  That jurisprudence has focused on whether Congress may condition grants of federal funds.  Even if § 666 is not a conditional-grant statute — a conclusion of which I am less certain than is Judge Smith — the conditional-grant cases establish both that "internal limits on congressional spending power are difficult to discern"[65] and that, to whatever extent the Tenth Amendment is an external limit on the spending power, that Amendment does not function as "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly."[66]  The Tenth Amendment thus is not as great an

---

[64]See United States v. Rasco, 123 F.3d 222, 226 (5th Cir. 1997).

[65]1 LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-6, at 839 (3d ed. 2000).

[66]South Dakota v. Dole, 483 U.S. 203, 210 (1987).

obstacle to the necessity and propriety of § 666 as Judge Smith believes it to be.

A.    Conditional-Grant Precedents

Congress likely enacted § 666 pursuant to the Spending Clause of the Constitution.[67]  Under that clause, it is settled, Congress may regulate the states by conditioning grants.[68]  Cases on such conditions have established that the structural limits on federal power that often arise in the commerce-clause context do not operate with the same force against conditional-grant provisions.

United States v. Butler,[69] for example, is still good law for its announcement that Congress's spending power, like its power to tax, is "to provide for the general welfare,"[70] and is therefore untrammeled by the specific grants of legislative power found elsewhere in Article I, Section 8:

> While, therefore, the power to tax is not unlimited, its confines are set in the clause which confers it, and not in those of section 8 which bestow and define the legislative powers of the Congress.  It results that the power of Congress to authorize expenditure of public

---

[67]Fischer, 529 U.S. at 689 n.3 (Thomas, J., dissenting) ("Section 666 was adopted pursuant to Congress' spending power."); Phillips, 219 F.3d at 414 ("Congress' authority to enact § 666 rests on the Spending Clause of the Constitution.").  The spending power is not granted in such terms but is an outgrowth of the "Power To lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the Common Defence and general Welfare of the United States."  U.S. CONST. art. I, § 8, cl. 1.

[68]TRIBE, supra note 65, § 5-6, at 833.

[69]297 U.S. 1 (1936).

[70]U.S. CONST. Art. I, § 8, cl. 1.

30

moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution.[71]

Although the Butler Court did hold that the Tenth Amendment cabined Congress's spending power,[72] the Court quickly abandoned this view, in Oklahoma v. United States Civil Service Commission,[73] which rejected a constitutional challenge to the Hatch Act. That Act then forbade political activities by any "officer or employee of any State or local agency whose principal employment is in connection with any activity which is financed in whole or in part by loans or grants made by the United States."[74] Oklahoma and its State Highway Commissioner challenged the Civil Service Commission's attempt to force on the State the choice between dismissing the Commissioner, who had engaged in political activities, or forgoing highway funds in the amount of twice the commissioner's salary.[75] The Court responded:

> While the United States is not concerned with and has no power to regulate local political activities as such of state officials, it does have power to fix the terms upon

---

[71]Butler, 297 U.S. at 66.

[72]Id. at 66–78.

[73]330 U.S. 127 (1947).

[74]Id. at 129 n.1, citing 18 U.S.C.A. § 61l. The Hatch Act, although recently reformed, remains on the statute books; today it criminalizes the extortion of political contributions under threat of withholding employment, payments, or benefits that are "provided for or made possible in whole or in part by an Act of Congress." This language shows that Congress knows how to link criminal sanctions tightly to federal spending, should it so desire.

[75]Oklahoma, 330 U.S. at 129–34.

which its money allotments to states shall be disbursed. <u>The Tenth Amendment does not forbid the exercise of this power in the way that Congress has proceeded in this case</u>.... [T]he Tenth Amendment has been consistently construed "as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end.".... The offer of benefits to a state...dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual.[76]

Oklahoma, the Court said, could evade the condition by the "simple expedient" of not yielding to the enticement of federal funds.[77]

The apex of the Court's conditional-grant jurisprudence is <u>South Dakota v. Dole</u>,[78] which involved a statute conditioning a small portion of each state's federal highway aid on the state's establishing a minimum drinking age.[79] The Court upheld the drinking-age requirement as an exercise of Congress's Spending-Clause authority to condition federal grants.[80] The Court also announced that when Congress chooses to go beyond its enumerated powers, and to use its spending power "to further broad policy objectives by conditioning receipt of federal monies upon compliance with federal statutory...directives," the statutory condition must itself meet four conditions, the failure to meet any

---

[76]<u>Id.</u> at 143–44.

[77]<u>Id.</u> at 143.

[78]483 U.S. 203 (1987).

[79]<u>Id.</u> at 205.

[80]<u>Id.</u> at 206.

one of which might render a statute unconstitutionally broad.[81]

B.    The Dole Test Is Instructive Here

Given Dole's context, applying its test to § 666 could be trebly problematic.  First, like Judge Smith, two district courts have concluded that § 666 is not a conditional-grant statute at all, because it does not require the state (here, Texas) or its political subdivision (here, Dallas) to do anything.[82]  As the court in United States v. Cantor noted, § 666 "does not impose a condition on the receipt of federal funds.  The statute neither requires a state's compliance with federal...directives nor prevents state action."[83]  Like the Cantor court, however, I believe that this lack of direct effect on states and localities actually supports the statute's constitutionality.[84]  Furthermore, the

---

[81]Id. at 207-08.  At least one court has concluded that use of § 666 to prosecute crimes with no federal nexus violates the Dole test's third condition.  See United States v. McCormack, 31 F. Supp. 2d 176 (D. Mass. 1998) (finding the statute unconstitutional as applied to a defendant who had bribed a local police officer to prevent that officer's further investigation into a state crime, and the entity that received federal funds was the police department that employed the bribed officer).

[82]United States v. Sabri, 183 F. Supp. 2d 1145, 1156 (D. Minn. 2002) ("[T]he statute does not apply to the recipient government.").

[83]United States v. Cantor, 897 F. Supp. 110, 113 (S.D.N.Y. 1995).  A condition statute generally requires a state's compliance with federal regulatory or administrative directives in exchange for receipt of federal funds.  Va. Dep't of Educ. v. Riley, 106 F.3d 559, 570-72 (4th Cir. 1997) (en banc) (plurality opinion).

[84]Id. ("All Congress has done in Section 666 is to pass a law making the conduct of individuals, not the state, criminal.  Hence, I do not believe that a Tenth Amendment argument is appropriate in

33

Supreme Court has not held that, for a statute to be a conditional-grant provision and stand or fall under a <u>Dole</u> analysis, the statute must require states or localities either to take or to refrain from taking any action.[85]  <u>Dole</u> may describe Congress's spending power generally, not just its power to condition grants.

Second, § 666 is a freestanding ban: It neither grants any funds nor takes part in a broader funding statute.  This fact has prompted the objection that its criminal sanction cannot be a condition.[86]  Although superficially appealing, this argument elevates form too highly over substance.  The anticorruption principle in § 666 applies equally to every federal dollar granted, and § 666 logically cuts across all federal grants to states and localities.[87]  To require Congress to insert a mini-§ 666 into every chapter of the United States Code that authorizes intergovernmental financial assistance would constitute excessive scrupulosity.

---

this case.") (citation omitted).

[85]<u>See</u> <u>New York v. United States</u>, 505 U.S. 144, 167 (1992) (stating that conditional-grant statutes "may influence a State's legislative choices" without clarifying that this is the <u>only</u> thing such statutes may do).

[86]<u>See</u> <u>Sabri</u>, 183 F. Supp. 2d at 1156 (distinguishing § 666 from the conditions attached specifically to highway funding).

[87]George D. Brown, <u>Stealth Statute —— Corruption, the Spending Power, and the Rise of 18 U.S.C. § 666</u>, 73 NOTRE DAME L. REV. 247, 292–93 (stating that "§ 666 is not a grant condition," but that it "operates in a similar way to grant conditions" and is analogous to a "crosscutting requirement" —— a "generally applicable requirement imposed on grants across the board to further various national, social and economic policies") (internal quotation marks omitted).

Third, several judges have objected that Congress's spending power cannot include the power to criminalize conduct by third parties, and that Dole therefore cannot apply.[88]  (This argument begs the broader question, which I address below, whether § 666 is necessary and proper to the spending power.)  Many courts, including this one in Phillips, have nevertheless interpreted § 666 using Dole's factors.[89]  Therefore, although we may debate whether

---

[88]See United States v. Morgan, 230 F.3d 1067, 1074 (8th Cir. 2000) (Bye, J., dissenting):

> In enacting § 666, [ ] Congress did not contract with states or local governments.  Neither did Congress bestow gifts of funds upon those governments.  Rather, Congress passed a federal criminal statute designed to punish conduct that falls within the domain of traditional state concerns (bribery, embezzlement, fraud, etc.).  Section 666 reaches beyond punishment of the state and local governments who receive those funds to proscribe the conduct of third persons who aren't parties to the funding contract.  Spending Clause power is not that broad.

See also Sabri, 183 F. Supp. 2d at 1157 (finding Judge Bye's observations in Morgan to be "germane and persuasive").  For a scholarly argument to the same effect, see David E. Engdahl, The Spending Power, 44 DUKE L.J. 1, 92 (1994).

[89]See, e.g., Fischer, 529 U.S. at 689 n.3 (Thomas, J., dissenting) ("Section 666 was adopted pursuant to Congress' spending power, Art. I, § 8, cl. 1.  We have held that the spending power requires, at least, that the exercise of federal power be related 'to the federal interest in particular national projects or programs.'") (citing Dole); Phillips, 219 F.3d 404, 414 ("[T]he power of Congress to impose duties on non-federal entities under the Spending Clause is not without limits.") (citing Dole); Zwick, 199 F.3d at 687 ("To pass muster under the Spending Clause, legislation regulating behavior of entities receiving federal funds must, among other things, be based upon a federal interest in the particular conduct.") (citing Dole); McCormack, 31 F. Supp. 2d 176, 188 ("Of the four limits established in Dole, limit (3) — requiring that the conditions be related to the federal interest in particular national projects or programs — provides the most plausible attack on § 666(a).").

35

the § 666 peg fits the conditional-grant hole, I shall test it under the four prongs of Dole.

C.    The Dole Analysis

Dole first requires that "exercise of the spending power must be in pursuit of the general welfare."[90]  In assessing whether this is so, Dole cautions, "courts should defer substantially to the judgment of Congress."[91]  Congress has stated that the purpose of § 666 is to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery."[92]  Mindful of the deference due this judgment, I accept that Congress easily could have thought that § 666 advanced the general welfare by protecting the federal fisc and by ensuring that state and local decisions regarding federal programs are not made by corrupt officials.  I do not doubt, then, that Congress enacted § 666 "in pursuit of the general welfare."

Second, Dole warns that "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously..., enabl[ing] the States to exercise their choice knowingly, cognizant

---

[90]Dole, 483 U.S. at 207 (citing Helvering v. Davis, 301 U.S. 619, 640–41 (1937)).

[91]Dole, 483 U.S. at 207 (citing Helvering, 301 U.S. at 640, 645).  "[T]he concept of welfare or the opposite is shaped by Congress." Helvering, 301 U.S. at 645.

[92]S. Rep. No. 98-225, at 370 (1983).

36

of the consequences of their participation."[93]  Even though § 666 does not require the states to act, it does make state and local government officers criminally liable for specific misdeeds.  Thus the states arguably have a dignity interest at stake, and if so, they have a right to know the threat to that interest that § 666 would pose — and the language of § 666, which is anything but ambiguous, surely lets them know.  To the extent that § 666 is a conditional-grant statute, both the grant (of $10,000 or more in federal funds) and the condition (criminalizing official bribery and theft) are pellucid.[94]  I see little danger that a state or locality that receives federal funds could mistake the potential of § 666 to criminalize conduct by its officials.

Third, <u>Dole</u> mandates that conditions on federal spending be related "to the federal interest in particular national projects or programs,"[95] or that conditions "bear some relationship to the federal spending."[96]  "The required degree of this relationship is one of reasonableness or minimum rationality."[97]  It suffices here

---

[93]<u>Dole</u>, 483 U.S. at 207 (citing <u>Pennhurst State School and Hospital v. Halderman</u>, 451 U.S. 1, 17 (1981)).

[94]Even a critic of the broad reading of § 666 concedes that its text is "unambiguously broad."  Brown, <u>supra</u> note 74, at 277.

[95]<u>Dole</u>, 483 U.S. at 207 (quoting <u>Massachusetts v. United States</u>, 435 U.S. 444, 461 (1978) (plurality opinion)).

[96]<u>New York v. United States</u>, 505 U.S. 144, 167 (1992).

[97]<u>Kansas v. United States</u>, 214 F.3d 1196, 1199 (10th Cir. 2000); <u>see also</u> <u>New York v. United States</u>, 505 U.S. at 172 (stating that conditions were valid under <u>Dole</u> because they were "reasonably

37

to observe that many courts have held that § 666 is reasonably related to the federal interest in safeguarding federal dollars from control of dishonest administrators, and that § 666 therefore passes spending-power muster.  At least one court has so concluded when the offense conduct did not involve federal funds.[98]  Some of the other decisions arriving at this conclusion, however, may have dismissed facial, rather than as-applied, challenges to the statute[99]; and other cases have affirmed convictions for conduct that implicated federal funds more directly than did Lipscomb's

_____

related to the purpose of the expenditure").

[98]United States v. Ferrara, 990 F. Supp. 146, 152 (E.D.N.Y. 1998) ("Federalism has not been compromised here.  The federal government has a right to attach reasonable conditions to the disbursement of its funds.  State and local governments are free to accept or reject federal monies so encumbered.").  There was nothing federal about the Ferrara defendants' conduct: they bribed members of a town board to secure a change in zoning that would have permitted the construction of a radio tower.  Id. at 148.

[99]United States v. Russo, 111 F.3d 124 (2d Cir. 1997) (table) (unpublished), 1997 WL 168276 at *2 ("Because the conduct prohibited by § 666 furthers the legitimate federal interest in protecting federal funds from local bribery schemes, the statute falls well within the scope of Congress' spending power.") (omitting any discussion of a connection to federal funds); United States v. Cantor, 897 F. Supp. 110, 113 (1995) ("Nor is the conduct prohibited by § 666 so remote from the federal interest in protecting federal funds from the effects of local bribery schemes as to exceed the scope of [the] Congressional spending power or to run afoul of the Tenth Amendment.") (applying § 666 to a defendant who had helped bribe an attorney for the New York City Board of Education, without detailing any connection to federal funds); United States v. Bigler, 907 F. Supp. 401, 402 (S.D. Fla. 1995) (rejecting a facial challenge to § 666).

38

actions here.[100] Because <u>Dole</u>'s relatedness inquiry merges with my analysis of whether applying § 666 is necessary and proper to the spending power, I discuss both questions together in detail below.

Fourth, in <u>Dole</u>'s final prong, the Court cautioned that "other constitutional provisions may provide an independent bar to the conditional grant of federal funds."[101] Yet the Court then reiterated its <u>Oklahoma</u> holding that "<u>a perceived Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants</u>."[102] Rather, the "independent bar" simply means that Congress may not use its spending power "to induce the States to engage in activities that would themselves be unconstitutional."[103] In this case, no action by Texas or Dallas is alleged to be unconstitutional, so the fourth <u>Dole</u> prong is plainly not at issue.

In sum, to the extent that <u>Dole</u> controls whether § 666 can apply here, the only problem lies in the third part of the <u>Dole</u> test: reasonable relationship to a federal interest. Because this reasonably-related prong of <u>Dole</u> is a specific application of the

---

[100]<u>See</u>, <u>e.g.</u>, <u>United States v. Rooney</u>, 37 F.3d 847, 851 (2d Cir. 1994) ("[Section] 666's manifest purpose is to safeguard finite federal resources from corruption and to police those with control of federal funds."); <u>id.</u> at 849 (stating that the defendant was developing a federally-funded housing project).

[101]<u>Dole</u>, 483 U.S. at 208 (collecting cases).

[102]<u>Id.</u> at 210 (emphasis added).

[103]<u>Id.</u>

39

more general test for whether an act of Congress is necessary and proper to an enumerated power,[104] I treat these questions together.

VI.

AS-APPLIED CONSTITUTIONALITY UNDER McCULLOCH

In addition to assigning Congress the spending power, which brings with it the power to condition grants, the Constitution also gives Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution" the powers expressly delegated to the federal government.[105]  Prosecuting Lipscomb under § 666 is therefore constitutional if § 666 is "necessary and proper" to Congress's spending power.

A.   McCulloch and the Necessary and Proper Clause

In testing for necessity and propriety, courts should remain mindful of Justice John Marshall's prescient explanation, in McCulloch v. Maryland,[106] of what "necessary and proper" means:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the

---

[104]See United States v. Ardoin, 19 F.3d 177, 188 & n.37 (5th Cir. 1994) (Wiener, J., concurring in part, dissenting in part and in the result) ("[T]he enumerated-power test of a federal statute's validity is whether 'the Congress might reasonably find that the act relates to one of the federal powers.'") (quoting John E. Nowak & Ronald D. Rotunda, Constitutional Law § 3.3 (West Publishing 1991)).

[105]U.S. Const. art. I, § 8. cl. 18 (emphasis added).

[106]17 U.S. 316 (1819).

40

constitution, are constitutional.[107]

Importantly for the instant case, Marshall derived an expansive meaning of "necessary" from the principle that Congress can derive from its enumerated powers the power to impose criminal sanctions.[108]  From the enumerated power to "establish Post Offices and post Roads,"[109] Congress had "inferred the right to punish those who steal letters from the post-office, or rob the mail."[110]  In other words, Congress's postal power carried with it the ability to impose criminal penalties to protect federal interests advanced by that power.  To the McCulloch Court, this example demonstrated that "necessary" has a range of meanings, including "needful, requisite, essential, or conducive to."[111]  It was through the lens of this broad construction of the Necessary and Proper Clause that Marshall saw justification for Congress's creation of the national bank, the power to create which is nowhere enumerated in Article I.  Whether that broad construction justifies applying § 666 here depends on Congress's intent in enacting the statute, as well as on the nature

---

[107]Id. at 421.

[108]Id. at 416–17 ("So, with respect to the whole penal code of the United States: whence arises the power to punish, in cases not prescribed by the constitution?  All admit, that the government may, legitimately, punish any violation of its laws; and yet, this is not among the enumerated powers of congress.").

[109]U.S. CONST. art. I, § 8, cl. 7.

[110]McCulloch, 17 U.S. at 417.

[111]Id. at 418.

41

of the federal interest embodied in this case and the relationship between that interest and Lipscomb's conduct.

B.    Legislative History

History often tells us why Congress deemed a statute necessary and proper.  Not so for § 666, however, because it was enacted as part of an omnibus spending bill of the type that makes the search for legislative history Sisyphean.  What history exists is multilayered, sparse, equivocal, and even mysterious.  By no means, I respectfully submit, is it capable of supporting Judge Smith's contention that "Congress did not find it necessary that § 666 be applied in cases not involving federal funds or programs."[112]

1.    The 1986 Technical Amendment

We owe the current language of § 666 to the Criminal Law and Procedure Technical Amendments Act of 1986.[113]  As that Act's title suggests, and as we recognized in Westmoreland,[114] Congress did not intend the Act to change § 666 substantively in ways that would affect our reading of it here.[115]  This is important, because the

_____

[112]Infra at __.

[113]P.L. 99-646, § 59, 100 Stat. 3592, 3612–13 (1986).

[114]Westmoreland, 841 F.2d at 577 ("[T]he amended version of section 666 reinforces our interpretation. . . . [I]ts legislative history indicates that the relevant changes were 'technical' ones.").

[115]H.R. REP. No. 99-797 at 30 (1986), reprinted in 1986 U.S.C.C.A.N. 6138, 6153:
      [S]ection 42 of the [House's version of the technical corrections] bill amends 18 U.S.C. § 666, which deals with theft or bribery concerning programs receiving

42

1986 amendment rewrote language that reveals how Congress would

have answered our constitutional question in 1984.

    2.    <u>The 1984 Enactment</u>

As first enacted, § 666(b) read:

> Whoever, being an agent of an organization, or of a State
> or local government agency...[that receives more than
> $10,000 a year in federal funds], solicits, demands,
> accepts, or agrees to accept anything of value from a
> person or organization other than his employer or
> principal for or because of the recipient's conduct in
> any transaction or matter or a series of transactions or
> matters involving $5,000 or more <u>concerning the affairs</u>
> <u>of such organization or State or local government agency</u>,
> shall be imprisoned....[116]

The emphasized phrase strongly suggests that in 1984 Congress

believed it necessary and proper for § 666 to reach bribery that

had no relation to federal funds.

    3.    <u>The 1983 Report</u>

To counter the broad original and current language of § 666,

---

> federal funds.... [S]ection 42 amends 18 U.S.C. 666 to
> avoid its possible application to acceptable commercial
> and business practices.  Section 42 also makes technical
> amendments in 18 U.S.C. 666 to conform that section to
> the drafting style and format used generally in title 18
> of the United States Code.

A footnote in the report, <u>id.</u> at 30 n.9, <u>reprinted in</u> 1986
U.S.C.C.A.N. at 6153 n.9, also stated:

> 18 U.S.C. 666 prohibits bribery of certain public
> officials, but does not seek to constrain lawful
> commercial business transactions.  Thus, 18 U.S.C. 666
> prohibits corruptly giving or receiving anything of value
> for the purpose of influencing or being influenced in
> connection with any business, transaction, or series of
> transactions.

[116]Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473,
§ 1104(a), 98 Stat. 1837, 2143—44 (1984).

Judge Smith relies heavily on a Senate Judiciary Committee report, but this report described a different bill that never became law. As eventually enacted, § 666 was a small part of a large crime bill which was engrafted on a huge omnibus spending bill that funded many departments and agencies.[117]  None of this bill's reports, written as they were by the Appropriations Committees, gives context for § 666, a criminal statute which, of course, appropriated no funds.[118]

Section 666 as enacted was identical to a provision in the Comprehensive Crime Control Act of 1984, which passed the Senate but never made it out of the House Judiciary Committee on its own and evidently had to piggyback on the omnibus spending bill to gain legislative momentum.[119]  The Senate report on the crime bill,

---

[117]See Pub L. No. 98-473, 98 Stat. at 1837-2199.  Entering "98 P.L. 473" on Lexis retrieves a list of the omnibus bill's twenty-eight short titles and a sense of its massive scope; it included five of the thirteen appropriations bills for fiscal year 1985. A summary of the bill, H.J. Res. 648 (98th Cong.), is available at http://thomas.loc.gov (visited Oct. 13, 2001).

[118]See H.R. REP. NO. 98-1159 (1984) (conference report), reprinted in 130 Cong. Rec. 31445 (Oct. 10, 1984); S. REP. NO. 98-634 (1984) (Senate Appropriations, accompanying S.J. Res. 356); and H.R. REP. NO. 98-1030 (1984) (House Appropriations).  Parts of the conference report are reprinted at 1984 U.S.C.C.A.N. 3710-17; for the conference report's entire discussion of the crime bill, see 130 Cong. Rec. at 31565-67.
The absence of language interpreting § 666 from the reports on this bill is understandable also as a result of the omnibus bill's timing.  Congress enacted it and the President signed it during October 10-12, 1984, less than a month before an election.  See 98 Stat. at 2199.

[119]See 1984 U.S.C.C.A.N. at 3182.

printed in 1983, can be taken as an authoritative statement of the Senate Judiciary Committee's intent for what became § 666. It is tenuous at best, however, to rely, as does Judge Smith, solely on one committee report — on a wholly separate bill — as stating the views of the entire Congress.

The questionable probative weight of the Senate report aside, that report is still not determinative here, for the evidence goes both ways. The relevant passage is titled "Part C—Program Fraud and Bribery," and states that § 666

> is designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery <u>involving Federal monies</u> that are disbursed to private organizations or State and local governments <u>pursuant to a Federal program</u>.[120]

The report notes, however, that under the prior law banning theft of federal property, prosecuting was often impossible

> because title has passed to the recipient [government] before the property is stolen, or the funds are so commingled that the Federal character of the funds cannot be shown. This gives rise to a serious gap in the law, since even though title to the monies may have passed, the Federal Government clearly retains a strong interest in assuring the integrity of such program funds.[121]

Even though the report's emphasis on program funds would support a narrow reading of the necessity and propriety of § 666, its emphasis on commingling supports a broad one. In fact, the Senate Judiciary Committee's most explicit direction actually suggests

---

[120]S. Rep No. 98-225, at 369 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 3182, 3510 (emphases added).

[121]<u>Id.</u>

45

that the Committee intended to limit the scope of § 666, but in a way that still would cover Lipscomb-like conduct:

> The Committee intends that the term "Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of Federal assistance" be construed broadly, consistent with the <u>purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from</u> theft, fraud, and <u>undue influence by bribery</u>. However, the concept is not unlimited. The term "Federal program" means that there must exist a specific statutory scheme authorizing the Federal assistance in order to promote and achieve certain policy objectives. Thus, not every Federal contract or disbursement of funds would be covered. For example, if a government agency lawfully purchases more than $10,000 in equipment from a supplier, it is not the intent of this section to make a theft of $5,000 or more from the supplier a Federal crime.[122]

Thus one of the two lines that the Senate Judiciary Committee expressly drew —— to exclude theft from a supplier from the coverage of § 666 —— would not exclude Lipscomb's conduct, quintessentially "undue influence by bribery."

### 4.  The Specified Cases

The immediate next sentence in the report, subject to much exegesis by Judge Smith, states:  "It is, however, the intent ['of this section'] to reach thefts and bribery in situations of the types involved in the <u>Del Toro</u>, <u>Hinton</u>, and <u>Mosley</u> cases."[123]  With continued due respect to Judge Smith, I do not discern in this sentence any clear direction to us.  Both <u>Hinton</u> and <u>Mosley</u>

---

[122]S. Rep No. 98-225, at 370, <u>reprinted in</u> 1984 U.S.C.C.A.N. at 3511 (emphasis added).

[123]<u>Id.</u>

46

<u>sustained</u> convictions of bribed local officials whom courts considered to be federal officials under the prior bribery statute because they exerted federal authority and controlled the disbursement of federal funds.[124] Simple logic dictates that just because the Committee intended § 666 in part to codify these cases does not meant that it sought to <u>limit</u> § 666 to these cases exclusively.

In <u>Del Toro</u>, the federal interest was more attenuated. The defendants were convicted of bribing a New York City official to ensure that they would supply office space to a city program that was eligible for federal funds.[125] The <u>Del Toro</u> court reversed these bribery convictions, noting that even if the official had succeeded in provisionally securing the lease as desired, three local agencies would have had to approve the lease before the city could apply to the federal government for funds, so that "[t]here were no existing committed federal funds for the purpose."[126] The Senate Committee's intent to overrule <u>Del Toro</u> thus reflects that the Committee thought it necessary and proper for § 666 to reach

---

[124]<u>United States v. Hinton</u>, 683 F.2d 195, 198–200 (7th Cir. 1982); <u>United States v. Mosley</u>, 659 F.2d 812, 815–16 (7th Cir. 1981).

[125]<u>United States v. Del Toro</u>, 513 F.2d 656, 658–61 (2d Cir. 1975).

[126]<u>Id.</u> at 662.

bribery even before the federal government had committed funds.[127]

The most that can be concluded from the report, then, is that the Senate Judiciary Committee delimited the scope of § 666 in part by seeking to exclude theft from suppliers but to include bribery of officials running programs that might receive federal funds. I do not see the report as shedding much light on our question. Lipscomb's conduct falls into a middle ground that the report simply does not address.

5. The 1981 Bill

The plot thickens still further when an effort is made to verify the assertion in the 1983 report that the language of § 666 was derived from a 1981 bill that never became law.[128] The 1981 bill and its report emerged from Senate Judiciary — the same committee that later wrote the 1983 bill and report. The Committee omitted from both the 1983 bill and the 1984 act, however, the very language in the 1981 bill that would have answered our question:

> (c) Jurisdiction.—There is federal jurisdiction over an offense described in this section if—
> ...
> (6) the public servant is an agent of a State or local government charged by a federal

---

[127]"Arguably [ ] Congress did not intend the involvement of federal funds in a corrupt transaction to be a factual certainty." Westmoreland, 841 F.2d at 577 (interpreting Del Toro).

[128]S. REP. NO. 98-225, at 369 ("The proposal is derived from S. 1630, the Criminal Code Reform Act of 1981[,] approved by the Committee in the 97th Congress.") & n.1 ("See, e.g., sections 1731 (Theft) and 1751 (Commercial Bribery) of S. 1630 and the discussion at pages 726 and 803 of S. Rept. No. 97-307 (97th Cong., 1st Sess.")), reprinted in 1984 U.S.C.C.A.N. at 3510.

statute, or by a regulation issued pursuant thereto, with administering monies or property derived from a federal program, <u>and the official action or legal duty</u> [with respect to which the bribe is taken] <u>is related to the administration of such program</u>.[129]

Thus, in 1983, the Senate Judiciary Committee had in hand — and even mentioned — a two-year-old bill that would have required a federal interest or nexus as a jurisdictional predicate. Yet the 1983 bill and 1984 enactment contained none of that language or anything similar.[130] The reason for that absence is unclear. In 1981, when the Committee clearly sought to require a federal nexus, it had sufficient command of the English language to do so. To suppose that the Committee lost that faculty over either two or four years is ludicrous. Section 666 as enacted and amended, therefore, might have reflected a change in the Senate Judiciary Committee's view on whether to require a federal nexus, but we

---

[129]S. 1630, 97th Cong. § 101 (1981) (recodifying all of Title 18). This jurisdictional language in the proposed bribery section would have been the new 18 U.S.C. § 1351(c)(6). <u>See</u> S. 1630, 97th Cong. § 101, at 76–77 (codifying program bribery offense).

The commercial bribery section in the 1981 bill contained a similar nexus requirement for the existence of federal jurisdiction. <u>See</u> S. 1630, 97th Cong. § 101, at 134 (1981) (proposing a new 18 U.S.C. § 1751(c)(1)(I)).

[130]Any attempt to rely on the legislative history of the 1981 bill is therefore misguided. Unfortunately, a panel of this court has done so, quoting the 1981 report as if it were the 1983 report that shed light on the enacted text. <u>See</u> <u>Phillips</u>, 219 F.3d at 413 n.14 (citing <u>United States v. Coyne</u>, 4 F.3d 100, 110 n.1 (2d Cir. 1993) for its description of the "Committee Report," but failing to note that the quote was from the 1981 report, not the 1983 report). Both <u>Phillips</u> and <u>Coyne</u> erred in relying on a report interpreting a jurisdictional requisite that never became law.

49

cannot say this with certainty: For all we know, the Committee might well have sought to exercise federal criminal jurisdiction up to its constitutional limits, leaving the issue to the courts to decide.

C.    The Views of Other Courts

Whatever the reason for § 666's silence on this question, the courts have struggled to produce the answer.  Some district courts have tested § 666 against the Tenth Amendment, treating the statute as an emanation of the spending power, and have come to varying conclusions.[131]  Additionally, four of our fellow appellate courts have examined the sweep of § 666, either as a statutory matter or a constitutional one, and are also divided.

---

[131]Compare United States v. Sabri, 183 F. Supp. 2d 1145, 1154-58 (D. Minn. 2002) (seemingly holding, contra Salinas, § 666 to be a facially unconstitutional exercise of the spending power) and United States v. McCormack, 31 F. Supp. 2d 176, 178, 183-89 (D. Mass. 1998) (finding § 666 unconstitutional, because exceeding Congress's spending power, as applied to indict defendant who bribed a local police officer to prevent investigation and prosecution of state crimes, despite the fact that the police department received federal funds) with United States v. Ferrara, 990 F. Supp. 146, 152 (E.D.N.Y. 1998) (rejecting federalism challenge to indictment of defendant who attempted to bribe members of a town board so that they would vote to approve zoning changes necessary to the construction of a radio tower completely unconnected to federal funds) and United States v. Bigler, 907 F. Supp. 401, 402 (S.D. Fla. 1995) (sustaining indictment against federalism and Tenth-Amendment attack, and finding § 666 a constitutional exercise of, because necessary and proper to, the spending and general-welfare powers, without detailing any connection to federal funds).  See also United States v. Cantor, 897 F. Supp. 110, 112-13 (S.D.N.Y. 1995) (affirming the constitutionality of § 666 under the spending power and against Tenth-Amendment attack, and thus sustaining indictment of defendant who had facilitated bribery of official of Board of Education, without detailing any connection to federal funds).

Lipscomb relies on United States v. Zwick,[132] in which the Third Circuit declined to apply § 666 to conduct such as his:

> Interpreting § 666 to have no federal interest requirement produces serious concerns as to whether Congress exceeded its power under the Spending Clause in enacting this statute. See McCormack, 31 F. Supp. 2d at 187-89. To pass muster under the Spending Clause, legislation regulating behavior of entities receiving federal funds must, among other things, be based upon a federal interest in the particular conduct. See South Dakota v. Dole, 483 U.S. 203, 207 (1987). Applying § 666 to offense conduct, absent evidence of any federal interest, would appear to be an unconstitutional exercise of power under the Spending Clause.[133]

To avoid this supposed constitutional problem, the Zwick court believed that to read § 666 literally is to err, and held that "§ 666 requires that the government prove a federal interest is implicated by the defendant's offense conduct."[134] Not to require a nexus, reasoned the Third Circuit, would erase significant federal-state boundaries by turning § 666 into a general anti-corruption law, which, in the Third Circuit's view, Congress had not intended.[135]

What then, under Zwick, would constitute a federal interest? "The amount of federal funds" alone, reasoned the Zwick court, could constitute the interest if the federal funds provided "the greater part of a township's budget"; if not, the offense conduct

---

[132]199 F.3d 672 (3d Cir. 1999).

[133]Id. at 687 (parallel citations omitted).

[134]Id.

[135]Id. at 686.

51

would have to implicate a substantive or programmatic interest, even though "a highly attenuated implication of a federal interest will suffice."[136] Since deciding <u>Zwick</u>, the Third Circuit has clarified that the federal interest can reach very deep into the ranks of local government.[137]

In diametric opposition to the Third Circuit, two other circuits have declined to read an extra-textual nexus into § 666. The Sixth Circuit has rejected a constitutional attack on its pre-<u>Salinas</u> position that except for the textual $10,000 threshold, § 666 does not require a nexus between federal funds and the offense conduct.[138] The Supreme Court recently declined to review

---

[136]<u>Id.</u> Evidence in <u>Zwick</u> showed that federal funds supported erosion control and emergency snow removal. <u>Id.</u> at 688. The defendant, a township commissioner, had taken bribes in exchange for action on "sewer access, use permits and landscaping performance bonds." <u>Id.</u> Finding "no obvious connection" between the two, the court remanded for a new trial. <u>Id.</u>

[137]<u>United States v. DeLaurentis</u>, 230 F.3d 659, 662 (3d Cir. 2000) (vacating dismissal of § 666 counts against former supervisor of police detectives for Hammonton, New Jersey, when a jury might conclude that (1) Hammonton received $25,000 a year under the federal Community Oriented Policing Services Program, (2) the defendant was bribed to intercede to protect a local bar, and (3) a federally-funded police officer was dispatched to the bar).

[138]<u>See</u> <u>United States v. Suarez</u>, 263 F.3d 468, 472–73, 489–91 (6th Cir. 2001) (affirming conviction of police officer for converting victim restitution funds and police evidence). The <u>Suarez</u> majority does not clearly state that <u>Suarez</u> is a constitutional holding, but Suarez "clarifie[d] that this claim is a constitutional one." <u>Id.</u> at 484 (Boggs, J., dissenting as to Part VI). <u>See also</u> <u>United States v. Dakota</u>, 188 F.3d 663, 666–68 (6th Cir. 1999) (affirming conviction of an agent of a tribal organization that received federal funds, although the agent's offense conduct bore no relation to federal funds).

this result.[139]  The Seventh Circuit likewise has held that the broad text of § 666 controls: "It is not our part to trim § 666 by giving its text a crabbed reading."[140]  Noting that the fungibility of money militates against a narrow reading of § 666, the Seventh Circuit concluded as a statutory matter that the district court properly convicted a township supervisor, even though his bribe-taking related only to his control of the town's general-assistance program, which did not receive any federal funds.[141]

In addition to his reliance on Zwick, Lipscomb would rely on a precedent from the Second Circuit, but close inspection of that case reveals that it actually supports his conviction here.  In United States v. Santopietro,[142] that court stood by its earlier

---

[139]Suarez v. United States, 122 S. Ct. 1547 (2002) (mem.).

[140]United States v. Grossi, 143 F.3d 348, 350 (7th Cir. 1998); id.:

> Grossi wants us to say that, unless the program or activity that was touched by bribery itself received $10,000 in federal funds, the "circumstance described in subsection (b)" does not obtain.  Yet money is fungible and its effect transcends program boundaries.  The general assistance program has more to spend on welfare (or dangle as a lure for bribes) if the federal government meets some of the Township's other expenses.
>
> Congress has on occasion limited regulation to the specific activity that receives the federal money. [Giving examples of statutory language] . . . Section 666(b), by contrast, refers not to a "program or activity" but to the "organization, government, or agency."  The difference is palpable.

[141]Id. at 350.  The court also stated that "the district court's subject-matter jurisdiction is supplied by 18 U.S.C. § 3231 and is secure."  Id. at 351.

[142]United States v. Santopietro, 166 F.3d 88 (2d Cir. 1999).

53

requirement of "at least some connection between the bribe and a risk to the integrity of the federal [sic] funded program."[143] — obviously a "corruption focus." Nevertheless, the example that the Second Circuit gave of bribery that § 666 would not reach — a bribe paid to the hypothetical meat inspector of a city that received a federal grant only for its parks department — involves a federal interest that is much more attenuated from the perpetrator than does this case.[144] Furthermore, the Santopietro court affirmed the convictions of former officials of Waterbury, Connecticut, who had accepted bribes from real estate developers.[145] Linkage between the officials' offense conduct and federal funds was actually more remote than the connection in the instant case:

> [C]orrupt payments were made by real estate developers to secure the use of the appellants' influence with city agencies including the City Plan Commission, the Zoning Commission, the Water Department, and the Fire Marshal, and the use of their influence to further the interests of the developers in the appointments of members and chairpersons of land use boards and relevant committees and agencies in the City of Waterbury. During the relevant periods, substantial federal funds were received by Waterbury for housing, urban development, and other programs within the purview of these agencies and officials. Since federal funds were received by Waterbury for housing and urban development programs and the corrupt payments concerned real estate transactions within the purview of the agencies administering federal funds, the requisite connection between the bribes and the integrity of federally funded programs is satisfied. Thus, this is not a case where the transactions sought to

---

[143]Id. at 93.

[144]Id.

[145]Id. at 91.

54

be influenced concerned one department of a city and the requisite $10,000 of federal funds were received by a totally unrelated department.[146]

Santopietro thus stands indisputably for a purview test: To be prosecuted under § 666, a bribed official must at least influence other officials who have within their purview federally funded programs, but the corruption need not touch those programs. In other words, Santopietro asks whether a defendant could have influenced the use of federal funds by controlling the same agencies or staffers whom he actually corruptly influenced with respect to purely local matters.

Such a purview test, applied to the case at bar, supports convicting Lipscomb, who took bribes in return for influencing matters within the purviews of two Dallas departments, human services and transportation, which both received federal funds. The connection between federal funds and corrupt conduct is closer here than in Santopietro, where the court did not explain how the "City Plan Commission, the Zoning Commission, the Water Department, and the Fire Marshal" administered federal funds, but rather suggested that these agencies and officials made decisions —— presumably determining whether proposed developments complied with zoning, fire, and other codes[147] —— with respect to housing and

_____

[146]Id. at 93-94 (emphasis added; citations and internal quotation marks omitted).

[147]See United States v. Santopietro, 996 F.2d 17, 18 (2d Cir. 1993) (prior merits appeal) ("Benefits to certain bankers and land developers included zoning changes, subdivision approvals,

55

urban development programs, likely administered by other agencies, that did receive federal funds.[148]  In other words, the federal interest in Santopietro was more remote than it is here, as Lipscomb himself cast votes to approve requests for federal funds, and himself both lobbied and pressured officials who ran federally-funded programs.

A less cumbersome and more direct purview rule would apply § 666 to defendants who themselves influence or control federal funds.[149]  Such a rule also would support convicting Lipscomb here. The Santopietro court, however, did not affirmatively adopt this rule, explicitly leaving open the question whether the former mayor could be prosecuted under § 666 for any transaction involving the city if the federal funds were entirely unrelated to that transaction.[150]  Santopietro, therefore, although confirming a nexus

---

confidential appraisal information for use in bidding on city-owned property, expedited treatment from city agencies, and input into appointments.").

[148]Santopietro, 166 F.3d at 93.

[149]This may be the rule in the Fourth Circuit, which has summarized § 666 as banning "payoffs to state and local officials who influence the distribution of federal funds." United States v. Jennings, 160 F.3d 1006, 1012 (4th Cir. 1998).  However, the offense conduct in Jennings clearly involved federally funded programs: the bribed official gave federally funded housing-construction contracts to the briber.  Id. at 1010–12.

[150]Santopietro, 166 F.3d at 94 n.3:
We need not consider whether Santopietro's role as mayor——the chief executive officer of the city and hence the officer ultimately responsible for all city departments——would render the statute applicable to corrupt payments received by him for any transaction

rule, also could be read as supporting Lipscomb's conviction under such a rule or (just possibly) as skirting the relevant question entirely. Thus, of the two cases from other circuits —— Zwick and Santopietro —— that Lipscomb relies on heavily, only Zwick could support finding § 666 unconstitutional as applied here.

D.    Federal Interests at Stake

My own review is guided by the traditional, rational-relationship test for whether a statute is necessary and proper to an enumerated federal power.[151] In this case, two federal interests support the view that Congress reasonably could have thought it necessary and proper to apply § 666 to agents and officials like Lipscomb.

    1.    Absolute Amount of Federal Dollars

The government argues that the total federal funding received by Dallas —— $56 million in 1998 —— justified federal jurisdiction over Lipscomb's conduct. Lipscomb focuses on the fact that $56 million was only 3.5% of Dallas's city budget in that year. In part, this is a dispute over the meaning of one passage in Zwick:

> We can conceive of several ways in which the government could prove a federal interest in a § 666 [case].... The amount of federal funds could provide the requisite federal implication, even if the purpose of those funds has no explicit relationship to the subject of the bribe. If, for example, in a given year, the greater part of a

involving the city, even though the federal funds were received for a program entirely unrelated to the program in connection with which the corrupt payments were made.

[151]See TRIBE, supra note 65, § 5-3, at 798–802, 805.

57

township's budget came from federal funds, bribery of a township agent for any purpose might be said to implicate federal interests.[152]

In the abstract, this "greater part" yardstick may have an appealing ring, but it is utterly divorced from reality.   In actuality, no state government and, I suspect, only a rare county or city government (not even the District of Columbia), is so wholly a creature of the United States as to rely on Washington for "the greater part" of its revenue.[153]  In the rare case that federal funding is a majority of total revenue, federal power to criminalize local corruption would undoubtedly exist; but surely the <u>absolute</u> level of federal grants, as well as their <u>relative</u> importance to the city's budget, would provide a federal interest, to the protection of which § 666 is necessary and proper.

To determine whether this is so ⸺ to judge if § 666 is indeed reasonably related to the federal interest in safeguarding $56 million ⸺ I would analogize the federal government and Dallas to partners in spending federal dollars to advance shared goals.  In the private sector, what would a reasonable funding partner who has advanced $56 million do after learning that its service partner takes kickbacks, albeit regarding matters not within the

---

[152]<u>Zwick</u>, 199 F.3d at 687.

[153]<u>See</u> U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES: 2001, tables 435, 437, 439, 445, 447 (121st ed. 2001) (showing total revenue and federal revenue of the states and the largest cities and counties by population).  None of the states, and none of the cities and counties listed, relies on the federal government for a majority of its revenue.

58

partnership's scope?  The funding partner might well dissolve the partnership rather than wait for the service partner's corruption to widen and infect partnership dealings.

The partnership analogy does not bear close inspection, but its failure, instead of undermining the constitutionality of § 666, actually supports it.  The analogy founders on the fact that in the public sector, states, counties, and municipalities hold monopolies on delivering many governmental services to their citizens.  Thus, when Congress seeks to benefit the citizenry of a particular state and locality, it can turn to very few potential public partners.  This scarcity suggests that if the federal-Dallas partnership were dissolved when corruption among Dallas officials is discovered — or if the federal government were to withhold funds in such a case — the purpose of the federally funded programs would be defeated, and Congress would be prevented from using the spending power to promote the welfare of citizens of Dallas.  The populace of Dallas, however, is by definition innocent of official corruption, and should not suffer a cut in federally funded services on account of it.  The prospective specter of criminal sanctions against corrupt officials themselves, rather than post-hoc, fiscally punitive measures against Dallas, is therefore a logical and appropriate solution for local corruption that threatens — even indirectly, as here — $56 million in federal funds.

The Council votes to apply for federal funds, to accept federal funds, and to approve all large contracts, including those

involving federal funds.  Congress could rationally believe that the integrity of $56 million of federal funds applied for by the Council —— particularly when the federal treasury is funding not just one or two projects but many —— suffices as a federal interest weighty enough to justify federal criminal jurisdiction over Council members who are bribed with respect to local issues.

2.    The Integrity of State and Local Officials
      with Authority over Federal Funds

A second federal interest at stake here is the integrity vel non of federal programs and funds, regardless of the quantum or budget percentage of funds at issue.  A corrupt state or city official who has real responsibility for, or often participates in, the allocation of federal funds is a "threat to the integrity"[154] of those funds, even if they are not actually or directly infected by his corruption.  Congress may legitimately view as necessary and proper the imposition of federal criminal liability for bribery, so as to ensure the honesty of state and local officials who have federal funds in their purview or federal programs under their authority.

Judge Smith advances two explicit arguments against such liability (neither of which, with respect, I find persuasive) and one implicit argument that is defeated by the text of the statute and the facts of this case.  The implicit contention is that bribery of Lipscomb alone, apart from any of his fourteen council

---

[154]Salinas, 522 U.S. at 61.

60

colleagues, cannot create a sufficient federal interest or nexus, because Lipscomb cannot act for the Council. This argument might also be grounded in the fact that, alone, one legislator does not administer program funds. The text of § 666 disposes of this argument, as a statutory matter, because Congress clearly sought to apply § 666 to legislative-branch officials.[155] As a constitutional matter, there is little or no basis for holding that federal jurisdiction over bribery of Council members depends on whether the briber can command a majority. One Council member's vote, after all, can tip the balance on a close question; and, as Lipscomb's conduct here demonstrates, a member has a number of arrows in his parliamentary quiver besides the final vote.

Judge Smith also speculates that the State of Texas would have prosecuted Lipscomb had it known of the evidence against him. This is not a constitutional argument; it merely begs the constitutional question regarding the limits of the spending power.[156] And, as

---

[155]Lipscomb is an "agent" under the statute because he is an "officer" of Dallas. 18 U.S.C. § 666(d)(1) (2000). Even if he were merely an agent of a "subdivision of the [ ] legislative... branch of government," the statute's text would still cover him. 18 U.S.C. § 666(d)(2) (2000).

[156]See United States v. Bailey, 990 F.2d 119, 126 (4th Cir. 1993) (citations omitted):

We find no merit to this claim.... [T]he Tenth Amendment does not prohibit the federal government from enforcing its laws, even when there are state laws addressing the same criminal act.
. . .
Although South Carolina could have brought state criminal charges against Bailey based upon the same facts, this does not prevent the United States from

either a positive or a normative statement —— that the federal government either does or should leave such prosecutions to the states —— it fails. There are at least three reasons why federal rather than state bribery prosecutions might be necessary and proper in cases like Lipscomb's. First, the federal government might have a greater incentive to prosecute than does the state government, either because the offense conduct directly or potentially affects federal funds or because the federal government provides more money to the locality than does the state government.[157] The latter proposition is true in this case: In terms of dollars provided to Dallas, the federal government has a stake in the city's fiscal integrity that is between fifteen and twenty times greater than the state's stake.[158]

Second, federal officials might be less corruptible than state

_____

enforcing its criminal statutes.

[157]Both reasons were part of the Senate Judiciary Committee's thinking in recommending that the Senate enact § 666. See S. REP. No. 98-225 at 369, reprinted in 1984 U.S.C.C.A.N. at 3510:
> In many cases, such prosecution is impossible because title has passed to the recipient before the property is stolen, or the funds are so commingled that the Federal character of the funds cannot be shown. This situation gives rise to a serious gap in the law, since even though title to the monies may have passed, the Federal Government clearly retains a strong interest in assuring the integrity of such program funds. Indeed, a recurring problem in this area (as well as in the related area of bribery of the administrators of such funds) has been that State and local prosecutors are often unwilling to commit their limited resources to pursue such thefts, deeming the United States the principal party aggrieved.

[158]See Part I.B., supra (discussing jurisdictional facts).

62

and local officials,[159] and an informant with evidence of misconduct by a state or local official might feel safer in taking his information to federal authorities; indeed, he could even prefer that it not be shared with state or local authorities.  Third, federal prosecutors are less likely to be linked to state and local politicians and are generally more independent of local political forces that might try to protect high officials from aggressive state enforcement.

Judge Smith's second contention against high-official liability is a law-and-economics argument that, in my opinion, does not hold water and affords courts little basis, if any, on which to pronounce a statute unconstitutional, whether facially or as applied.  As I understand his argument, it is that if courts permit the United States as well as states to prosecute high local officials for bribery involving <u>local</u> funds and programs, corrupt officials will change their behavior and, on the margin, take more bribes directly related to <u>federal</u> funds and programs than they otherwise would.[160]  With respect, I perceive at least three flaws

---

[159]<u>See</u> RICHARD A. POSNER, ECONOMIC ANALYSIS OF THE LAW 698 (5th ed. 1998) (emphasis added):
> Some federal criminal jurisdiction can be explained by reference to the point...that monopolies of political power are more easily achieved at the state than at the federal level.  Federal criminal prosecutions of corrupt local government officials exploit the relative incorruptibility of federal officials — stemming from the greater costs of corrupting a federal agency... — in order to reduce corruption at the local level.

[160]<u>See</u> <u>infra</u> at ___.

of logic in this argument.

First, social science has not yet proven that the rational-actor model adequately explains the real-world behavior of white-collar criminals: As behavioral law and economics warns us, inadequate information, biases, and heuristics often prevent individuals from acting rationally. For example, unless a local official is well integrated into a culture of white-collar criminality (which would itself suggest that federal prosecution may be necessary), he will lack even anecdotal data on the probability that either the state or the federal government will detect and prosecute bribery. (Anecdotal data would, of course, be the only data available.) Therefore, an official considering whether to take a bribe would not be likely to calculate the odds of detection or prosecution in the dispassionately mathematical way that the rational-actor model might suggest.

Furthermore, standard law-and-economics analysis actually justifies federal criminal jurisdiction on the basis of interstate externalities, an argument eminently applicable here.[161] If bribery in Dallas threatens federally-provided funds, that corruption threatens the federal Treasury, which is funded by taxes collected not just from Texas but from all across the Nation.

Lastly and most importantly, even if Judge Smith's law-and-economics objection to federal jurisdiction here were an accurate

---

[161]See POSNER, supra note 120, at 697.

predictor, it has little force. The most that his prediction might prove is that Congress has deluded itself into passing a law that may be self-defeating, because it increases the vulnerability of federal funds to corruption and thus disregards economic facts. "But a law can be both economic folly and constitutional."[162] A means-ends tradeoff, weighing costs against benefits, is precisely the sort of political judgment that members of Congress are entitled —— and better equipped than judges —— to make, and that courts should generally defer to. As judges, we do not experience the perils attendant on taxing one's own constituents, do not enjoy the political significance of bringing home the fiscal bacon, and do not share the frustration of seeing hard-won federal dollars bleed off through the hands of corrupt local officials. Lacking the power to tax and spend, federal judges should defer to a plausible risk-reward construct that Congress has enacted to protect the federal fisc.

E.    Constitutional Limits to § 666?

Lipscomb strongly argues that if § 666 constitutionally criminalizes conduct like his by state and local agents, then there are no limits to its sweep, and federal criminal law extends to briberies totally removed from federal funds. As I have analyzed Lipscomb's constitutional challenge to the statute as it applies to him, I need not determine here whether there is a constitutional

---

[162]CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 96-97 (1987) (Scalia, J., concurring).

limit on § 666's reach.  A brief comment is nonetheless in order.

As a statutory matter, even Westmoreland — our broadest (and controlling) reading of § 666 — did not address whether § 666 can reach the lowest levels of state and local bureaucracies. Westmoreland did, however, advert to the limits in the statute's text:

> [T]he statute does not encompass every local bribery as Westmoreland suggests.  Although the extent of the federal government's assistance programs will bring many organizations and agencies within the statute's scope, the statute limits its reach to entities that receive a substantial amount of federal funds and to agents who have the authority to effect significant transactions.[163]

As a constitutional matter, under the Necessary and Proper Clause, the test is whether prosecution would be rationally related to a federal interest — that is, to effecting Congress's spending power.  In this case, two already-noted federal interests justify applying § 666 to Lipscomb's conduct: (1) the total amount of federal funds extended to Dallas and (2) Lipscomb's purview — his high rank and his broad influence over many programs that receive federal funds.  Of these two interests, his purview would easily accommodate, in another case, the Second Circuit's hypothetical implication in Santopietro that it could not be necessary and proper to the spending power for federal criminal liability to extend to a corrupt city meat inspector when the city receives

---

[163]Westmoreland, 841 F.2d at 578.

federal funds only for its parks.[164]  That case is not before us today, however, so I need not predict, in double _dicta_, whether there might be categories of prosecutions under § 666 that are not necessary and proper to the spending power.  For today's purposes it is sufficient to note that if there are such categories, Lipscomb is far removed from them.

F.  Conclusion

The constitutional argument in this case boils down to how _direct_ must local corruption's threat to federal funds be for § 666 to apply.  Lipscomb insists that, although federal funds need not be directly involved in the offense conduct, the state or local official's conduct still must threaten the integrity of federal funds more directly than did his.  Not so.  The foregoing analysis has shown that (1) the text of § 666 reads otherwise; (2) the legislative history does not clearly contradict it (as it must to override a clear criminal statute[165]); and (3) our controlling precedents on point reject such a limit.  Reduced to the bare

---

[164]_Santopietro_, 166 F.3d at 93.  Meat inspection is very much a federal responsibility, however, and the Second Circuit may have overlooked the Federal Meat Inspection Act, 21 U.S.C. § 601 _et seq._, especially 21 U.S.C. § 622 (banning bribery of meat inspectors employed by the United States).

[165]_Salinas_, 522 U.S. at 57 ("Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language.  Only the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language.") (quoting United States v. Albertini, 472 U.S. 675, 680 (1985)) (further citations, internal quotation marks, and brackets omitted).

essentials, application of § 666 to Lipscomb's conduct is indeed <u>reasonably related</u> to a <u>federal interest</u>, and thus is <u>necessary and proper</u> to Congress's exercise of its <u>spending power</u>. Congress could have believed, quite legitimately, that preventing federal funds from passing through state and local legislative bodies whose members are corrupt, and to do so with the deterrent of criminalizing the legislators' corruption, even with respect to purely state or local issues, was necessary and proper to the federal spending power. As courts can require of Congress nothing more than such a rational relationship to the spending power, § 666 is constitutional as applied here.

## VII. VENUE

Having established that the federal courts have jurisdiction of this case, we turn to Lipscomb's assignments of reversible error by the district court. Chief among these is his contention that the court abused its discretion in transferring the trial from Dallas to Amarillo <u>sua sponte</u>, shortly before trial, and over Lipscomb's objection.

A. <u>The Transfer Order</u>

The district court read its unexpected transfer order into the record at the end of a hearing on December 20, 1999. The order reads, nearly in its entirety:

> As everyone knows this case will involve the trial of one of the best[-]known sitting elected officials in the Dallas/Fort Worth metroplex for allegations of public corruption. This Court cannot recall such a trial of a sitting elected official in Dallas for allegations of

68

public corruption.   This case has already received significant media attention and undoubtedly will receive more.

The Court notes that both sides have requested or not opposed requests for individual voir dire examination of the prospective jury panel and both sides have requested use of a jury questionnaire.  Both motions, unusual and rare motions in federal criminal cases in Dallas, are made precisely because of the high profile of Defendant Lipscomb, a Dallas City Councilman of twelve years['] experience and one of the most influential and well[-]known political leaders in the Dallas African[-]American community for the last three decades.  Councilman Lipscomb has been an effective representative of his constituency and locally has strong supporters and detractors.  These facts will obviously make selection of a jury of twelve with no preconceived opinions about Al Lipscomb no easy task.

As stated this case has thus far generated substantial publicity in the local media and will generate more throughout the trial.  Such coverage has resulted in the Court reading in the newspapers certain information that has been filed under seal.  The Court is also concerned about the ability to select a fair and impartial jury.

In considering the various motions regarding jury selection that both sides have filed[,] the Court is not convinced that such measures would be sufficient to assure Councilman Lipscomb, the other defendants, and the Government a fair trial.  It is this Court's fervent desire and absolute obligation to see to it that a fair trial is conducted —— fair to both the defendants and the Government.  This Court will do all in its power under the law to make sure the verdict in this case is based on the evidence presented in the courtroom, and absolutely nothing else.

There is no "divisional" venue in criminal cases under Federal Criminal Rule [sic] of Procedure 18.  Since the 1966 amendment of this rule[,] providing for prosecution to be had in the district in which the offense was committed, a division of a federal judicial district is no longer a unit of venue in criminal cases.  United States vs. Burns, 662 F.2d 1378 (11th Cir., 1981); Zicarelli vs. Gray, 543 F.2d 466 (3rd Cir., 1976).  Within[-]district transfers of criminal cases are allowed under the law in this circuit.  See United States vs.[ ]Bridges, 551 F.2d 651 (5th Cir. 1977) and United States vs. James, 528 F.2d 999 (5th Cir. 1976), cert. denied, 97 S.Ct. 382, 770.  Indeed, this Court disposed

69

of <u>all</u> criminal cases filed in the Wichita Falls Division of the Northern District of Texas (about 100 cases) over a 4 ½ year period (1994 to 1999) in the Dallas Division of the Northern District of Texas. The law is clear that in the Court's sound discretion, after considering the statutory elements, which this Court has done, this case may be tried anywhere within the Northern District of Texas.

Amarillo is a good[-]size[d] city[,] serviced by several airlines and is only a five[-]hour drive from Dallas. No defendant is indigent and all have retained, as opposed to appointed, council [sic]. The Court has made a careful analysis and given due consideration of the convenience of the witnesses and the parties, and considered the prompt administration of justice. These considerations, coupled with the concerns for selection of an impartial jury as expressed by the parties in their pretrial motions, as well as all the concerns the Court has expressed above, causes [sic] the Court to find that the prompt administration of justice would best be effectuated by having the trial of this case in the Amarillo Division of the Northern District of Texas.

...

The Court is absolutely convinced that the prompt administration of justice will best be served by conducting this trial in Amarillo, where it is unlikely [sic] that few, if any on the jury panel will have ever heard of Al Lipscomb or Floyd Richards, and fewer still, if any[,] will have any preconceived ideas or opinions about them. This will help assure that the jury verdict is based on the merits of the evidence presented in the courtroom, and nothing else.

Before the issuance of this order, no party had presented evidence regarding prejudice from pretrial publicity or regarding any other issue relative to venue. On hearing the order read, lawyers for Lipscomb and his co-defendant, Richards, objected. Lipscomb filed written objections nine days later —— objections on which the court did not rule before the trial began, as long scheduled, on January 11, 2000, in Amarillo, some three hundred miles from Dallas.

In a motion for a new trial following his conviction, Lipscomb

70

renewed his objections to the venue transfer, which motion the district court later denied.  Also after trial, the government filed thirty-seven newspaper articles about Lipscomb's case that had appeared from March through December 19, 1999, as well as other articles that appeared after the transfer order — none of which had been in the record when the transfer order issued and none of which were so much as mentioned by the district court.

B.    Standard of Review: Abuse of Discretion

We review all questions concerning venue under the abuse of discretion standard.[166]   In general, "[a] district court by definition abuses its discretion when it makes an error of law."[167] A district court also abuses its discretion if it "bases its decision ... on a clearly erroneous assessment of the evidence."[168] As a leading treatise on standards of review suggests, a trial court abuses its discretion "when the judge has considered the wrong factors in applying his discretion (the judgment call was made as to issues or factors not within the scope of his discretionary powers)."[169]

---

[166]United States v. Asibor, 109 F.3d 1023, 1037 (5th Cir. 1997); United States v. Alvarado, 647 F.2d 537, 539 (5th Cir. Unit A June 1981).

[167]Koon v. United States, 518 U.S. 81, 100 (1996).

[168]Esmark Apparel, Inc. v. James, 10 F.3d 1156, 1163 (5th Cir. 1994).

[169]1 STEVEN ALAN CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW § 4.01(A) (3d ed. 1999).

71

Reversal of an intradistrict transfer is proper only if a party demonstrates a "substantial ground for overturning the district court's decision."[170] In the typical case, the defendant appeals the trial court's <u>denial</u> of a Rule 18 motion to transfer venue. And, in the typical case, the defendant's appeal is unsuccessful because the district court is "not [ ] required to move the trial absent a strong showing of prejudice"[171] <u>to the defendant</u>. Some of our cases suggest that this same strong-showing-of-prejudice standard applies when, as here, the defendant seeks to block a transfer.[172] When the government is the party seeking a transfer, however, at least one case appears to require that the government have a "legitimate reason" for doing so.[173]

---

[170]<u>United States v. Dickie</u>, 775 F.2d 607, 609 (5th Cir. 1985), <u>abrogated in part on other grounds</u>, 37 F.3d 160 (5th Cir.1994), (brackets omitted) (citing <u>United States v. Malmay</u>, 671 F.2d 869, 876 (5th Cir. 1982)).

[171]<u>United States v. Duncan</u>, 919 F.2d 981, 985 (5th Cir. 1990) ("An intradistrict transfer is not required absent a strong showing of prejudice."); <u>Malmay</u>, 671 F.2d at 876. <u>See also</u> <u>Dickie</u>, 775 F.2d at 609.

[172]<u>See</u> <u>United States v. Osum</u>, 943 F.2d 1394, 1399 (5th Cir. 1991) ("[T]he transfer [requested by the government] may be granted within the trial court's discretion unless the defendant shows that a transfer would be prejudicial."). <u>Osum</u> cited only <u>Duncan</u> for this proposition, but <u>Duncan</u> actually involved a transfer motion made by the defendant. <u>Duncan</u>, 919 F.2d at 985. <u>Osum</u> also stated that "[W]e cannot in this case, given the existence of a valid reason supporting transfer and no showing of prejudice by the defendant, say that the district court abused its discretion." <u>Osum</u>, 943 F.2d at 1400.

[173]<u>Osum</u>, 943 F.2d at 1400 (finding that the transferee judge's familiarity with the conspiracy alleged in the case was a "legitimate reason").

72

Here, however, neither the government nor the defense sought transfer.

C.    Analysis

We must begin our analysis by recognizing an important distinction between intradistrict and interdistrict transfers: Only an interdistrict transfer implicates the Constitution.[174]  There is no basis for inferring the existence of a constitutional right to trial within the division where a criminal defendant lives or where a crime was committed.[175]  In one intradistrict transfer case, however, we interpreted the Sixth Amendment to mean that "it is the public policy of this Country that one must not arbitrarily be sent, without his consent, into a strange locality to defend himself against the powerful prosecutorial resources of the Government."[176]

The Federal Rules of Criminal Procedure also distinguish between interdistrict and intradistrict transfers. Rule 21 governs transfers to another district and provides that this may be done

---

[174]See U.S. CONST. art. 3, § 2, cl. 3; U.S. CONST. amend. VI.

[175]United States v. James, 528 F.2d 999, 1021 (5th Cir. 1976) (noting that the Sixth Amendment makes "no reference to a division within a judicial district"); Lafoon v. United States, 250 F.2d 958, 959 (5th Cir. 1958).

[176]Dupoint v. United States, 388 F.2d 39, 44 (5th Cir. 1967) (interpreting a prior version of Rule 18 that did not allow for an intradistrict transfer for the prompt administration of justice).

only on motion of the defendant.[177]  Rule 18, in contrast, governs

intradistrict transfers:

> Except as otherwise permitted by statute or by these
> rules, the prosecution shall be had in a district in
> which the offense was committed.  The court shall fix the
> place of trial within the district with due regard to the
> convenience of the defendant and the witnesses and the
> prompt administration of justice.[178]

Although the text of Rule 18 refers only to convenience and prompt

administration, the district court may consider other factors.[179]

---

[177]FED. R. CRIM. P. 21(a):
For Prejudice in the District.  The court upon motion of
the defendant shall transfer the proceeding ... to
another district ... if the court is satisfied that there
exists in the district where the prosecution is pending
so great a prejudice against the defendant that the
defendant cannot obtain a fair and impartial trial ... in
that district.
See also FED. R. CRIM. P. 21(b) ("For the convenience of parties and
witnesses, and in the interest of justice, the court upon motion of
the defendant may transfer the proceeding ... to another
district.").

[178]FED. R. CRIM. P. 18.

[179]See 2 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE Crim § 305,
at 339–40 & n.11 (3d ed. 2000 & supp. 2002) (collecting cases)
("There is now substantial authority for the proposition that the
court . . . may take into account numerous factors appearing in the
particular case.").  Compare FED. R. CRIM. P. 18 advisory committee's
notes to 1979 amendments:
The amendment to rule 18 does not eliminate either of the
existing considerations which bear upon fixing the place
of trial within a district, but simply adds yet another
consideration in the interest of ensuring compliance with
the Speedy Trial Act of 1974.  The amendment does not
authorize the fixing of the place of trial for yet other
reasons.  Cf. United States v. Fernandez, 480 F.2d 726
(2d Cir. 1973) (court in the exercise of its supervisory
power held improper the fixing of the place of trial "for
no apparent reason other than the convenience of the
judge").

74

In this case, the court mentioned several, which we shall evaluate in turn, and we shall rule out others that are not relevant here.

1.   Convenience

Rule 18's "due regard to the convenience of the defendant and the witnesses" militates strongly against transfer in this case. The record shows that the defendant and all witnesses resided in Dallas.  In addition, every defense attorney practiced there, and the judge was based in Dallas.  Not a single relevant event occurred outside Dallas.[180]  As "convenience of the prosecution...is not a factor to consider in changing venue,"[181] the convenience facts rarely cut as totally against transfer as they did here.

The district court did not mention these contra-transfer facts in its order.  It merely noted that Amarillo was served by several airlines, that it was a five hours' drive from Dallas, and —— perhaps inaccurately and irrelevantly —— that the defendants were represented by "retained" counsel.[182]  These facts, of course, did

---

[180]This case is thus readily distinguishable from United States v. Gourley, 168 F.3d 165 (5th Cir. 1999), where we found no abuse of discretion when the Southern District of Texas transferred a trial from the Houston division to the Laredo division.  Some of the defendant's witnesses were in Houston, id. at 171, suggesting that convenience in that case may have cut in favor of Houston; but an element of the offense conduct —— conspiracy to import cocaine —— took place "at the border near Laredo," and the crime in progress was detected in both Laredo and Houston.  Id. at 167.

[181]Dickie, 775 F.2d at 610.

[182]Although Lipscomb was not represented by court-appointed lawyers, the trial court's use of "retained" connotes that Lipscomb was paying his lawyers' fees.  The record clearly shows, however, that Lipscomb faced large legal bills, lacked the means of his own

not diminish the basic truth that trial in Amarillo was inconvenient for Lipscomb, his counsel, and all witnesses. This case is, therefore, easily distinguishable from the two cases on which the district court relied, because convenience did not militate against transfer in either of them.[183] Those cases do not support the court's <u>sua sponte</u> transfer here, and the trial court erred as a matter of law in relying on them.

## 2. Court Policy

The trial court also referred to its prior transfers of "about 100 [criminal] cases" from Wichita Falls to Dallas (less than half the distance, we note, as Dallas to Amarillo). This historical fact, however, does not support the transfer at issue. Nothing in the record shows why those transfers took place. Such reference to the court's prior venue practice verges on circularity and runs the risk of creating a <u>per se</u> rule that violates Rule 18's focus on the

---

to pay them (partly because Dallas city council members are not paid a salary), and resorted to fundraising. One article also stated that Lipscomb's lead defense lawyer had placed himself last in line for whatever money Lipscomb might manage to raise.

[183]<u>See</u> <u>James</u>, 528 F.2d at 1003, 1021–22 (showing that convenience did not militate against transfer because six of the seven defendants did not even live in state, much less in the transferring division, and four of the witnesses were in jail). In the other case relied on by the district court, the defendants never objected to the place of trial, which was only forty miles further from the place of the crime than the alternative courthouse; inconvenience, if any, was slight. <u>United States v. Bridges</u>, 551 F.2d 651, 652 & n.5 (5th Cir. 1977).

76

facts of each case.[184] To whatever extent the district court perceived from past transfers a generalized but informal policy regarding transfers as a matter of course, without reference to the permissible considerations under Rule 18 that may have supported those transfers, it committed legal error by including an impermissible consideration in its Rule 18 balancing.

As local court policy is irrelevant, and permissible convenience considerations militated strongly against transfer to Amarillo, the issue becomes whether any other legitimate factors, discernible from the record as it stood when the order was made, sufficiently supported transfer to bring this one within the range of discretionary choices to which we must defer on appeal.

3. Speedy Trial

The rule's second textual factor — "due regard to...the prompt administration of justice" — is in part a literal command that trials comply with the Speedy Trial Act.[185] This factor, however, did not support trial transfer in this case, as a review of the record shows. Lipscomb was indicted on March 4, 1999, and he appeared in court the next day. Trial was initially set for May 17, but Lipscomb moved for continuance. The court refused to continue the trial date indefinitely, instead setting a hearing for May at which counsel had to submit their schedules for the coming

---

[184]See United States v. Burns, 662 F.2d 1378, 1382–83 (11th Cir. Dec. 1981).

[185]18 U.S.C. § 3161 (2000).

77

months.  Counsel for Lipscomb had court engagements scheduled in each month from August through November of 1999, so at the hearing, all parties agreed on January 10, 2000, as the trial date.[186] Later, in November, the trial court extended the trial date one day, to January 11.  Early in December, 1999, Lipscomb filed another motion to continue the trial, which motion the district court promptly denied.  When, on December 20, the district court unexpectedly ordered the transfer, the parties already knew that (1) trial was firmly set for January 11 and (2) there was no reason to expect that voir dire would not begin on that day.  Nothing in the record suggests that facilities appropriate for the trial were unavailable in Dallas at that time.  There were thus no speedy-trial issues in this case.

The district court did characterize the possibility of a difficult voir dire as an obstacle to "prompt administration."  We do not understand the term "prompt administration" to have been promulgated in the Rules with the intention of permitting courts to avoid even attempting arduous voir dire proceedings.  Rather, the triggering purpose of the "prompt administration" amendment to Rule 18 was to clarify that district courts are authorized to fix the place of trial so as to comply with the Speedy Trial Act.[187]  That

---

[186]The scheduling order determined, pursuant to 18 U.S.C. § 3161(h)(8)(A) and (B)(iv), that the ends of justice would be best served by the new trial date.

[187]See note 137.

78

Act concerns itself solely with the timeliness of when trial <u>begins</u>, not with when either voir dire or the entire trial will <u>conclude</u>,[188] and in this circuit, trial is deemed to begin with voir dire.[189]  Because the transfer to Amarillo did not change, much less hasten, the already-scheduled start of the trial, the transfer did not accomplish the "prompt administration" of this case in the textual, speedy-trial sense.

Nevertheless, we have held that a trial court, in its discretion, may fix the place of trial with regard to factors other than convenience and prompt administration: such factors commonly include, but are not necessarily limited to, docket management, courthouse space and security, and — most importantly for this case — pretrial publicity.

### 4.   Docket Management

In the context of docket management, we have construed the term "prompt administration of justice" to refer not just to the particular case that may be transferred, but also to other trials on the court's docket.[190]  A district court may consider docket management in its Rule 18 balancing, and docket issues may even

---

[188]<u>See</u> 18 U.S.C. § 3161.

[189]<u>United States v. Howell</u>, 719 F.2d 1258, 1262 (5th Cir. 1983).

[190]<u>In re Chesson</u>, 897 F.2d 156, 159 (5th Cir. 1990).

outweigh convenience factors that point entirely the other way.[191]

But nothing in the court's remarks or in the record of this case suggests that docket management was implicated here.

    5.   <u>Logistics</u>

Another factor that a court may consider in fixing the place of trial within its district is whether a particular courthouse meets a particular trial's security requirements or other facilities needs. Courtroom availability, unsurprisingly, is a permissible consideration.[192] So too are the amount of jail space available there for defendants or witnesses[193] and the adequacy of security arrangements in a particular criminal trial.[194] Even so,

---

    [191]Thus, when the Western District of Louisiana was at two-thirds its authorized strength, and the trial judge not only resided in Monroe, Louisiana, but also had other civil and criminal matters on his docket there, he did not abuse his discretion by transferring an anticipated three-week trial there from Lake Charles, Louisiana, 150 miles away, over the defendants' objections that they, their witnesses, and their counsel lived and worked in the Lake Charles area. <u>Chesson</u>, 897 F.2d at 157–59. In another case, even though the offense was committed in Greenville, Mississippi, and all the witnesses, counsel, and defendants were located there, the district court did not abuse its discretion by fixing the place of trial at Oxford, Mississippi, where the district court had other cases scheduled. <u>United States v. Harris</u>, 25 F.3d 1275, 1277–78 (5th Cir. 1994).

    [192]<u>United States v. Faulkner</u>, 17 F.3d 745, 757 & n.13 (5th Cir. 1994) (listing courtroom availability as one of the considerations that prevented an intradistrict transfer from rising to the level of plain error, which was the applicable standard of review because defendants had failed to preserve error).

    [193]<u>United States v. McKinney</u>, 53 F.3d 664, 673 (5th Cir. 1995).

    [194]<u>Harris</u>, 25 F.3d at 1278 ("Rule 18 allows a court to consider 'the prompt administration of justice' in fixing the place of trial, and 'matters of security clearly fall within that

the record and transfer order here are devoid of any indication that such logistical considerations played any role in the transfer from Dallas to Amarillo, and no party argues to us that they did.

6.    Pretrial Publicity

Pretrial publicity, then, is the only factor that might counterbalance convenience and render the transfer to Amarillo a proper exercise of discretion.  We have not delineated the quality or quantity of prejudicial publicity that will support a trial court's sua sponte transfer in the face of countervailing convenience factors.  We have, however, defined the opposite end of the zone of deference for interdistrict transfers:  When pretrial publicity is the basis for a defendant's motion to transfer to another district under Rule 21, a trial court errs as a matter of law in denying such a motion only if the defendant can show that pretrial publicity inflamed the jury pool, pervasively prejudiced the community against the defendant, probatively incriminated the defendant, or exceeded "the sensationalism inherent in the crime."[195]

Here, the district court neither identified nor analyzed the publicity that it conclusionally relied on as sufficiently prejudicial to require a highly inconvenient transfer over the

consideration.'") (quoting FED. R. CRIM. P. 18 and United States v. Afflerbach, 754 F.2d 866, 869 (10th Cir. 1985)).

[195]United States v. Parker, 877 F.2d 327, 331 (5th Cir. 1989).

defendant's objections.[196]   Indeed, until after the trial, the

record did not even contain copies of the publicity at issue.

(Notably, we have not found one criminal case in which the trial

court inferred prejudice justifying a transfer from publicity of

which it merely took judicial notice.[197])   The court did nothing

more than globally label the unspecified publicity as "significant"

and "substantial" and state that voir dire in Dallas would be "no

easy task."[198]   But surely, this is not the standard for determining

whether pretrial publicity renders a trial unfair.   The court's

lack of record documentation or analysis on this point is

particularly troubling in light of our acknowledgment that "[e]very

claim of potential jury prejudice due to publicity must turn upon

its own facts."[199]

Despite the trial court's statement to the contrary, it was

not that court's duty, in ensuring a fair trial, to select "a jury

---

[196]Although the court did state that the media had reported
material filed under seal, the only sealed material in the record
on appeal is Lipscomb's pre-sentencing report.  We therefore have
no way of evaluating the prejudice of the reports to which the
court referred and reviewing the court's reasoning on this point.

[197]The government points us to In re Agent Orange Product
Liability Litigation, 818 F.2d 145, 169 (2d Cir. 1987), but that
was not a criminal case, and the court there took notice of the
publicity to evaluate not prejudice among the venire pool but the
sufficiency of notice to potential class members.

[198]We are somewhat troubled by the implication in this remark
that, foreseeing a lengthy jury-selection process in Dallas, the
court may have become concerned for its own convenience.

[199]United States v. Aragon, 962 F.2d 439, 444 (5th Cir. 1992).

82

of twelve with no preconceived opinions about Al Lipscomb."  This simply is not the applicable standard.  The law is actually much more realistic:

> Qualified jurors need not [ ] be totally ignorant of the facts and issues involved.
>     "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."[200]

A defendant's right to a fair trial is violated only if he shows that "the trial atmosphere was 'utterly corrupted by press coverage.'"[201]  Therefore, even if inflammatory pretrial publicity did saturate the community, raising a presumption of prejudice to the defendant, the government can usually rebut this presumption through voir dire that ferrets out such prejudice.[202]  In this case, to the extent that the district court focused on prejudice to the government, it failed to give Lipscomb any opportunity to rebut that presumption through voir dire.

The exception to this rebuttable-presumption rule regarding prejudicial publicity was announced by the Supreme Court in Rideau

---

[200]Murphy v. Florida, 421 U.S. 794, 799-800 (1975) (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).  See also Dobbert v. Florida, 432 U.S. 282, 302 (1977) (same).

[201]Black v. Collins, 962 F.2d 394, 409 (5th Cir. 1992) (quoting Dobbert, 432 U.S. at 303).

[202]Parker, 877 F.2d at 331 (quoting United States v. Harrelson, 754 F.2d 1153, 1159 (5th Cir. 1985)).

v. Louisiana,[203] in which a defendant's uncounselled, taped confession had been broadcast three times to two-thirds of a small community, rendering the venire pool presumptively prejudiced against him, so that confirmation of this prejudice through voir dire was not necessary.[204]  From Rideau we derived the following rules for habeas cases:

> where petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, jury prejudice is presumed and there is no further duty to establish bias.
> ...
> Given that virtually every case of any consequence will be the subject of some press attention, however, the Rideau principle of presumptive prejudice is only rarely applicable, and is confined to those instances where the petitioner can demonstrate an extreme situation of inflammatory pretrial publicity that literally saturated the community in which his trial was held.[205]

Despite this standing caution against presuming prejudice, the trial court in this case essentially created out of whole cloth a Rideau exception for cases in which publicity is unfavorable to the government and (we infer) jury nullification is possible.  Even if such a rule were proper, however, the record of this case would not support its application.

Lipscomb contends that such a rule would not be proper, urging

---

[203]373 U.S. 723 (1963).

[204]Id. at 724.

[205]Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980) (citations, brackets, and internal quotation marks omitted).

that in fixing the quantum of prejudicial publicity that renders a highly inconvenient transfer discretionary, we should distinguish between publicity prejudicing the defendant and publicity prejudicing the government. Essentially, he proposes that publicity prejudicial to him may justify transfer, but publicity prejudicial to the government cannot. To support this contention, he points to the Advisory Committee Notes to Rule 18, which state:

> If the court is satisfied that there exists in the place fixed for trial prejudice <u>against the defendant</u> so great as to render the trial unfair, the court may, of course, fix another place of trial within the district (if there be such) where such prejudice does not exist. Cf. Rule 21 dealing with transfers between districts.[206]

Rule 21 — which some courts find illuminative of Rule 18[207] — requires an <u>inter</u>district transfer for prejudice if the defendant requests it and the court determines that "there exists in the district where the prosecution is pending so great a <u>prejudice against the defendant</u> that the <u>defendant</u> cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."[208]

We cannot entirely accept Lipscomb's suggested distinction, because we have in fact upheld a <u>sua sponte</u> <u>intra</u>district transfer — to a division unrelated to the offense conduct, as here, and

---

[206]FED. R. CRIM. P. 18 advisory committee's notes to 1966 amendments (emphasis added).

[207]See <u>United States v. Walker</u>, 890 F. Supp. 954, 958 n.5 (D. Kan. 1995) (collecting authorities).

[208]FED. R. CRIM. P. 21(a) (emphasis added).

85

over the objection of the defendant —— to cleanse the trial of the effects of publicity prejudicing the government.  Yet, as Lipscomb correctly notes, whenever we have upheld a <u>sua sponte</u> transfer over the defendant's objection (whether the prejudice from publicity was to the government or to the defendant), a mistrial had already demonstrated that the venire pool had been badly tainted by publicity and that retrial within the transferring division would pose virtually insuperable difficulties.

Our most recent ruling to this effect, in <u>United States v. Gonzalez</u>,[209] exemplifies this pattern: The defendant's first trial was interrupted by two bomb threats and ended in a hung jury, and his second trial ended in a mistrial after three jurors reported that they received anonymous phone calls urging them to convict.[210] "[C]onsiderable publicity...from the first two trials" resulted.[211] Under such easily distinguishable circumstances, the trial court did not abuse its discretion in ordering an intradistrict transfer <u>sua sponte</u>.[212]  To the same effect are our decisions in <u>United States v. Weddell</u>[213] and <u>United States v. Dickie</u>.[214]

---

[209]163 F.3d 255 (5th Cir. 1998).

[210]<u>Id.</u> at 259.

[211]<u>Id.</u>

[212]<u>Id.</u> at 260.

[213]800 F.2d 1404, 1406 (5th Cir. 1986).

[214]775 F.2d 607 (5th Cir. 1985).

United States v. Faulkner[215] involved prosecution of businessmen who developed condominium projects and in the process exhausted the funds of several savings and loan associations in the Dallas area.[216] The "I-30 scandal" generated 1,100 newspaper articles, an ad in a gubernatorial campaign mentioning a defendant in a negative light, and such a public awareness of the case that 60% of Dallas residents had formed an opinion that one defendant was guilty.[217] After the first trial —— held in the Lubbock division of the Northern District —— ended in a mistrial, the trial court attempted voir dire in Dallas itself, but dismissed the panel after several days because of the effect of pretrial publicity.[218] The court then granted the defendants' motions to transfer venue, moving the case to the El Paso division of the Western District, where the trial court sua sponte transferred the case yet again, to the Midland division of the same district.[219] On appeal, given the unproblematical interdistrict transfer, we held that the second, sua sponte transfer did not amount to plain error.[220]

No case of ours, therefore, stands squarely for the

---

[215]17 F.3d 745 (5th Cir. 1994).

[216]Id. at 751–54, 756.

[217]Id. at 756 & n.9.

[218]Id. at 754.

[219]United States v. Faulkner, 17 F.3d at 754–55.

[220]Id. at 757–58.

proposition that the government urges us to accept, i.e., that for purposes of the venue of a defendant's initial trial, pretrial publicity alone would permit the trial court, <u>sua sponte</u> and without a supporting record, to order an intradistrict transfer to a division entirely unrelated to the offense conduct, and in the process overrule the defendant's objection, giving no regard to convenience, making no attempt at voir dire, and expressing only a generalized desire to ensure that the government, as well as the defendant, receive a fair trial.

In his dissent, Judge Smith urges that the government's proposed rule is embodied in <u>United States v. Alvarado</u>.[221]  Even a cursory reading of <u>Alvarado</u>, however, shows that our terse discussion of the transfer issue there is entirely silent on several key questions: (1) Did the district court in that case transfer the case <u>sua sponte</u>; (2) if the transfer was <u>sua sponte</u>, did the district court create a record that showed prejudice by analyzing publicity or by attempting <u>voir dire</u>; (3) by what standard did the district court determine the publicity to be prejudicial; and (4) what was the nature of the publicity itself?[222] From the opinion, none of these issues appears to have been contested.  As far as the <u>Alvarado</u> opinion goes, the defendants' argument was founded entirely on a mis-citation and

---

[221]647 F.2d 537 (5th Cir. Unit A June 1981).

[222]<u>Id.</u> at 539–40.

misunderstanding of the criminal venue statutes.[223]  Research into the district court case confirms not only that the Alvarado defendants actually moved to transfer, but also that they asked (unsuccessfully) that a newspaper reporter be instructed not to print anything concerning the rejection of a plea agreement, lest such publicity prejudice the case.[224]  The Alvarado district court held an evidentiary hearing on the defendants' motion to transfer "due to publicity in the area" and took the motion under advisement until after voir dire on publicity was concluded.[225]  At that point, the district court denied the motion[226]; but the court later reconsidered that denial and granted the motion after a witness caused a mistrial by testifying that defendants had pled guilty.[227]

All these facts provide context for, and render entirely understandable, the silence of our Alvarado opinion.  These facts also completely distinguish Alvarado from this case: The Alvarado

---

[223]Id. at n.4.

[224]See proceedings in United States v. Martinez, No. Cr. B-78-29 (S.D. Tex., Brownsville Div.), particularly the docket sheet entries for 8/17/79 (motion regarding newspaper reporter made and rejected); 8/24/79 and 8/27/79 (motions to transfer made). Martinez was the caption of Alvarado in the district court until the transfer of proceedings against fourteen defendants, at which point the case became United States v. Alvarado, No. Cr. V-79-4 (S.D. Tex., Victoria Div.) —— the case appealed to us.

[225]Martinez, docket sheet at entry for 8/28/79.

[226]Id. at entry for 8/30/79.  The court also denied a motion for mistrial based on some jurors having been seen with a newspaper.  Id. at entry for 9/17/79.

[227]Id. at entry for 9/21/79.

89

trial court did <u>not</u> transfer the case <u>sua sponte</u> as did the <u>Lipscomb</u> court; and the <u>Alvarado</u> defendants advocated transfer, unlike Lipscomb, who vigorously opposed it. Rather than undermine our conclusion here, the <u>Alvarado</u> facts confirm our impression that the transfer in the instant case was quite unusual. Any court that views <u>Alvarado</u> as trumping today's holding under our rule of orderliness will have been led into serious error.[228]

We have found only one case (from another circuit) that comes close to supporting the proposition for which the government contends, but that case ultimately is unpersuasive. In <u>United States v. Mabry</u>,[229] a defendant moved for individual voir dire regarding pretrial publicity.[230] The trial court interpreted this motion as raising a concern about whether trial in the Albuquerque division of the district of New Mexico would be fair —— seemingly

---

[228]The dissent's reliance on two other cases is similarly misplaced. <u>United States v. Kaufman</u>, 858 F.2d 994, 1006 (5th Cir. 1988) is entirely irrelevant here, because docket management is, as we have noted, a permissible factor in the Rule 18 balancing, but one that is entirely absent from this record. The reasoning of the other Fifth Circuit case that the dissent relies on is also easily understood:

> [T]he Southern District of Texas was the *only* district in which (at least absent further evidence) venue was initially proper as to all counts. While this does not prevent a Rule 21(b) transfer of all counts to another district, it is at least an indication that the government's selection of the forum was not arbitrary. We conclude that the district court did not abuse its discretion in denying Fagan's Rule 21(b) motion.

<u>United States v. Fagan</u>, 821 F.2d 1002, 1008 (5th Cir. 1987).

[229]809 F.2d 671 (10th Cir. 1987).

[230]<u>Id.</u> at 683.

to the defendants, not to the government — and transferred the case, over the defendants' objections, to Roswell,[231] which we estimate to be some two hundred miles from Albuquerque. On appeal, the Tenth Circuit found no abuse of discretion: "There was no substantial inconvenience to the defendants or the witnesses as a result of the transfer and no real prejudice has been demonstrated."[232]

We discern several reasons not to follow the Mabry result here. First, the Mabry district court did not appear to transfer the case out of concern that the government receive a fair trial. To this extent, Mabry actually supports Lipscomb's contention on that point. Second, the cases on which the Tenth Circuit relied buttress Mabry's result only weakly, if at all.[233] Third, Mabry's transfer holding has been largely ignored by other courts, perhaps because the Supreme Court later abrogated Mabry's entrapment-instruction holding.[234] Mabry is thus hardly persuasive authority

---

[231]Id.

[232]Id.

[233]See United States v. Raineri, 670 F.2d 702, 706 (7th Cir. 1982) (finding no abuse of discretion where trial court refused to transfer case to towns that lacked federal courthouses); Burns, 662 F.2d at 1383 (reversing the trial court's transfer order that was based conclusionally on the district's court's policy of consolidating criminal trials in one courthouse); United States v. Young, 618 F.2d 1281, 1288 (8th Cir. 1980) (restating the general rule that a defendant has no constitutional right to be tried in a particular district).

[234]See United States v. Whalen, 976 F.2d 1346, 1348 n.1 (10th Cir. 1992) ("Mabry has since been indirectly overruled by Mathews

here.

The district court here did not learn through hard experience that voir dire would be challenging. It developed no facts to suggest that the pretrial publicity presumptively or actually tainted the jury pool; it failed to analyze the publicity itself for prejudice; it applied a wrong and unrealistically high standard to determine whether the putative jury would be prejudiced; and it relied on cases of ours that are not on point. There is a plethora of support for holding that the district court abused its discretion in transferring Lipscomb's case to Amarillo.

7. Summary

Both our precedents and persuasive authorities from other courts suggest, even if only by negative implication, that this case's facts and proceedings make it a true outlier in the Rule 18 jurisprudence. In concluding that there was no abuse of discretion in the aforementioned cases, neither we nor the other courts have purported to fix any bright-line boundary of that discretion. We are constrained to set one such limit by example, however, believing that the district court's doctrinal mistakes and clear factual errors make this case an appropriate vehicle with which to circumscribe at least one boundary of the use of Rule 18 discretion. When as here, facts of convenience militate exclusively against transfer, and no factor other than pretrial

v. United States, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988).").

92

publicity —— some favorable and some unfavorable to both the prosecution and the defense —— might, if properly developed and analyzed, militate in favor of transfer, the trial court abuses its discretion under Rule 18 by ordering a far-distant intradistrict transfer, sua sponte and over the defendant's objections, without (1) attempting voir dire or otherwise creating a record, (2) providing an analysis of the publicity for the record to show how it prejudiced the jury pool, or (3) conducting a Rideau-style presumptive analysis.  In this instance, we as an appellate court can detect virtually nothing on the Rule 18 scale to counterbalance the defendant's established inconvenience; and something outweighs nothing every time.

Given the district court's abuse of discretion, we must reverse Lipscomb's conviction, vacate his sentence, and remand for a new trial in a venue determined consistently with this opinion.

## VIII. CONCLUSION

The trial court had jurisdiction to try Lipscomb for violating 18 U.S.C. § 666, which is facially constitutional and —— in my own sole opinion —— is constitutional as applied to him.  As we conclude that the trial court abused its discretion in transferring Lipscomb's trial, however, we must reverse and remand for a new trial.  The other issues Lipscomb raises on appeal are either moot, meritless, or irrelevant to a new trial.

CONVICTION REVERSED, SENTENCE VACATED, AND CASE REMANDED for a new trial.

93

DUHÉ, Circuit Judge, CONCURRING IN PART, DISSENTING IN PART:

I write separately because, although I concur in the conclusion reached by Judge Wiener that we must reverse Lipscomb's conviction, vacate his sentence, and remand for a new trial, I cannot join his method of getting there. I adopt Judge Wiener's factual and procedural background sections; concur in the result but not the reasoning of Part III; dissent from Parts IV, V, and VI; and concur in Part VII. I begin with an overview of the appropriate analytical framework.

## I. ANALYTICAL FRAMEWORK

Judge Wiener's opinion merges analysis of jurisdiction with analysis of the constitutionality of § 666. In Part IV of his opinion, Judge Wiener writes that the term "federal jurisdiction" is ambiguous, and defines it for purposes of this case as encompassing (a) the question whether we have subject matter jurisdiction under § 666 over Lipscomb's conduct (which Judge Wiener calls "adjudicative jurisdiction"), and (b) the question whether Congress had the authority to enact § 666 (which Judge Wiener terms "legislative jurisdiction", and we term constitutionality). In this manner, Judge Wiener reaches the constitutionality of § 666, by calling it a jurisdictional question. With all due respect, this is a categorization with no support.

Jurisdiction is discussed in terms of "legislative" and "adjudicative" in only one context in American law – native

American law.[235] This case does not arise in that context, so we must follow the generally applied definition of "federal jurisdiction".

Black's Law Dictionary defines "federal jurisdiction" as "powers of federal courts founded on United States Constitution (Article III) and Acts of Congress (e.g. Title 28 of United States Code)".[236] Federal jurisdiction is *not* defined as the power of Congress to enact a statute. Professor Erwin Chemerinsky's treatise on the subject, widely regarded as comprehensive, not once mentions legislative jurisdiction or the power of Congress to enact statutes.[237] The only discussion of congressional authority is Congress' authority to control federal jurisdiction, and

---

[235] See Strate v. A-1 Contractors, 520 U.S. 438, 440, 117 S.Ct. 1404, 1406, 137 L.Ed. 2d 661 (1997); Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 12, 107 S.Ct. 971, 974, 94 L.Ed. 2d 10 (1987); Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1507 n.6 (10th Cir. 1997); Louis v. United States, 967 F. Supp. 456, 459 (D. N.M. 1997). Judge Wiener cites Justice Scalia's dissenting opinion in Hartford Fire Ins. Co. v. California, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed. 2d 612 (1993) as support for his contention that the term "jurisdiction" can mean both legislative and adjudicative jurisdiction. However, Justice Scalia's words do not support Judge Wiener's application. In Hartford Fire, Justice Scalia was faced with determining the extraterritorial reach of a statute – a constitutional issue placed by the parties before the Court – and to do so he had to consider whether Congress had the power to enact the statute with application outside our borders. This, he termed "legislative jurisdiction". Hartford Fire, 509 U.S. at 813-14, 113 S.Ct. at 2918-19. He did not term it "jurisdiction" as a means of raising extraterritoriality *sua sponte*, in an end-run around our requirement that parties argue those issues they wish before us.

[236] Black's Law Dictionary 612 (1990).

[237] See Erwin Chemerinsky, Federal Jurisdiction (1994).

96

congressional power to create courts.[238] Neither of these questions is before us.

Moreover, Lipscomb explicitly asked that we find no *subject matter jurisdiction*. "The alleged bribery here had no connection to a federally funded program and, thus, the court below was without subject matter jurisdiction to proceed."[239] Even if Judge Wiener's categorization can find support in the law, Lipscomb explicitly seeks a determination of adjudicative, not legislative jurisdiction.

Judge Wiener's categorization fails when extended to its logical conclusion, which he affirmatively does in his opinion. He writes: "[A] federal forum must lack adjudicative jurisdiction to hear a case based on a federal statute that Congress lacked the legislative jurisdiction (translation: constitutional power or authority) to apply to the situation in question." This implies that federal courts must *always* consider constitutionality, even raising it *sua sponte*, when interpreting a statute. This elevates constitutionality to a category of claims over which we *always* have jurisdiction, and this is unsupported by our jurisprudence.

For the foregoing reasons, I respectfully submit that Judge Wiener's is an erroneous analytical framework, and leads to inappropriate consideration of the constitutionality of § 666. For

---

[238] See id. at 167–246.

[239] See App. Brief at 28.

this reason, I believe it necessary to outline the appropriate analytical framework.

As a threshold matter in all cases, we are faced with the question whether we have personal and subject matter jurisdiction.[240] If we find that we do, we then address whatever substantive issues are before us. This is an abstract description of our task – what it means here is that we must first determine whether Lipscomb's actions fall within the jurisdiction of § 666, and if our answer is "yes," then address the merits of his appeal. It is at this second step that, were constitutionality at issue, it would arise. Constitutionality is an issue on the merits, not a jurisdictional one.

Our governing precedent interpreting § 666 does exactly this. We have first answered the jurisdictional question, and have not taken it upon ourselves to consider the constitutionality of § 666 if it was not appropriately before us on the merits.[241]

_____

[240] See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, 118 S.Ct. 1003, 1012, 140 L.Ed. 2d 210 (1998) ("On every writ of error or appeal, the first and fundamental question is that of jurisdiction...") (qtg. Great S. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453, 20 S.Ct. 690, 691-92, 44 L.Ed. 842 (1900)). See also United States v. Texas Tech Univ., 171 F.3d 279, 287 (5th Cir. 1999).

[241] See, for example, United States v. Reyes, 239 F.3d 722 (5th Cir. 2001) (affirming a conviction under § 666 and making no constitutional ruling), cert. denied, Maldonado v. United States, 533 U.S. 961, 121 S.Ct. 2618, 150 L.Ed. 2d 772 (2001); and cert. denied, Reyes v. United States, 122 S.Ct. 156, 151 L.Ed. 2d 106 (2001); United States v. Phillips, 219 F.3d 404 (5th Cir. 2000) (reversing a conviction under § 666 but making no constitutional ruling); United States v. Westmoreland, 841 F.2d 572 (5th Cir.

In United States v. Westmoreland,[242] a county supervisor appealed her conviction under § 666 for accepting kickbacks in purchases of county materials. A panel of this court affirmed her conviction. Judge King's carefully crafted opinion first considers the jurisdictional scope of § 666. After finding that § 666 did apply to Westmoreland's conduct, and thereby answering the jurisdictional question in the affirmative, the opinion addresses the substantive issues of the case.

Nine years later, the Supreme Court decided Salinas v. United States,[243] an appeal of the conviction of a Texas county sheriff for accepting bribes in exchange for allowing a federal prisoner housed in the county jail to receive conjugal visits. There, the Court affirmed the sheriff's conviction, holding that federal jurisdiction under § 666 is not limited to cases in which the bribe has a demonstrated effect upon federal funds. The Court later asserted the constitutionality of § 666 as applied to that case. The Salinas decision followed the two-step approach – first determine jurisdiction, and then address whatever substantive issues are before the court. The Court decided Salinas on jurisdictional grounds, and then went on to mention that § 666 was constitutional as applied.

---

1988) (affirming a conviction under § 666 and making no constitutional ruling).

[242] 841 F.2d 572 (5th Cir. 1988).

[243] 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed. 2d 352 (1997).

Since Salinas, this circuit has been faced with questions of the jurisdictional reach of § 666 twice before the case at bar. Both times we followed the "jurisdiction-merits" two-step.

In United States v. Phillips,[244] we reversed the conviction under § 666 of a parish tax assessor, holding that he was not an agent of the parish for purposes of the statute. Thus, the statute's jurisdiction did not extend to his actions. No discussion of the merits was required; and the ensuing discussion on potential constitutional issues is entirely dicta, because this court was without jurisdiction to hear the case.

Our most recent holding on the applicability of § 666 was in United States v. Reyes,[245] where we affirmed the § 666 conviction of a city councilman for accepting kickbacks on city contracts. We held that whatever nexus is statutorily required for jurisdiction under § 666, existed in that situation. We then went on to address the evidentiary and sentencing issues before us.

Our analytical approach here should be exactly like that in the above-cited line of cases. We must satisfy ourselves of our jurisdiction, and then go on to address whatever issues are before us on the merits. For the foregoing reasons, the constitutionality of § 666 is a question on the merits that we will only address if

[244] 219 F.3d 404 (5th Cir. 2000).

[245] 239 F.3d 722 (5th Cir. 2001), cert. denied, Maldonado v. United States, 533 U.S. 961, 121 S.Ct. 2618, 150 L.Ed. 2d 772 (2001); and cert. denied, Reyes v. United States, 122 S.Ct. 156, 151 L.Ed. 2d 106 (2001).

(a) we find we have jurisdiction over this case, and (b) we find it appropriately before us.

## II. STEP ONE – JURISDICTION

Our first step in the analytical two-step is to satisfy ourselves of our jurisdiction over this case. Lipscomb argues that we do not have subject matter jurisdiction, because his actions do not fall within those governed by § 666. He argues that jurisdiction under § 666 does not extend to cases of local bribery such as his, where the underlying conduct does not directly involve federal funds. A detailed review of Fifth Circuit and Supreme Court precedent demonstrates that his argument fails as a matter of statutory construction.[246]

(A) Early Fifth Circuit Precedent

We first interpreted § 666 in United States v. Westmoreland.[247] There, the defendant was a county supervisor convicted of accepting bribes in purchases of materials for the county's highway construction projects.[248] The district court found that the federal funds received by the county were not spent by Westmoreland,[249] and

---

[246] Because Article III of the United States Constitution authorizes federal courts to hear matters arising under all federal laws, and § 666 is a federal law, we may turn directly to whether there is statutory jurisdiction. U.S. CONST., Art. III. The question whether § 666 is a valid exercise of congressional authority is not before us when we determine our jurisdiction.

[247] 841 F.2d 572 (5th Cir. 1988).

[248] See id. at 574–75.

[249] See id.

nonetheless convicted her under § 666.

Westmoreland argued on appeal that her bribery did not fall under the jurisdiction of § 666, because it did not concern federal funds.[250] We rejected this argument, concluding through statutory interpretation that federal funds need not be traceable to the "tainted transactions" in order for those transactions to be punishable under the statute:

> [W]e find the relevant statutory language plain and unambiguous. By the terms of section 666, when a local government agency receives an annual benefit of more than $10,000 under a federal assistance program, its agents are governed by the statute, and an agent violates subsection (b) when he engages in the prohibited conduct "in any transaction or matter or series of transactions or matters involving $5,000 or more concerning the affairs of" the local government agency. 18 U.S.C. § 666(b) (Supp. 1984) [emphasis added]. Subsection (b) contains nothing to indicate that "any transaction involving $5,000" means "any federally funded transaction involving $5,000" or "any transaction involving $5,000 of federal funds," and other subsections of the statute contain no inconsistent provisions that might suggest such a qualification.[251]

We next reviewed the jurisdictional reach of § 666 in United States v. Moeller.[252] There, the government appealed the dismissal of § 666 claims against employees of the Texas Federal Inspection Service, state workers empowered to conduct federal inspections.[253] We held that jurisdiction under § 666 extended to the employees'

---

[250] See Westmoreland, 841 F.2d at 575.

[251] Id. at 576.

[252] 987 F.2d 1134 (5th Cir. 1993).

[253] See id.

actions, because the Texas Department of Agriculture, a "government agency" within § 666, received more than $10,000 a year in federal funds; and the defendants were "agents" of that federally-funded agency for purposes of § 666.[254]

In United States v. Marmolejo,[255] we upheld the conviction of a sheriff who accepted bribes in return for permitting conjugal visits to a federal prisoner whom Texas, in return for a fee from the federal government, housed in a facility constructed with federal funds.[256] In holding that these actions came under the jurisdiction of § 666, we referenced our earlier statutory decisions: "[w]e have previously held that § 666(a)(1)(B) does not require the government to prove that federal funds were directly involved in a bribery transaction, or that the federal monies funded the corrupt transaction."[257] We went on to conclude that conjugal visits are "anything of value" under the statute.

The dissent in Marmolejo argued that Westmoreland interpreted § 666 to reach "only those acts of bribery that could somehow be traced, directly or indirectly, to the integrity of federal program

---

[254] See id. at 1137–38.

[255] 89 F.3d 1185 (5th Cir. 1996), aff'd sub nom. Salinas v. United States, 522 U.S. 52 (1997).

[256] See Marmolejo, 89 F.3d at 1188–89, 1201.

[257] Id. at 1191 (citing Westmoreland, 841 F.2d at 578).

funds."[258]

(B) The Supreme Court Weighs In

The Supreme Court granted certiorari in Marmolejo on whether § 666 is "limited to cases in which the bribe has a demonstrated effect upon federal funds."[259] Under the caption Salinas v. United States, the Court stated that "[t]he statute's plain language fails to provide any basis for limiting § 666(a)(1)(B) to bribes affecting federal funds" and that the legislative history "forecloses this type of limitation."[260] The Court therefore decided that as a statutory matter, federal funds need not be directly involved in a violation of § 666.[261] The Court then in passing asserted the constitutionality of § 666 as applied to the case at bar.[262]

---

[258] Id. at 1203. "Turning to the precise legislative history, I find that it clearly reveals that Congress did not intend for § 666(a)(1)(B) to be applied to conduct such as the acceptance of bribes to allow conjugal visits. Instead, Congress was only concerned with protecting the federal monies disbursed to non-federal entities." Id.

[259] Salinas v. United States, 522 U.S. 52, 54, 118 S.Ct. 469, 471-72 (1997).

[260] Id. at 57, 59.

[261] See id. at 56-57.

[262] See Salinas, 522 U.S. at 61. Judge Wiener cites this as evidence that we too should consider the constitutionality of § 666 here. However, the Supreme Court's assertion in passing that § 666 was constitutional as applied does not bind us to rule on the constitutionality of § 666 as applied to Lipscomb here. First, we are not the Supreme Court and have different limitations on our jurisdiction. The Supreme Court, unlike us, is the definitive voice in interpreting federal statutes. See Erwin Chemerinsky, Federal

Since <u>Salinas</u>, the Supreme Court has decided only one other case involving § 666 – <u>United States v. Fischer</u>.[263] There the Court affirmed the conviction of a defendant who defrauded a city hospital authority that participated in the federal Medicare program.[264] The <u>Fischer</u> analysis, however, is not relevant to this case.

(C) Recent Fifth Circuit Cases

The first Fifth Circuit panel to interpret § 666 post-<u>Salinas</u> decided <u>United States v. Phillips</u>.[265] There, we reversed the conviction of a parish tax assessor, holding that he was not an "agent" of St. Helena Parish for purposes of the statute. Thus, the statute's jurisdiction did not reach his activity. This has little bearing on our case, as city councilmen are clearly "agents" under the statute.[266]

---

<u>Jurisdiction</u> 571 (1994). Second, the Supreme Court in <u>Salinas</u> declined to avoid the constitutional question because it considered it a greater disservice to "rewrite language enacted by the legislature" than to fail to avoid the issue. <u>Salinas</u>, 522 U.S. at 59. This reasoning does not compel us to reach the constitutionality of § 666 here; if anything, it counsels against that. We are *not* rewriting § 666 – we are faithfully reading the language of the statute, and recognizing that in order to question the congressionally-enacted language, the issue of constitutionality must be explicitly before us.

[263] 529 U.S. 667, 120 S.Ct. 1780, 146 L.Ed. 2d 707 (2000).

[264] <u>See</u> <u>id.</u>, 529 U.S. at 669-70, 681, 120 S.Ct. at 1782-83, 1788-89.

[265] 219 F.3d 404 (5th Cir. 2000).

[266] <u>See</u> <u>United States v. Reyes</u>, 239 F.3d 722 (5th Cir. 2001), <u>cert. denied</u>, <u>Maldonado v. United States</u>, 533 U.S. 961, 121 S.Ct.

The two most recent Fifth Circuit § 666 cases demonstrate our continued commitment to applying § 666 to members of city councils, like Lipscomb, and support our finding of jurisdiction here.

In United States v. Reyes[267] we affirmed the § 666 conviction of a city councilman for accepting kickbacks on city contracts. We held that whatever nexus is statutorily required for jurisdiction under § 666, existed in that case.[268]

More recently, we decided United States v. Williams[269] without discussing jurisdiction at all. Williams, a former city councilman, was convicted under § 666 of "aiding and abetting others in the corrupt solicitation and acceptance of bribery payments".[270] We affirmed his conviction.

(D) The Bottom Line

Fifth Circuit and Supreme Court precedent alike construe the jurisdictional reach of § 666 broadly. Federal funds need not be directly involved in a violation of § 666. The Phillips panel construed the term "agent" narrowly, and reversed the conviction,

---

2618, 150 L.Ed. 2d 772 (2001); and cert. denied, Reyes v. United States, 122 S.Ct. 156, 151 L.Ed. 2d 106 (2001); United States v. Williams, 264 F.3d 561 (5th Cir. 2001).

[267] 239 F.3d 722 (5th Cir. 2001), cert. denied, Maldonado v. United States, 533 U.S. 961, 121 S.Ct. 2618, 150 L.Ed. 2d 772 (2001); and cert. denied, Reyes v. United States, 122 S.Ct. 156, 151 L.Ed. 2d 106 (2001).

[268] See id. at 734.

[269] 264 F.3d 561 (5th Cir. 2001).

[270] Id. at 567.

but that is irrelevant to our case, because the term "agent" plainly includes city council members. The <u>Westmoreland</u> view of § 666 therefore continues to be the law in this circuit, and precludes us from more narrowly construing the statute here. Because Lipscomb's actions satisfy the jurisdictional requirements found in the language of § 666, we conclude that the district court had jurisdiction to try Lipscomb under § 666, and turn to the issues which the parties put before us on the merits.

### III. STEP TWO – MERITS

Before reaching the issues raised by Lipscomb, I must address the issue of the constitutionality of § 666 – an issue raised not by the Appellant, but by the opinions of my colleagues on this panel. This issue is not properly before us, but because my colleagues have raised it, I respond.

(A) Constitutionality of § 666

There do exist troubling constitutional issues under the surface of this case. Whether Congress had the authority it claimed to enact § 666 under the Spending Clause of the Constitution, U.S. CONST., art. I, § 8, is a close question. However, although my colleagues hold otherwise, it is not our question today. We may only decide those issues properly before us, and the constitutional question is not such an issue. It was argued neither at trial nor on appeal, and there is no legal justification for us to raise it sua sponte.

(1) Not Argued at Trial

The record shows that despite mention of potential constitutional issues, Lipscomb never argued at trial that § 666 was unconstitutional as applied to him. Following is discussion of the four motions by which he made the jurisdictional argument, and where any constitutional discussion at all (not sufficient to raise the issue of constitutionality) exists.

> (a) Motion to Dismiss the Indictment or, Alternatively, for an Evidentiary Hearing Requiring the Government to Establish Federal Jurisdiction

On September 3, 1999, Lipscomb filed a Motion to Dismiss the Indictment or, Alternatively, for an Evidentiary Hearing Requiring the Government to Establish Federal Jurisdiction.[271] It is worth noting that the title of the Motion shows that it seeks proof of federal jurisdiction, and does not challenge the constitutionality of § 666. Moreover, Lipscomb crafts his arguments in support of the Motion in terms of challenging federal jurisdiction. "In this case... no sufficient jurisdictional basis is evident."[272] "On its face, this indictment fails even to allege an appropriate basis for the exercise of federal jurisdiction...."[273]

Lipscomb does mention the potential constitutional problems that could arise if § 666 is applied to his conduct. He goes so far as to say "[s]ection 666 is being unconstitutionally applied in

---

[271] See R. at 60.

[272] R. at 62.

[273] R. at 63.

108

this case," and mentions possible Tenth Amendment consequences of applying § 666 to Lipscomb's conduct.[274] Moreover, one of Lipscomb's attorneys signed the Motion as "Special Counsel for Tenth Amendment purposes only".[275] However, this discussion arises <u>in the context of a challenge to jurisdiction</u>, *not* as a challenge to the constitutionality of the statute as applied (which would arise under the Spending Clause, not the Tenth Amendment). Even the statement "[s]ection 666 is being unconstitutionally applied in this case"[276] stands alone, and is not supported by any argument.

The District Court denied Lipscomb's motion:

> Came to be considered the motion of the defendants to dismiss the indictment for lack of federal jurisdiction, and after due consideration thereof, as well as a plain reading of the statute, and the briefs and arguments of counsel, this court is of the opinion that the motion should be DENIED.[277]

Judge Kendall declined to dismiss the indictment because he found that federal jurisdiction did exist. He neither mentioned nor considered the constitutionality of § 666. His Order includes the hand-written addition of the phrase "as well as a plain reading of the statute," further supporting the conclusion that his analysis was a statutory and not a constitutional one.

(b) Motion for Judgment of Acquittal Pursuant to Rule

---

[274] <u>Id.</u>

[275] R. at 66.

[276] R. at 63.

[277] <u>Id.</u>

29(A), Following the Government's Case in Chief

Following the government's case, Lipscomb moved the District Court for Judgment of Acquittal.[278] Lipscomb argued that some nexus between the bribe and the federally-funded program must exist in order for there to be jurisdiction, and that here, no such connection exists.[279] He couched his argument in terms of "get[ting] this case in federal court properly," which is clearly a jurisdictional concern.[280] Later in the colloquy Lipscomb's attorney told Judge Kendall that "666 doesn't cover this",[281] another argument about the scope of jurisdiction under § 666.

The Government's response follows the same approach, citing cases that analyze the jurisdictional reach of § 666, not its constitutionality.[282] The District Court denied the Motion.

(c) Motion for Judgment of Acquittal Pursuant to Rule 29(A), Following the Jury Verdict

On February 8, 2000, following the jury verdict, Lipscomb again moved the District Court for Judgment of Acquittal.[283] He argued that the Government failed to present evidence of a connection between the alleged bribes and a federally-funded

---

[278] See R. Vol. 13 at 32.

[279] See id. at 36-9.

[280] Id. at 37.

[281] Id. at 40.

[282] See id. at 41-2.

[283] See R. at 556.

110

program.[284] Lipscomb asks the court again to find a failure of jurisdiction due to the lack of nexus.

The Government's response cites case law analyzing the jurisdictional reach of § 666.[285] The Government makes no argument that § 666 is constitutional as applied, suggesting that it did not consider a constitutional argument raised. Further, the District Court's denial of Lipscomb's Motion makes no mention of a constitutional issue.[286]

> (d) Conditional Motion for Voluntary Surrender Date and Bond Pending Appeal

Lipscomb filed a Conditional Motion for Voluntary Surrender Date and Bond Pending Appeal on April 26, 2000.[287] He sought bond pending appeal because:

> it is legitimately predictable that the Fifth Circuit in light of the *Salinas* [sic] opinion and its subsequent interpretation by the other federal circuits will revisit its past positions regarding the necessary connection between the federal funds and the alleged bribes.[288]

Lipscomb seeks bond because he thinks the Fifth Circuit on appeal will find a nexus requirement for jurisdiction under § 666. This is a pure question of statutory interpretation. Nowhere does Lipscomb seek bond pending appeal because he thinks the Fifth Circuit might

---

[284] See R. at 560.

[285] See R. at 600, 617–19.

[286] See R. at 644.

[287] See R. at 898.

[288] R. at 901.

111

find § 666 as applied to his conduct unconstitutional. That is because he never made such an argument.

(2) Not Argued on Appeal

Even assuming *arguendo* that constitutionality was argued at trial, it was certainly not preserved on appeal, which is required if we are to consider it. The record shows that despite mention of *potential* constitutional issues, Lipscomb did not argue on appeal that § 666 was unconstitutional as applied to him.

Lipscomb's Appellate Brief repeatedly uses the vocabulary of jurisdiction, not constitutionality, to define his claim. In his request for oral argument, Lipscomb writes that "[t]his appeal involves a substantial jurisdictional question," and never mentions a constitutional question.[289] Moreover, Lipscomb defined the issue as follows:

> The fact that the City of Dallas received federal funds in excess of $10,000 in a given year does not, without more, *establish federal jurisdiction* to prosecute a City Councilman for bribery under 18 U.S.C. 666 [sic].[290]

Constitutionality is not mentioned.

Lipscomb writes that "it is incumbent upon federal courts – trial and appellate – to constantly examine the basis for jurisdiction...."[291] "A nexus between the expenditure of federal

---

[289] App. Brief at ii.

[290] Id. at iii, 2, 19 (emphasis added).

[291] Id. at 19, qtg. Save the Bay, Inc. v. United States Army, 639 F.2d 1100, 1102 (5th Cir. 1981).

112

funds and the illicit conduct, bribery, is inherent in the statutory scheme and consistent with the legislative history."[292] He goes on to say:

> Federal jurisdiction was entirely contrived here. The alleged bribery was unrelated to any expenditure of federal monies. Accordingly, Federal [sic] jurisdiction did not and does not exist.[293]

Lipscomb's argument is it is a jurisdictional requirement of § 666 that there be some connection between the bribe and the federal funds.[294]

Lipscomb concludes his argument on this issue with the words "[t]he alleged bribery here had no connection to a federally funded program and, thus, the court below was without subject matter jurisdiction to proceed."[295] I can imagine no clearer statement that his claim is jurisdictional, unless you consider Lipscomb's conclusion and plea for relief:

> For the foregoing reasons, the defendant-appellant, ALBERT LOUIS LIPSCOMB, respectfully requests that this Court reverse these convictions and remand the case to the district court with instructions to *dismiss the indictment for lack of federal jurisdiction*.[296]

Lipscomb's Appellate Brief also sheds light on his District Court arguments, and exposes them as purely jurisdictional, not

---

[292] App. Brief at 14.

[293] Id.

[294] See id. at 20.

[295] App. Brief at 28.

[296] Id. at 59 (emphasis added).

113

constitutional. He writes that he "objected to the absence of federal jurisdiction before, during and after trial."[297] Not once does he claim to have objected at trial on the basis that the statute was unconstitutional. Moreover, had he thought that he had argued constitutionality at trial, we would expect him on appeal to challenge the District Court's failure to decide that issue. Lipscomb makes no such challenge, further showing that he never made an argument regarding the constitutionality of § 666.

Lipscomb does mention that contrary statutory interpretation *could* raise constitutional concerns.[298] However, as before the District Court, this is mere mention of potential constitutional concerns in the context of a jurisdictional challenge; it is not a challenge to the constitutionality of § 666. Moreover, Lipscomb mentions the potential constitutional issue in order to exhort us to avoid it.[299]

The Government's Brief continues the dialogue in jurisdictional terms.[300] It does not defend the constitutionality of § 666, strongly suggesting the Government did not consider that issue raised. Appellant's Reply Brief follows suit.[301]

---

[297] Id.; see also id. at 19.

[298] See App. Brief at 14, 20, 22-5, 27.

[299] See id. at 27-8.

[300] See U.S. Brief at ii, 2, 31, 33-40.

[301] See App. Reply Brief at i, 1-5, 16-21.

114

(3) No Legal Basis to Reach Constitutional Issue

Despite the urgings of my colleagues to the contrary, *no facts* exist to support the contention that Lipscomb ever argued the constitutionality of § 666, or preserved that issue on appeal. However, assuming for sake of argument only the allusions to a potential constitutional issue found in the record are sufficient to raise the issue and preserve it for appeal, we still may not decide the issue. There exists *no* legal support for the constitutional determinations made by my colleagues today.

(a) Court of Error

Our jurisdiction is exclusively appellate,[302] and we are not endowed with any original jurisdiction except in aid of our appellate jurisdiction.[303] These rules embody the policy that legal issues should be developed initially before the district courts. As a panel of this circuit put it, "[g]enerally speaking, we are a court of errors and appeals."[304] The trial court cannot have erred as to matters which were not presented to it, nor decided by it.[305] This is black letter law.

---

[302] See <u>Roche v. Evaporated Milk Assn.</u>, 319 U.S. 21, 63 S.Ct. 938, 87 L.Ed. 1185 (1943); <u>United States v. Mayer</u>, 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129 (1914). <u>See also</u> Charles Alan Wright, <u>Law of Federal Courts</u> 10 (1983).

[303] See <u>Whitney v. Dick</u>, 202 U.S. 132, 26 S.Ct. 938, 50 L.Ed. 963 (1906); <u>Travis County v. Kind Iron Bridge & Mfg. Co.</u>, 92 F. 690 (5th Cir. 1899).

[304] <u>Gavel v. Lynaugh</u>, 835 F.2d 124, 125 (5th Cir. 1988).

[305] See <u>id.</u>

Here, the district court did not consider the constitutionality of § 666. Thus, we have no decision on constitutionality to review.[306] Moreover, it was not error for the district court not to consider the constitutional issue, because that issue was never presented to it.

Of course, there are some situations in which appellate courts have jurisdiction to raise issues on their own.[307] For example, if parties do not raise the issue of jurisdiction, or even if they contend that the Court of Appeals has jurisdiction, we still must determine, *sua sponte*, whether we have jurisdiction in a particular case.[308] However, constitutional questions are not among those which we can raise *sua sponte*.

#### (b) Issue Not Briefed

Appellant's brief must contain the "appellant's contentions and the reasons for them".[309] Issues that are not clearly designated in the appellant's brief are normally deemed abandoned.[310] This is

---

[306] Therefore, even assuming, *arguendo*, that the parties adequately raised the issue of the constitutionality of § 666 before us on appeal, we are without authority to decide that question. Were this question appropriately before us, we would not have the power to rule on constitutionality, as both Judge Wiener and Judge Smith are so eager to do; we would rather be bound to remand the issue to the district court for determination.

[307] See Charles Alan Wright, Law of Federal Courts 10 (1983).

[308] See United States v. Garner, 749 F.2d 281 (5th Cir. 1985).

[309] Fed. R. App. P. 28(a)(9)(A).

[310] See United States v. Miranda, 248 F.3d 434, 444 (5th Cir. 2001), cert. denied, Miranda v. United States, 122 S.Ct. 410, 151

116

especially true in the context of constitutional issues. We generally do not anticipate constitutional questions, but wait until a case is presented that requires a decision of a constitutional issue.[311] There is also established Supreme Court precedent declining to address constitutional questions not put in issue by the parties.[312]

This Circuit held last year that "[c]iting cases that may contain a useful argument is simply inadequate to preserve that argument for appeal,"[313] in Clyde Bergemann, Inc. v. The Babcock & Wilcox Co., 250 F.3d 955 (5th Cir. 2001). Bergemann was a creditor who objected to a financing arrangement between the debtors and a bank which would let the debtors continue operating. On appeal he argued, *inter alia*, that the financing arrangement was a fraudulent conveyance of assets. However, his brief to the bankruptcy court referred to that issue only in passing. Although he quoted two

---

L.Ed. 2d 312 (2001); and cert. denied, Espinoza v. United States, 122 S.Ct. 823, 151 L.Ed. 2d 705 (2002); Fehlhaber v. Fehlhaber, 681 F.2d 1015, 1030 (5th Cir. 1982).

[311] See Texas v. Grundstrom, 404 F.2d 644, 648 (5th Cir. 1968).

[312] See, for example, Andrews v. Louisville & Nashville Railroad Co., 406 U.S. 320, 324-5, 92 S.Ct. 1562, 1565, 32 L.Ed. 2d 95 (1972) ("The constitutional issue discussed in the dissent was not set forth as a 'question presented for review' in the petition for certiorari, and therefore our [rule] precludes our consideration of it."); Mazer v. Stein, 347 U.S. 201, 206 n.5, 74 S.Ct. 460, 464 n.5, 98 L.Ed. 630 (1954) ("We do not reach for constitutional questions not raised by the parties.").

[313] In re Babcock & Wilcox Co., 250 F.3d 955, 961 (5th Cir. 2001).

cases in that brief, neither quotation identified the issue of fraudulent conveyance sufficiently for the bankruptcy court to rule on it, nor was there any discussion of how the theory applied. We held the issue waived.

Here neither party raised the constitutionality of § 666 in its briefs or arguments before us. Thus, it is beyond the scope of our review.

### (c) Avoidance of Constitutional Questions

Even assuming everything else away, and considering the constitutional issue adequately raised, we still have the duty to decline to decide that issue unnecessarily. It is a well-established canon of construction that federal courts avoid addressing constitutional questions when possible, even those that are raised by the parties.[314] As stated by Justice Brandeis in his well-known and oft-cited concurring opinion (dissenting in part) in Ashwander v. TVA, 297 U.S. 288, 346-47, 56 S. Ct. 466, 483, 80 L. Ed. 688 (1936):

> The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it. It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case. ... The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. ... Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the

---

[314] See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 88 L.Ed. 688 (1936) (Brandeis, J., concurring).

118

Court will decide only the latter.[315]
The Fifth Circuit has agreed that we will not take a constitutional
question for decision if there is some other legitimate ground on
which the case can be decided.[316]

Because this case can legitimately be decided on
jurisdictional grounds (in fact, that is the issue briefed and
argued), we must avoid any constitutional decision.

(4) Conclusion

It is quite likely that a case will someday arise that
squarely challenges the constitutionality of § 666, but this is not
that case. Until that day, we must answer only those questions
before us. Because the constitutionality of § 666 was not argued at
trial or on appeal, and there is no legal justification for our
reaching it, I must respectfully dissent from the entire discussion
of constitutionality found in the opinions of both Judge Wiener and
Judge Smith.[317]

---

[315] Id. (internal citations omitted, emphasis added).

[316] See Grundstrom, 404 F.2d at 648.

[317] Judge Smith challenges my analysis of whether the
constitutional issue was raised as "hyper-technical," and
"elevat[ing] semantics over substance. While I appreciate the value
he places on avoiding hyper-technicality, I cannot agree with
elevating *that* goal over our requirement that parties raise the
issues they wish us to decide. I seek no magic words; I wish only
that the parties would clearly raise those issues they wish us and
the district court to decide (as our precedent requires). The
parties here did not meet even this most-light burden on the issue
of the constitutionality of § 666.

In the same vein, Judge Smith accuses me of invoking the

(B) Transfer

I concur in Judge Wiener's discussion and conclusions on the transfer issue.

CONCLUSION

For the foregoing reasons, I concur in part and dissent in part, but share Judge Wiener's conclusion that we must reverse Lipscomb's conviction, vacate his sentence, and remand for a new trial.

---

"rigid form pleading" that was eliminated by the Federal Rules of Civil Procedure. This misunderstands my analysis. To the contrary, I am not concerned with what the parties raise in the complaints and answers that set out in broad brushstrokes the case they intend to bring. However, we must (and our precedent shows we do) require parties to specifically argue before us and the district court, at some point during the adjudication of their dispute, what issues they wish decided. The courts are not required to divine what issues are before them, nor do they have the power to choose what issues they would like to be before them – that is the responsibility of the parties.

The conclusions of Judge Wiener and Judge Smith place a burden on the trial court to read between the lines of the parties' arguments and ascertain what the parties "should have" or "could have" argued. That is just not the way our judicial system works. The burden lies with the parties to place a case or controversy before the court. On the issue of constitutionality, that burden was not met here. Requiring judges to act as mindreaders, as Judge Wiener and Judge Smith do here, cannot be an acceptable part of our judicial system.

JERRY E. SMITH, Circuit Judge, dissenting:

I would reverse the conviction and render a judgment of dismissal with prejudice, thereby precluding a retrial of defendant Albert Lipscomb.  Accordingly, I respectfully dissent from the contrary result reached by Judge Wiener's opinion and Judge Duhé's partial concurrence, which is to subject this seventy-seven-year-old defendantSSwho has already served more than half of his approximately three and one-half-year sentence of incarceration waiting for his appeal to be decidedSSto a new trial under a statute that has no application to him.

Two of the three judges on this panel are of the view that Lipscomb properly raised the issue of whether 18 U.S.C. § 666 is unconstitutional as applied to him.  Nonetheless, we fail to decide that issue because one of the judges declines to address it, leaving the other two judges evenly split on the question.  If we were to address it, we should easily conclude that Congress has no authority to criminalize Lipscomb's conduct, and the government had no authority to subject him to a first trial, let alone a second one.

## I.

Judge Duhé is correct that "[c]onstitutionality is an issue on the merits, not a jurisdictional one."  He also accurately states that a criminal defendant may waive constitutional challenges to a

statute by failing to argue them.  Although Judge Duhé follows the proper methodology by looking to Lipscomb's four trial motions and his appellate brief for the answer, Judge Duhé errs in applying a hyper-technical test in reviewing Lipscomb's arguments, a test that elevates semantics over substance.

Our inquiry is a relatively easy one:  Has Lipscomb argued that Congress cannot reach his conduct under the United States Constitution?  When we focus on the text of Lipscomb's motions and briefs, we can have no doubt that the answer is yes.

## A.

Judge Duhé argues that Lipscomb's September 3, 1999, "Motion To Dismiss the Indictment or, Alternatively, for an Evidentiary Hearing Requiring the Government To Establish Federal Jurisdiction" is a motion that "seeks proof of federal jurisdiction, and does not challenge the constitutionality of § 666."  But the full text shows that Lipscomb is making a constitutional argument; he just uses the words "jurisdiction" and "power" interchangeably:

> However, in *Salinas*, the Court squarely left open the question whether Section 666 "requires some other kind of connection between a bribe and the expenditure of federal funds" lest it be applied in some manner which *would alter or fail to "give proper respect to the federal-state balance" of powers* [quoting *Salinas*].  The Court found "no serious doubt about *the constitutionality of Section 666(a)(1)(B) as applied* to the facts of this case" [quoting *Salinas*].
>
> In this case, however, no sufficient jurisdictional basis is evident . . . .  Any exercise of federal

122

jurisdiction must demonstrate a proper respect for concepts of *dual sovereignty and federalism*.  On its face, this indictment fails even to allege an appropriate basis for the exercise of federal jurisdiction and accordingly *Section 666 is being unconstitutionally applied in this case . . . .*

The *Tenth Amendment . . .* provides:  [quoting] . . . [T]he 'double security' embodied in the concept of federalism requires 'a proper balance between the States and the Federal Government" [citing *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991)].  The States' *constitutional* prerogatives  plainly  include  their  "*constitutional* responsibility for the establishment and operation of its own government . . . ."  Under our federal system, states possess the primary authority to define and enforce criminal law [citing *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995)].

Thus, the application of Section 666 in circumstances with no evident assertion of a federal interest offends two state prerogatives:  (1) the States' *constitutional responsibility* for regulation of electoral government and for the establishment and operation of its own government and the qualifications of its officials; and (2) the definition and enforcement of criminal law.  *As a constitutional principle, it simply cannot be that $10,000.00 in federal funds provided to a major city trumps the Tenth Amendment and the prerogatives and responsibilities reserved to the States therein.  The Tenth Amendment*, after all, 'was enacted to allay lingering concerns  about  the  extent  of  national  power" [citing *Alden v. Maine*, 527 U.S. 706, 713-14 (1999)].  "When the Federal Government asserts authority over a States' [*sic*] most fundamental political processes, its [*sic*] strikes at the heart of the political accountability so essential to our liberty and *republican form of government*" [citing *Alden; Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992)].

The proper state-federal balance is disturbed when there  is  an  intrusion  upon  State  prerogatives  in important *areas reserved to the States*.  This indictment fails  to  identify  the  federal  interest  served  by  this exercise  of  federal  jurisdiction  and  therefore constitutes *an unconstitutional application of Section 666 . . . .*  [F]ederal jurisdiction is being exercised in

a manner that plainly intrudes upon the prerogative of the States to define, apply and enforce criminal law, and to monitor and oversee the operation of its government.

(Emphasis added.)

If Lipscomb were merely arguing jurisdiction, why would he five times cite *Salinas*SSwhich does not even mention jurisdictionSSfor the proposition that § 666 has been unconstitutionally applied to him?  Why would he employ a "Special Counsel for Tenth Amendment purposes only," and have that counsel sign the motion?  Why would he twice invoke the Tenth Amendment and cite the Tenth Amendment cases of *Gregory*, *Printz*, and *New York v. United States*, as well as *Alden*'s Tenth Amendment discussion?  Why would he six times argue that § 666 abridges the states' constitutional responsibilities and prerogatives?  Why would he three times argue that § 666 upsets the constitution's federal-state balance of powers?  Why would he three times state that § 666 is being unconstitutionally applied to him?

Judge Duhé sidesteps all of this and, instead, notes that the motion's title mentions federal jurisdiction, not constitutionality, and Lipscomb uses the word "jurisdiction" throughout his argument.  Since when do we accord one word such talismanic power that its mere presence or absence in a motion or brief can negate all remaining arguments?  Since when do we forbid a defendant from raising two pointsSSboth constitutionality and jurisdictionSSin one motion?   The Federal Rules of Procedure

124

eliminated just the type of rigid form pleading that Judge Duhé invokes today.

Lipscomb's motion is less than polished, and his interchange of "jurisdiction" and "power" is clumsy. As Judge Wiener explains, sometimes Lipscomb uses "jurisdiction" to refer to a federal court's subject matter jurisdiction, and sometimes he uses "jurisdiction" to refer to the persons and acts over which Congress may legislate. But any confusion is easily eliminated: Substitute "federal power" or "congressional power" every time Lipscomb says "jurisdiction" in his motion, and the motion's meaning remains the same. But substitute "subject matter jurisdiction" or "federal court jurisdiction," and parts of the motion become nonsensical.

For example, the final paragraph makes no sense when "federal court jurisdiction" is used:

> The proper state-federal balance is disturbed when there is an intrusion upon State prerogatives in important areas reserved to the States. This indictment fails to identify the federal interest served by this exercise of [*federal court jurisdiction*] and therefore constitutes an unconstitutional application of Section 666 . . . . [*Federal court jurisdiction*] is being exercised in a manner that plainly intrudes upon the prerogative of the States to define, apply and enforce criminal law, and to monitor and oversee the operation of its government.

But this paragraph reads perfectly well when "congressional power" is filled in.

Lipscomb's lack of artfulness should not doom his appeal, especially given that the Supreme Court and our circuit often have

125

been guilty of the same offense of conflating "jurisdiction" and "power." In *United States v. Cotton*, 122 S. Ct. 1781 (2002), the Court acknowledged that it has sometimes employed a "somewhat expansive notion of jurisdiction" that covered both general constitutional questions and the concept of subject matter jurisdiction. *Id.* at 1784-85 (internal quotations omitted). Recently, the en banc court of this circuit reheard *United States v. Longoria*, 259 F.3d 363 (5th Cir.), *vacated for rehearing en banc*, 262 F.3d 455 (5th Cir. 2001), to undo the confusion generated by our loose use of the term "jurisdiction." Lipscomb should not be held to a higher standard of legal diction than are the judges and Justices of this court and the Supreme Court.

Judge Duhé and I also read Lipscomb's February 8, 2000, motion for judgment of acquittal quite differently. Lipscomb made, *inter alia*, the following arguments:

> *As applied to Lipscomb, 18 U.S.C. § 666 is unconstitutional.* No evidence was introduced that any of the funds given to Lipscomb can be connected to "a threat to the integrity and proper function of a federal program." None of the federal funds was shown to relate to the taxicab industry. At no time did any of the votes alleged in the indictment impinge upon the use, distribution, diversion or application of any federal funds. Congress intended to protect federal and the integrity of those funds.

(Emphasis added.)

Lipscomb flatly states that § 666 is unconstitutional as applied to him, and he follows with a constitutional argument from *Salinas*. The *Salinas* Court explained that because the crime "was

126

a threat to the integrity and proper operation of the federal program[, w]hatever might be said about § 666(a)(1)(B)'s application in other cases, the application of § 666(a)(1)(B) to Salinas did not extend federal power beyond its proper bounds." *Salinas v. United States*, 522 U.S. 52, 61 (1997). Lipscomb argues the inverseSSbecause his crime did not threaten the integrity and proper operation of a federal program, the application of § 666 to him is not constitutional.

Judge Duhé recharacterizes this argument as a challenge to the jurisdictional reach of § 666; Lipscomb, he concludes, actually is asserting that § 666 requires a nexus between federal funds and the bribery. Judge Duhé does not explain why, if this is so, Lipscomb failed to place this argument under heading B of his motionSS"The Government has failed to establish the jurisdictional prerequisite for each substantive count."

Nor does Judge Duhé explain why Lipscomb would support this argument by quoting from the same passage in *Salinas* that held, "The text of § 666(a)(1)(B) is unambiguous . . . [and] does not require the Government to prove federal funds were involved in the bribery transaction." *Salinas*, 522 U.S. at 60. Instead, Judge Duhé notes that neither the government nor the district court mentioned the constitutional issue. Just because the district court and the government may have misunderstood Lipscomb's claim, however, does not mean he failed to present it.

127

Lipscomb devotes ten pages of his appellate brief to the constitutional issue. Even though Lipscomb admits that "[i]t is not a jurisdictional requirement of [§] 666 that the alleged bribe actually affect federal funds," Judge Duhé insists that Lipscomb is making only a jurisdictional argument. More incredibly, Judge Duhé claims Lipscomb "never mentions a constitutional question," even though Lipscomb states, "there must be some connection between the bribe and the expenditure of federal funds. Otherwise, the reach of § 666 intrudes well beyond the scope of federal authority into areas of state responsibility, and *serious constitutional questions are presented*." (Emphasis added.)

Lipscomb further notes that the *Salinas* Court

left open the question whether Section 666 "requires some other kind of connection between a bribe and the expenditure of federal funds" lest it be applied in some manner which *would alter or fail to "give respect to the federal-state balance" of powers* [citation]. "Whatever might be said about [§] 666(a)(1)(B)'s application in other cases, the *application of Section 666(a)(1)(B)* to Salinas did not extend federal power beyond its proper bounds." [citation].

Lipscomb follows with the observation that "[a]ny exercise of federal jurisdiction must demonstrate a proper respect for *concepts of dual sovereignty and federalism* (citing the *Tenth Amendment*). The States' *constitutional prerogatives* plainly include '*constitutional* responsibility for the establishment and operation of its own government . . . . [citing *Gregory*, 501 U.S. at 462]."

128

He adds, "As a *constitutional principle*, it simply cannot be that $10,000.00 in federal funds provided to a major city trumps the *Tenth Amendment and the prerogatives and responsibilities reserved to the States*" (referring also to our "*republican form of government*") (emphasis added).

Lipscomb further argues that § 666 is enacted under the *Spending Clause*, which has limits. Beyond those limits, the "delicate balance of federalism" is obliterated, he argues. Finally, Lipscomb notes that a prosecution under § 666 must be "undergirded by some adequate federal jurisdictional base" to avoid *serious constitutional problems*."

Again, Lipscomb uses the term "jurisdiction" loosely, and he sometimes makes two arguments under one heading in his brief. Nonetheless, he easily has raised adequately the requisite constitutional arguments.

## II.

Despite the caption of this opinion as a dissent, this part II is not a dissent, because there is no majority decision, on this issue, from which to dissent. Judge Wiener opines that § 666 is constitutional as applied, and I conclude, to the contrary, that the statute is unconstitutional as applied. But Judge Duhé declines to address this issue, even in the alternative, despite that it is law of the case, under the majority holding of two judges,

129

that the issue is properly raised and preserved.

So, although a majority of this court holds that Lipscomb properly raised and preserved this constitutional challenge, and although this challenge, if decided, could lead to Lipscomb's immediate release with no possibility of retrial, we do not rule on it. The government had no authority to try Lipscomb the first time around; instead of announcing that fact and ending these proceedings, we compound the error by forcing Lipscomb to undergo a second illegitimate trial.

The full absurdity of today's decision comes to light when we imagine the future of this case. If Lipscomb is convicted a second time, he presumably will appeal (if he lives that long; he is elderly and too ill to be incarcerated in prison). In his second appeal, Lipscomb could argue the same constitutional claim before this same courtSSperhaps even before this same panelSSand this time, because he was careful to omit the word "jurisdiction" from his brief, he could be acquitted and told that the government never had the power to try or detain him in the first case. As I explain below, this should be our decision today.

### A.

As Judge Wiener explains, *Westmoreland*'s broad construction of § 666 continues to be the law in this circuit, so we are precluded from construing the statute to avoid a constitutional question. We

130

must, perforce, examine Lipscomb's constitutional challenge to the statute as applied.

Congress enacted § 666 under the Spending Clause.[318]  *Phillips,* 219 F.3d at 414.  It is well recognized that Congress may use its spending power to regulate the states indirectly through the use of conditional grants.  *E.g.,* 1 LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-6, at 833 (3d ed. 2000).  The power to regulate indirectly is nevertheless a limited one, as explained in *South Dakota v. Dole,* 483 U.S. 203, 207-08 (1987).

*Dole* involved a statute conditioning a small portion of each state's federal highway aid on the state's establishing a minimum drinking age.  *Id.* at 205.  The Court upheld the condition based on Congress's authority under the Spending Clause to "condition" states' access to federal funds.  *Id.* at 206.  The Court held that when Congress chooses to go beyond specific enumerated powers and to use its spending power "to further broad policy objectives by conditioning receipt of federal monies upon compliance with federal statutory and administrative directives," it must meet four conditions, the failure to meet any of which might render a statute unconstitutionally broad:  (1) The power must be used in pursuit of the general welfare; (2) Congress must state any conditions unambiguously; (3) conditions must be related to the federal interest

---

[318] U.S. CONST. Art. I, § 8 ("Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the debts and provide for the common Defense and general Welfare of the United States . . . .").

131

in particular national projects or programs; and (4) conditions must not violate other independent constitutional restrictions on government activity. *Id.* at 207-08.[319]

The *Dole* test is inappropriate to analyze the constitutionality of § 666, however, because the section does not qualify as a conditional-grant statute. First, § 666 does not un-ambiguously state that certain conditions attach to the receipt of any particular federal grants. Second, a condition statute generally requires a state's compliance with federal regulatory or administrative directives in exchange for receipt of federal funds. *Va. Dep't of Educ. v. Riley,* 106 F.3d 559, 570-72 (4th Cir. 1997) (en banc) (plurality opinion).

Section 666, however, neither requires an act of compliance nor applies directly to the recipient governments, as did the stat-ute in *Oklahoma v. United States Civil Serv. Comm'n,* 330 U.S. 127 (1947).[320] Instead, § 666 applies directly to individuals; as the

---

[319] At least one court has concluded that use of § 666 to prosecute crimes with no federal nexus violates the *Dole* test's third condition. *See United States v. McCormack*, 31 F. Supp. 2d 176 (D. Mass. 1998) (finding the statute unconstitutional as applied where a defendant had bribed a local police officer to prevent that officer's further investigation into a state crime, where the entity that received federal funds was the officer's employing police department).

[320] In *Oklahoma*, the statute at issue placed "Hatch Act" limitations on any officer or employee of any state or local agency whose principal employment was in connection with any activity that was financed in whole or in part by loans or grants made by the federal government. The condition on the state appears to have been that either it would agree to fire any individual who, after an inves-tigation by the federal civil service commission, was found to have violated the statute, or the commission in the future would be authorized to withhold, from the state, an amount equal to twice that employee's salary. The *Dole* Court cited
(continued...)

court in *United States v. Cantor*, 897 F. Supp. 110, 113 (S.D.N.Y. 1995), stated persuasively, § 666 does not impose *any* conditions at all, much less conditions related to federal interests, on particular national projects or programs: "18 U.S.C. § 666 does not impose a condition on the receipt of federal funds. The statute neither requires a state's compliance with federal regulatory or administrative directives, nor prevents state action." *Id.* Therefore, § 666 cannot be classified as a conditional grant to the states,[321] and, correspondingly, *Dole* cannot be applied to analyze its constitutionality.[322]

---

[320](...continued)
*Oklahoma* as an example of the federal government's conditioning receipt of federal funds on compliance by the recipient with federal statutory and administrative objectives. *Dole,* 483 U.S. at 206-07.

[321] But see *United States v. McCormack*, 31 F. Supp. 2d 176 (D. Mass. 1998)*,* which suggests that § 666 is a "condition" statute because the recipient can avoid the statute's application to its officials by not accepting federal funds of $10,000 or more. The *McCormack* court argued further that § 666 sets out federal requirements for recipient governments and prescribes negative consequences if those requirements are not followed. I disagree. A mere grant of money cannot be called a condition, and *Dole* requires not just a condition, but an explicitly stated condition. Section 666 fails this requirement.

[322] If the *Dole* test were applicable, it would require a holding that § 666 is unconstitutional as applied, because the third requirement of the *Dole* testSSthat "conditions must (among other requirements) bear some relationship to the federal spending," *New York v. United States*, 505 U.S. 144, 167 (1992)SSis not met. The only relationship the government can manage to muster between Lipscomb's violation of state criminal law and federal spending is that Yellow Cab's taxis sometimes go to a city airport that receives federal dollars for improvements. This connection is so tenuous as to be no connection at all; were it enough to satisfy the *Dole* test, then "the spending power could render academic the Constitution's other grants and limits of federal authority." *Id.*

133

Recognizing that *Dole* does not answer the question, we turn elsewhere for constitutional grounding.  In *Salinas*, the Court held § 666 constitutional as applied, addressing constitutionality only briefly:

> [T]here is no serious doubt about the constitutionality of § 666(a)(1)(B) as applied to the facts of this case. Beltran was without question a prisoner held in a jail managed pursuant to a series of agreements with the Federal Government.  The preferential treatment accorded to him was a threat to the integrity and proper operation of the federal program.  Whatever might be said about § 666(a)(1)(B)'s application in other cases, the application of § 666(a)(1)(B) to Salinas did not extend federal power beyond its proper bounds.  See *Westfall v. United States*, 274 U.S. 256, 259 (1927).

*Salinas*, 522 U.S. at 60-61.  Unfortunately, the Court did not reveal the framework it used in concluding that § 666 was constitutionally applied in *Salinas*, nor did it say what test should be used in determining whether other applications of the statute are constitutional.  We conduct our own inquiry, because this case, unlike *Salinas*, does not involve any readily apparent connection to federal funds or programs.

As I have said, the fact that § 666 is not a direct exercise of the spending power does not doom its constitutionality.  The Constitution gives Congress the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer

134

thereof."  U.S. CONST. art. I, § 8.  Thus, to determine whether the application of § 666 to Lipscomb's acceptance of bribes by a local taxi company is constitutional, we must decide whether prosecuting such behavior is "necessary and proper" to carrying out Congress's spending power.[323]

### 1.

We examine the relevant legislative history to discover why Congress thought that § 666 was necessary and for what purposes it deemed the statute proper, for although Congress is not the final judge of what is necessary and proper to carry out its powers, it is likely to have an informed opinion on the matter.  Such opinion is particularly persuasive to the extent that it finds legislation is necessary and proper only in limited circumstances, because, in such cases, we need not worry that Congress's interpretation is motivated by a desire to expand its power beyond proper bounds. Thus, when Congress states that legislation passed as necessary and proper to carry out one of its enumerated powers is actually neces-sary only in certain circumstances, we should be hesitant to con-

---

[323] Since the early days of the Republic, the Necessary and Proper Clause has provided justification for laws necessary for the execution of Congressional powers.  For example, in *McCulloch v. Maryland*, 17 U.S. 316 (1819), the Court held that the enactment of a law establishing a national bank was necessary and proper to carrying into execution the spending power, the commerce power, the taxing power, the power to coin money, and the war power.  Chief Justice Marshall described the reach of the clause as follows:  "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."  *Id*.

clude that the Necessary and Proper Clause permits the legislation to reach further than Congress felt necessary or proper to carry out its delegated powers.

Courts have recognized the particular relevance of the legislative history of § 666 in cases§§like this§§in which that history shows Congress's limited goals in drafting a broadly worded statute. The legislative history of the act shows that Congress passed § 666 because it was concerned with its inability to protect federal funds once they are transferred from the federal government to states, local governments, and agencies. Section 666 "is designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery *involving Federal monies* that are disbursed to private organizations or State and local governments pursuant to a Federal program." 1984 U.S.C.C.A.N. at 3510 (emphasis added). Congress also stated that "the purpose of this section [is] to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." *Id*. at 3511.

In *Salinas*, the Court noted that § 666 was enacted in response to specific difficulties the federal government had encountered under preceding statutes in prosecuting the theft of federal funds by non-federal employees. The Court explained:

> Before § 666 was enacted, the federal criminal code contained a single, general bribery provision codified at 18 U.S.C. § 201. Section 201 by its terms applied only to "public official[s]," which the statute defined as "offi-

136

> cer[s] or employee[s] or person[s] acting for or on be-half of the United States . . . ." § 201(a). The Courts of Appeals divided over whether state and local employees could be considered "public officials" under § 201(a) . . . . § 666(a)(1)(B) was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds. The facts and reasoning of [*United States v.*] *Del Toro*, [513 F.2d 656, 661-62 (2d Cir. 1975)], give particular instruction in this respect. In that case, the Second Circuit held that a city employee was not a "public official" under § 201(a) even though federal funds would eventually cover 100% of the costs and 80% of the salaries of the program he administered. 513 F.2d, at 662. Because the program had not yet entered a formal request for federal funding, the Second Circuit reasoned, "[t]here were no existing committed federal funds for the purpose." *Ibid*. The enactment of § 666 forecloses this type of limitation.

*Salinas*, 522 U.S. at 58-59. Moreover, in *United States v. Zwick*, 199 F.3d 672, 684 (3d Cir. 1999), the court explained that under a separate statute criminalizing the theft of federal property, 18 U.S.C. § 641,

> the federal government could prosecute only when it could establish that the stolen property was property of the United States, which often was impossible if title had passed before the property was stolen or when federal funds were so commingled with non-federal funds that the federal character of those funds could not be shown.[324]

Furthermore, the Senate Report states that the intent of § 666 is "to reach thefts and bribery in situations of the types involved in the *Del Toro*, *Hinton*, and *Mosley* cases cited herein[.]" S. REP. NO. 98-225, 369-370, 1984 U.S.C.C.A.N. at 3511. The court in *Zwick*

---

[324] Based on this legislative history, the *Zwick* court concluded that "[t]he goal [of § 666] was to overcome impediments to reaching actions in which there was a federal interest, not to federalize crimes in which a federal interest was lacking." *Zwick*, 199 F.3d at 684.

noted that the corrupt transactions in these three cases all plainly implicated federal interests.  *Zwick*, 199 F.3d at 684.

In *Del Toro*, the defendants conspired to bribe Pedro Morales, the Assistant Administrator of the Harlem-East Harlem Model Cities Program, for which the United States Department of Housing and Urban Development ("HUD") paid 100% of the cost of the program and 80% of its salaries.  Because Morales was a city employee, however, the court concluded that, notwithstanding that he was administering a HUD program, he was not a "public official" for purposes of § 201 and therefore could not be prosecuted.  *Id.*

Similarly, in *United States v. Hinton*, 683 F.2d 195, 198-200 (7th Cir. 1982), *aff'd sub nom. Dixson v. United States*, 465 U.S. 482 (1984), the defendants were officials of a non-profit corporation that administered a HUD program and had discretion in the distribution of HUD funds.  The court found that they were "public officials for purposes of § 201 because they exercised considerable discretion in the distribution of federal funds.  *Id*. at 198-200. The Supreme Court affirmed but noted that, to be a "public official" under § 201(a), "an individual must possess some degree of responsibility for carrying out a federal program or policy . . . . Individuals who work for block grant recipients and business people who provide recipients with goods and services cannot be said to be public officials under section 201(a) unless they assume some duties of an official nature."  *Dixson v. United States*, 465 U.S.

482, 499-500 (1984).

In *United States v. Mosley*, 659 F.2d 812, 816 (7th Cir. 1981), the defendant, an Illinois state employee, was convicted of receiving bribes while evaluating applicants for jobs under a federally-funded program. Here again, the defendant was covered by § 201, because he exercised discretion in the administration of federal funds. In *Zwick*, the court concluded that the inclusion of these cases as examples of conduct that would be covered by § 666 showed that Congress intended that the statute would be applied only in corruption cases impacting federal interests.[325]

Although I do not agree that the plain language of § 666 allows prosecution only where the charged corrupt activity has impact on a federal interest, the fact that Congress did not find it necessary that § 666 be applied in cases not involving federal funds or programs is highly relevant to the issue of whether the statute's application to local corruption not involving federal funds is "necessary and proper" to execute the spending power. Armed with knowledge of Congress's purpose in enacting § 666, I examine whether the statute's employment hereSSto prosecute a city coun-

---

[325] *See Zwick*, 199 F.3d at 685 (holding that "nothing in the legislative history suggests that Congress intended to go well beyond the examples in *Del Toro*, *Hinton*, and *Mosley* to make § 666 applicable when no federal interest is implicated by certain offense conduct."). The *Zwick* court also noted that "[a]nother comment in the Senate Report illustrates that an entity's receipt of federal funds does not automatically establish a federal interest in corrupt activity of employees of that entity." *Id.* The court quoted the Senate Report: "For example, if a government agency lawfully purchases more than $10,000 in equipment from a supplier, it is not the intent of this section to make a theft of $5,000 or more from the supplier a Federal crime." *Id.* (quoting S. REP. NO. 98-225, at 370, 1984 U.S.C.C.A.N. at 3511).

cilmember for accepting bribes in return for pursuing local taxi regulations beneficial to a local taxi company��is "necessary and proper for carrying into execution" the spending power.  In other words, what are the minimum factors that must be present to make a prosecution under § 666 "necessary and proper" under the spending power?

I am aware of no court that has dealt with the issue of what uses of § 666 are necessary and proper to effect the spending power.  Of no help is *United States v. Suarez*, 263 F.3d 468 (6th Cir. 2001).[326]  The Second and Third Circuits have narrowly interpreted § 666, however, for the express purpose of avoiding a constitutional question.  Their views on what limitations are necessary to keep § 666 within the realm of constitutionality are therefore useful.  In *Zwick*, the court interpreted § 666 to require

---

[326] *Suarez* advances the position of neither side in the instant case. There, the panel majority reluctantly upheld the conviction:

> Were we writing on a clean slate, I like [the dissent], might well agree that proper application of 18 U.S.C. § 666 requires a minimal nexus between the alleged criminal activity and the federal funding received pursuant to that statute.  We are not, however[;] the well established law of this Circuit [binds us].

*Suarez*, 263 F.3d at 489.  In *Suarez*, only the dissent analyzed the constitutional issue and Supreme Court precedent, and the dissent concluded that the statute was *unconstitutional* as applied:

> To sustain Suarez's conviction would make § 666 a generalized anti-corruption statute under the spending power.  The best reading of the *Fischer* and *Salinas* cases seems to be that the Supreme Court does not want this interpretation to take hold.

*Id.*  The dissenting judge voted to remand for development of the record on whether there was a nexus between the crime and the federal program.

140

a relationship between the prohibited conduct and a federal interest, because doing otherwise would raise constitutional problems:

> Interpreting § 666 to have no federal interest requirement produces serious concerns as to whether Congress exceeded its power under the Spending Clause in enacting this statute. *See McCormack*, 31 F. Supp. 2d at 187-89. To pass muster under the Spending Clause, legislation regulating behavior of entities receiving federal funds must, among other things, be based upon a federal interest in the particular conduct. *See South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Applying § 666 to offense conduct, absent evidence of any federal interest, would appear to be an unconstitutional exercise of power under the Spending Clause.

*Zwick*, 199 F.3d at 687 (footnote omitted). The court thus rejected the government's position that no connection between the bribery and the federal funds was necessary beyond proof that the agency in question had received federal funds in excess of $10,000. To do otherwise, the court reasoned, would eviscerate significant federal-state boundaries by turning § 666 into a general anti-corruption statute, an intention not expressed by Congress. *Id*. at 686.[327]

In the pre-*Salinas* case of *United States v. Foley*, 73 F.3d 484, 493 (2d Cir. 1996), the court held that the conduct prosecuted under § 666 must be "shown in some way to touch upon federal

---

[327] Although the court in *Zwick* seems to have applied a *Dole* analysis to the issue, the court's reasoning that a federal interest must be present to avoid a constitutional question is persuasive, as well, in analyzing § 666's constitutionality under the Necessary and Proper Clause.

funds." The court also held that the local government or agency whose transaction involves $5,000 or more and at which the corruption is aimed must itself receive at least $10,000 in federal funds. *Id.*

The court re-evaluated *Foley* post-*Salinas* in *United States v. Santopietro*, 166 F.3d 88 (2d Cir. 1999), recognizing that *Salinas* had made plain that the corruption need not have a value of $5,000 to the local government on which the corruption is practiced. Instead, there only must be the receipt of at least $10,000 of federal funds and a corrupt transaction valued at $5,000 or more by any of the parties§§the local government, the party paying the bribe, or the bribe recipient. Thus, the *Santopietro* court reversed and held that the defendants could be convicted under § 666. Even though the bribery at issue did not result in a loss of $5,000 or more to the town, the statutory requirement that a transaction of at least $5,000 be involved was plainly satisfied by the fact that the total bribe was $25,000. *Id.* at 92-93.

*Santopietro*, however, did not retreat from *Foley*'s requirement of "at least some connection between the bribe and a risk to the integrity of the federal funded [sic] program," because "nothing in *Salinas* disturbs such a requirement." *Id.* at 93. The court held that a federal connection sufficient to satisfy § 666 existed where real estate developers had made corrupt payments to the mayor, the Republican town chairman, and the president of the board of alder-

men to secure their influence in landing city development contracts that were substantially funded by HUD dollars. *Id.* The court held that the evidence

> satisfies the requirements of *Foley*, undisturbed by *Salinas*, that the transaction sought to be influenced had some connection with a federal program. Indeed, *Salinas* may be read to indicate that the "threat to the integrity and proper operation of [a] federal program" created by the corrupt activity is necessary to assure that the statute is not unconstitutionally applied.

*Id.* (quoting *Salinas* 522 U.S. at 60-61) (citation omitted) (alteration in original).

The court made plain that there was a direct connection between the bribery and the federally-funded programs and that "this is not a case where the transactions sought to be influenced concerned one department of a city and the requisite $10,000 of federal funds were received by a totally unrelated department." *Id.* at 93-94. The court stated that "even after *Salinas*, [the undisturbed requirements of] *Foley* would not permit the Government to use § 666(a)(1)(B) to prosecute a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $10,000." *Id.*[328]

The reasoning of the Second and Third Circuits is persuasive.

---

[328] *But see United States v. Jennings*, 160 F.3d 1006, 1012 (4th Cir. 1998) (interpreting § 666, without examining its constitutionality, to require no nexus between bribes and federal funding); *United States v. Dakota*, 197 F.3d 821 (6th Cir. 1999) (same).

It is a tautology to say that for legislation to be necessary and proper for effecting the spending power, it must be related to that power in some way.  In other words, prohibiting activity that is unrelated to federal spending or programs cannot be necessary to execute the spending power.

This is not to say that only activity that directly affects federal funds may be prohibited.  *Salinas* made evident that the spending power can be rendered ineffectual not only where the integrity of federal funds is compromised, but also where the integrity of programs funded by those federal dollars is assaulted.  Thus, in *Salinas* the Court found that § 666 did not "extend federal power beyond its proper bounds," *id*. at 61, where the statute was used to prosecute a state officer who had allowed himself to be bribed to influence his management of a federally funded program, even though no federal funds actually were diverted.  In *Zwick*, the court held that "a highly attenuated implication of a federal interest will suffice for purposes of § 666."[329]

---

[329] The court provided examples of attenuated connections that would be sufficient to allow prosecution under § 666:

> We can conceive of several ways in which the government could prove a federal interest in a § 666 [*sic*] in light of this threshold.  The amount of federal funds could provide the requisite federal implication, even if the purpose of those funds has no explicit relationship to the subject of the bribe.  If, for example, in a given year, the greater part of a township's budget came from federal funds, bribery of a township agent for any purpose might be said to implicate federal interests.  Absent that situation, the offense conduct would have to somehow implicate a particular substantive federal

(continued...)

144

<u>2.</u>

The government goes far beyond the holding of *Salinas* and argues that for a prosecution to be proper under § 666, no relationship at all is required between federal funds or programs and local corruption. The government argues that because funds are fungible, and the receipt of federal funds for any project frees a state to spend more funds on other projects, no more is required for a prosecution under § 666 than that a local government receive at least $10,000 in federal funds annually.

Although this is, strictly speaking, a correct textual interpretation of § 666, the statute obviously does not satisfy constitutional requirements when used in this manner; it cannot be necessary and proper to executing the spending power for the government to prosecute local crimes that have no relationship whatsoever to federal funds and programs.

Any argument that it is "necessary" to protect the spending power by passing legislation that regulates conduct totally unrelated to federal spending is meritless on its face. Accepting this proposition would allow § 666 to become a general federal police power statute that criminalizes corruption in all local governments and private agencies receiving federal funds.

---

[329](...continued)
interest, as the Supreme Court found it did in *Salinas*, where federal funds were being provided to house federal prisoners in local prisons.

*Zwick*, 199 F.3d at 687.

145

Such a general police power is denied the federal government by constitutional design, for it is among those powers, reserved to the states, that constitute the heart of state sovereignty.[330]  Furthermore, states have the primary authority to define and enforce criminal law,[331] *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995), and the "double security" embodied in the concept of federalism requires "a proper balance between the States and the Federal Government," *Gregory*, 501 U.S. at 459.  Central to that balance, and to state sovereignty, is each state's prerogative over the "constitutional responsibility for the establishment and operation of its own government . . . ."  *Id.* at 462.

Congress may pass laws criminalizing conduct that is already proscribed by the states, but this "change in the sensitive relation between federal and state criminal jurisdiction"[332] must be

---

[330] *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000); *New York v. United States*, 505 U.S. 144, 155 (1992); *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).

[331] As the Court said in *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995):

> Under our federal system, the "'states possess primary authority for defining and enforcing the criminal law.'" *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)); *see also Screws v. United States*, 325 U.S. 91, 109 (1945) (plurality opinion) ("Our national government is one of delegated powers alone.  Under our federal system, the administration of criminal justice rests with the states except as Congress, acting within the scope of those delegated powers, has created offenses against the United States.").

[332] *United States v. Enmons*, 410 U.S. 396, 411-12 (1973) (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)).

146

made under the powers delegated to the federal government by the Constitution. If adopted, the government's argument that it is necessary and proper, under the Spending Clause, for the federal government to root out all local corruption whenever more than $10,000 of federal funds is received by a local government would cause a massive shift in the "balance between the States and the Federal Government" that is contrary to basic concepts of federalism and the Tenth Amendment.[333]

This power cannot be said to be necessary and proper to carrying into execution the spending power, because the means are not appropriate, are well beyond "the scope of the constitution," are inconsistent "with the letter and spirit of the constitution," and thus are unconstitutional. *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819).[334] Moreover, the government's argument that no connection need be shown between federal funds or programs and the local corruption prosecuted under § 666 confuses a connection to a fed-

---

[333] *See* U.S. CONST. amend. 10 ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

[334] *See also Zwick*, 199 F.3d at 686:

> If we adopted the government's interpretation that § 666 requires no connection between the offense conduct and federal funds or programming, § 666 would criminalize a host of corrupt acts committed by state agents, among others, by virtue of the fact that all states receive at least $10,000 in federal funds per year. *See McCormack*, 31 F. Supp. 2d at 186. This result raises significant federalism concerns, turning traditionally local conduct into a matter for federal enforcement involving a substantial extension of federal law enforcement resources.

eral interest in federally-funded programs with the federal government's generalized interest in everything that occurs within its borders.

The government argues that the United States has an interest in the honesty of all officials, local and federal, and this is assuredly so. The government has a similar interest in a great many things that are, however, beyond its power to regulate directly. For example, members of Congress profess sincere interest in a variety of problemsSSfrom reducing crime to encouraging the stability of marriageSSyet Congress has no more power directly to criminalize local burglaries than it does to regulate marriage directly. In both cases, if the government wishes to pursue its interest, it must do so through targeted spending and conditional grants of federal funds.[335]

It is this conflation of generalized federal interests with a federal interest in a program (i.e., a connection to federal funding) that prompts the government to argue that any generalized interest of the United States suffices to allow federal criminalization of local matters, so long as some insignificant amount of federal funds are given to the locality. Such an analysis turns the accepted understanding of the Necessary and Proper Clause on its head and, in effect, asserts that because Congress may pursue the

---

[335] For instance, the government may provide funds to put more local police officers on the streets or may reform federal welfare spending in an effort to create incentives for families to stay together.

148

general welfare through the Spending Clause, all laws that are necessary and proper to the general welfare must be considered constitutional under the Spending Clause.[336]  This argument, if followed, would overturn the accepted meaning of the Spending and the General Welfare Clauses that has existed for nearly two centuries. *See generally* 1 TRIBE, *supra*, § 5-6, at 831-34 (3d ed. 2000).

### 3.

The government argues, alternatively, that if a connection is required between federal funding or programs and the charged corruption, such connection is present in this case.  The federal connection that the government asserts, however, is exceedingly tenuous.  The government avers that a federal connection existed between Lipscomb's acts of corruption and federal funds because

> Lipscomb voted to seek and disburse federal money on improvements to Love Field airport.  Thus, the federal government had an interest in the success of the airport, a center of interstate travel.  It is common sense that an airport depends in part for its success on the taxicab service provided for passengers.  On the flip side, taxicabs depend in part for their success on the viability of airports, which provide fertile ground for fares.
>
> If merely the airportSSrather than the city as a wholeSSis seen as the analog of the jail in *Salinas*, that case's holding must extend to this one.  Lipscomb, like the jailer, was partly responsible for managing a federally-funded entity, the airport.  The airport in turn

---

[336] Using this reasoning, the government could as easily argue that under the Commerce Clause, conduct may be criminalized wherever it is committed by one who participates in interstate commerce, rather than only where there is some link between the conduct and interstate commerce.  In fact, this reasoning would allow federal police power under numerous clauses of the Constitution.

provided business to, and needed the business of, taxi-cabs (including Richards' taxicabs) for its success§§just as the jail had a direct relationship with the welfare of the prisoner who paid the bribes. And just as the pre-ferential treatment given to the prisoner was "a threat to the integrity and proper operation of the federal pro-gram," *Salinas*, 522 U.S. at 61, so the preferential treatment of Richards was a threat to the integrity of the airport-funding program.

The government's "cabs go to the airport" theory is feeble at best. The government may as well argue that because the United States funds medical research at Dallas hospitals, and researchers sometimes take taxis, especially to airports to fly to conferences, there is a sufficient nexus between taxis and federal funds. Or, the government could aver that federal funds go to pay welfare ben-efits and, because welfare recipients often cannot afford cars, they may take taxis to the grocery store to use their food stamps, and thus federal prosecution of cases of local bribery affecting taxi regulations is necessary to protect the spending power. In sum, if the government's posited connection between the federal funds and the corruption is sufficient to provide nexus, any con-nection at all will do.

The facts of this case reveal no substantial relationship to federal funds or programs, whereas in *Salinas* there were three direct connections between federal funds and the corrupt activity. First, the prisoner paying the bribes was a federal prisoner. Sec-ond, the county jail in which the prisoner was housed had been con-structed substantially with federal funds. Third, the prisoner was

150

in the jail as part of a federal program in which the county was paid *per diem* for each federal prisoner it housed.

Here, to the contrary, Richards, who was the person paying the bribes, had no federal status or connection. Neither the taxis nor the city regulation of the taxi industry was funded by federal funds in any way. Finally, there was no federal program relating to taxi regulation, nor was the integrity of any federally funded program affected by the payment of Lipscomb to vote for certain taxi regulations.

Thus, the connection between federal funds and the prosecuted activity here is nothing like the direct connections between federally funded programs and corrupt activity in *Salinas*. It is far less substantial than even the most attenuated connections that the Third Circuit imagined might suffice to avoid constitutional questions in *Zwick*.[337] Under the specific facts of this case, the con

---

[337] The "highly attenuated implication of a federal interest" that *Zwick* imagined would provide a "sufficient federal connection" to satisfy the requirements of § 666 was a far less attenuated federal interest than is the one the government asserts here. The *Zwick* court

> conceive[d] of several ways in which the government could prove a federal interest in § 666 . . . . If, for example, in a given year, the greater part of a township's budget came from federal funds, bribery of a township agent for any purpose might be said to implicate federal interests. Absent that situation, the offense conduct would have to somehow implicate a particular substantive federal interest, as the Supreme Court found it did in *Salinas*, where federal funds were being provided to house federal prisoners in local prisons.

*Zwick*, 199 F.3d at 687. The court cited further examples, including *Santopietro*, holding that bribes paid by real estate developers in search of development con-
(continued...)

151

nection to federal funds is insufficient, as a matter of law, to support a conclusion that the § 666 prosecution was necessary and proper to protect federal funding of Love Field or the city generally.[338]

### 4.

The government alternatively posits that, because the City of Dallas received a sizeable amount of federal funds in real dollars, it was proper for Lipscomb's bribery to be federally prosecuted. The government points out that in 1998, the city accepted over $56 million in federal funds. This, it argues, is a significant amount that warrants the federal prosecution of a local official even for

---

[337](...continued) tracts with city agencies that were overseeing HUD programs met the federal nexus requirement of § 666. *Zwick* also cited *Frega*, in which a district court concluded that bribery of state judges did not meet the requisite federal interest, but hypothesized that a sufficient federal connection could exist in different circumstances, such as if the state courts received federal funds for the purpose of appointing habeas counsel and the bribes paid affected the appointment of particular habeas counsel. *Id.* at 687-88.

Although these indeed are examples of federal connections that are somewhat attenuated, nevertheless the federal interest in each example is plain, as is the necessity of protecting it against corruption so that Congress may properly execute its spending power, free of the danger that federally funded programs will be corrupted and perverted. The same cannot be said of Lipscomb's prosecution, for no federal program was, in any way, affected by his corruption.

[338] Moreover, this *post hoc* argumentSSthat the integrity of federal funding at the airport was endangered by Lipscomb's taxicab corruptionSSwas never charged in the indictment or argued to the jury. Instead, the jury instructions merely stated:

> It is also not necessary that the $10,000 in federal assistance be directly involved in or traced to the allegedly corrupt acts charged in the Indictment. All that is necessary is that the City of Dallas received in excess of $10,000 from the federal government during a one-year period.

mere local corruption.

The government contends that the receipt of this large amount of federal money would make the prosecution of Lipscomb pass muster even under *Zwick*.  This is plainly incorrect.  *Zwick* stated that if "the *greater part* of a township's budget came from federal funds, bribery of a township agent for any purpose might be said to implicate federal interests."  *Zwick*, 199 F.3d at 687 (emphasis added).  The city received over $56 million in 1998SSadmittedly a significant amount.  Because its 1988 budget was $1.6 billion, however, federal funds made up only 3.5% of the City's budget.

This is nowhere near the example given in *Zwick*, where a federal interest could arise if the "greater part of a township's budget" came from federal funds.  Indeed, if federal funding of as little as 3.5% of a city's budget allows prosecution of a city official, then the fact that every state and most cities receive more than $10,000 in federal funds each year is alone enough to allow the federalization of local corruption cases.  This cannot be necessary and proper for executing the spending power.

5.

The government further contends that Lipscomb was not just any city employee and that as a city councilman he "was one of fifteen people responsible for running the City of Dallas."  The government then argues that high officials, such as Lipscomb, always should be

153

liable for prosecution under § 666, because high officials make decisions on the disposition of both local and federal funds, and therefore dishonesty in the disposition of local funds is a proper cause of worry to the United States.[339]

The government contends that such prosecution is necessary, because otherwise corrupt officials would be left in place to administer federal funds in the same corrupt fashion that they administer local matters.  While this argument has some initial appeal, it ultimately has no merit.

First, it seems unlikely that, had the state prosecutor been given the fruits of the Lipscomb investigation, he would have declined to prosecute.  The charges against Lipscomb were serious, the evidence was compelling, and Lipscomb was a high-profile public servantSSall factors that strongly argue for state prosecution.

Second, even if one thinks that states sometimes do not prosecute local crimes where federal prosecutors might do so, it does not follow that allowing double prosecution of local crimes would deter corruption involving federal funds and programs.  Instead, allowing the double prosecution of local, but not federal,

---

[339] *Santopietro*, 166 F.3d at 94 n.3, also raised this question, but did not answer it:

> We need not consider whether Santopietro's role as mayorSSthe chief executive officer of the city and hence the officer ultimately responsible for all city departmentsSSwould render the statute applicable to corrupt payments received by him for any transaction involving the city, even though the federal funds were received for a program entirely unrelated to the program in connection with which the corrupt payments were made.

154

corruption might tend to cause dishonest local officials to abuse federal dollars rather than local funds.

Before § 666 was enacted, local embezzlement was covered by local penalties, and federal embezzlement was covered by federal penalties, with only small overlap. Thus, before the advent of § 666, a rational local official would simply weigh the rewards of embezzling local or federal funds against the risk of getting caught and the probable penalty carried by each crime. He then would commit those acts of embezzlement with the best ratio of payoff-to-punishment. Because of the severity of federal penalties, the most rational acts of embezzlement often would be local.

If § 666 is used to prosecute purely local acts of corruption, however, this calculus changes substantially. Federal acts of corruption still carry the same ratios of reward-to-punishment, but local crimes of corruption now qualify as both federal and local crimes. Thus, federal embezzlement would be more rewarding at the margins than would be local embezzlement. As a result, rather than protecting federal funds and programs, § 666, if applied to purely local crimes, should actually cause an increase in the criminal misuse of federal funds; accordingly, it cannot be said that prosecution of local crimes under § 666 is necessary and proper to carry into execution the spending power, and the application of § 666 to Lipscomb on the facts of this case is, accordingly, unconstitutional.

155

The panel majority errs in deciding the question of venue. The majority teaches that it is better to force the government and defendant to have a biased trial than to inconvenience them with a five-hour drive or a one-hour flight. Because this directly contradicts the plain text of our past precedents, and all common sense, I respectfully dissent.

"The trial court has broad discretion in determining whether a transfer is warranted."[340] "[A]bsent a showing of illicit motivation, the transfer may be granted within the trial court's discretion unless the defendant shows that a transfer would be prejudicial." *Osum*, 943 F.2d at 1399. Lipscomb makes two attempts to show prejudice; both are meritless. First, Lipscomb asserts that if he had been tried in Dallas, he would have had more blacks in his jury pool, and black jurors would have been more likely to acquit him, a black defendant. Besides the fact that a criminal defendant has no right to jury or venire of "any particular composition," *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *United States v. Sanchez*, 508 F.2d 388, 395 (5th Cir. 1995), there is a not a hint of an indication that the district court transferred the case to alter the jury pool's racial composition, *see United States v. McKinney*, 53 F.3d 664, 673 (5th Cir. 1995).

---

[340] *United States v. Osum*, 943 F.2d 1394 (5th Cir. 1991); *accord United States v. Kaufman*, 858 F.2d 994, 1006 (5th Cir. 1988); *United States v. Weddell*, 800 F.2d 1404, 1406 (5th Cir. 1986).

156

Lipscomb next argues that Amarillo was inconvenient because it "is 300 miles from Dallas," and the "defendant and all of the witnesses resided in Dallas and every defense attorney practiced there." This cannot rise to the necessary level of prejudice. We repeatedly have held that so long as the district court has some "valid reason for changing venue," "travel and lodging expenses for lawyers and witnesses do not constitute prejudice sufficient to overcome a district court's determination regarding the place of trial." *United States v. Kaufman*, 858 F.2d 994, 1006 (5th Cir. 1988). In *Kaufmann*, we held that a district court's concern "that if it held trial in Austin, then [its] docket in Waco would have to be completely ignored" constituted such a valid reason and outweighed the "only minor inconvenience" of a 102 mile transfer. *Kaufmann*, 858 F.2d at 1006. If docket management constitutes a valid reason for transfer, then surely a court's conviction that it cannot provide a fair trial does.

Directly on point is *United States v. Alvarado*, 647 F.2d 537 (5th Cir. Unit A June 1981). We affirmed a *sua sponte* decision to transfer a case to a venue 231 miles away based on pretrial publicity. We held that the alleged prejudicial effects of "additional travel and lodging expenses [for the defendants] and their attorneys in addition to the expenses that became necessary in order to subpoena crucial witnesses . . . do not rise to the level necessary to prove the trial judge abused his discretion by

157

transferring venue so as to avoid an unfair trial from a great deal of publicity."  *Id.* at 539.

The majority seems to argue that Lipscomb's case is different because 300 miles is really far.  But *Kaufmann* makes no allowance for distance within a district.  What's more, *Kaufmann* relies on *United States v. Fagan*, 821 F.2d 1002, 1008 (5th Cir. 1987), for its holding.  In *Fagan*, a FED. R. CRIM. P. 21 case, we affirmed the  refusal to transfer from the Southern District of Texas to the Eastern District of Louisiana.  We noted "that holding trial in Houston, rather than Louisiana, made it more disruptive to [the defendant], his witnesses, and his attorney" and may have cost him the representation of a second attorney, but this was not enough to mandate transfer.  *Id.* at 1008.  If the 348-mile distance in *Fagan* was not prejudicial as a matter of law, then the 300 mile distance in this case certainly is not.

Today's holding has the potential to inject great uncertainty into the trial process and actually to increase the number of unfair trials.  Luckily, future district courts will not be bound by it.  The majority's venue ruling plainly contradicts *Alvarado*, and it is well established that "[w]hen two panel opinions appear in conflict, it is the earlier which controls." *Harvey v. Blake*, 913 F.2d 226, 228 (5th Cir. 1990).  But, the fact that today's holding will not be binding does not make it any less in error.

I respectfully dissent.